GRAHAM A. BOYD (CBN 18419)
REBECCA BERNHARDT
ADAM B. WOLF
MICHAEL PEREZ
AMERICAN CIVIL LIBERTIES UNION
   DRUG LAW REFORM PROJECT
1101 Pacific Ave., Suite 333
Santa Cruz, CA  95060
Tel: (831) 471-9000
Fax: (831) 471-9676

Attorneys for Plaintiffs

FILED

2005 SEP 28  A 10: 42

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, JOHN ROE, & CONNECTICUT HARM REDUCTION COALITION,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT POLICE DEPARTMENT & ANTHONY ARMENO,[*] Acting Chief of the Bridgeport Police Department, in his official capacity only,<br><br>Defendants, | Case No. 3-00-cv-2167 (JCH)<br><br>**PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CONTEMPT**<br><br>Court: Hon. Janet C. Hall<br>Hearing Requested |

Over the past three years, Bridgeport Police Department ("BPD") officers have routinely stopped, searched, arrested, and otherwise penalized individuals based on nothing more than their possession of drug-injection equipment. They have done so in spite of this Court's order in *Doe v. Bridgeport Police Department*, 198 F.R.D. 325 (D. Conn. 2001), which expressly

---

[*] The plaintiffs request that Anthony Armeno, Acting Chief of Police of the Bridgeport Police Department, be substituted for Wilber Chapman, the former Chief of Police of the Bridgeport Police Department.

Pls.' P&As in Support of Mot. for Contempt
Case No. 3-00-cv-2167 (JCH)

prohibits the officers from engaging in such unconstitutional conduct. In order to compensate the victims of the officers' illegal conduct and to coerce the defendants to alter their conduct and comply with this Court's order, the plaintiffs move to hold the defendants in contempt of court.

## BACKGROUND

### I.  THE BRIDGEPORT SYRINGE EXCHANGE

The Bridgeport Syringe Exchange ("the Exchange") seeks to reduce the public health risks associated with injection drug use in Bridgeport, Connecticut and surrounding areas. *Doe v. BPD*, 198 F.R.D. at 329. It provides sterile syringes and other drug-injection equipment (e.g., "cookers" and citric acid) to injection drug users in exchange for used syringes, which prevents the transmission of infectious diseases, such as HIV/AIDS and Hepatitis C, to drug users and community residents who otherwise would encounter used syringes on streets and sidewalks. *Id.* at 329; Decl. of John Roe 6 (July 12, 2005), Exh. H at ¶ 2; Decl. of John Doe (March 26, 2004), Exh. A, at ¶ 3.[1] The Exchange operates out of the office of the Bridgeport Health Department and a mobile van, which stops at several locations around Bridgeport on a regular schedule. *Doe v. BPD*, 198 F.R.D. at 329.

When an individual uses the Exchange for the first time, he or she is issued an Exchange identification card. *Id.* at 329 & n.3. The front of the card identifies the cardholder with a

---

[1] The plaintiffs wish to continue to proceed under fictitious names, as approved by court order at an earlier stage of the litigation. *Doe v. BPD*, 198 F.R.D. at 328 n.1. None of the factors militating in favor of anonymity has changed since the court issued its order: the plaintiffs' identities have remained confidential; the plaintiffs still legitimately fear stigmatization, damage to reputation, and reprisal if they are identified; the plaintiffs do not have ulterior motives in remaining anonymous; the plaintiffs might not proceed otherwise if their names would be revealed; and identifying the plaintiffs' real names would not serve the public interest. *Doe v.*

number and code name, and it states, in bold capital letters, that the holder is a "syringe exchange program participant." *Id.* at 329 n.3. The back of the card reads:

> The cardholder is an official participant in the Bridgeport Exchange, an approved exchange throughout the State of Connecticut. The cardholder is exempt from arrest and prosecution for the possession of syringes furnished to the cardholder by the Bridgeport Health Department. Public Act #99-2, Connecticut General Statutes 19a-124.

*Id.*

The role of the Exchange, however, extends beyond registering participants and exchanging syringes. The Exchange's staff considers participants to be clients, often developing long-term relationships based on a client's regular visits to the Exchange. *See, e.g.*, Decl. of David Tracy (July 13, 2005), Exh. I, at ¶ 3; John Doe Decl., Exh. A, at ¶ 4. Clients discuss their health and welfare with the van staff, *see, e.g.*, John Doe Decl., Exh. 4, at ¶ 4, who frequently persuade clients to enter drug treatment programs, *see, e.g.*, John Roe 6 Decl., Exh. H, at ¶ 3; Decl. of John Doe 2 (April 2, 2004), Exh. B, at ¶ 4.

## II. THE COURT'S INJUNCTION ENJOINS BPD OFFICERS FROM PENALIZING INDIVIDUALS FOR USING THE SYRINGE EXCHANGE.

Shortly after the Exchange commenced operating, BPD officers began harassing, arresting, and otherwise penalizing Exchange participants for possessing the paraphernalia they received from the Exchange. *See, e.g., Doe v. BPD*, 198 F.R.D. at 330 (quoting plaintiffs' declarations demonstrating that BPD officers "arrest[ed] and harass[ed] injecting drug users . . . solely on the basis of the users' possession of hypodermic syringes and needles, whether sterile or previously-used . . . ."). Accordingly, plaintiffs John Doe and John Roe, along with the

---

*Provident Life & Acc. Ins. Co.*, 176 F.R.D. 464, 467-68 (E.D. Pa. 1997); *see also* Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, § 1321 (2005).

Connecticut Harm Reduction Coalition, filed a putative class-action complaint, alleging, *inter alia*, that the officers' conduct violated the plaintiffs' Fourth Amendment rights. *Id.* at 328.

The court certified a class of "all injecting drug users, present and future," in Bridgeport, Connecticut, *id.* at 333-34, and then addressed the merits of the plaintiffs' Fourth Amendment claim, namely, that the defendants did not have probable cause to search or seize plaintiffs for possessing "less than thirty-one sterile or previously-used hypodermic syringes and needles and any trace amounts of narcotic substances contained therein as residue," because such possession is not a crime under Connecticut law. *Id.* at 336. After a thorough analysis of the applicable federal and state law, *id.* at 334-50, the Court agreed that the defendants' conduct undermined the purposes of the Exchange, *id.* at 345, and violated the Fourth Amendment, *id.* at 350. Accordingly, the Court issued the following permanent injunction:

> Defendants Bridgeport Police Department and Wilber L. Chapman, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240 (20) (A) (ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

*Id.*

### III. BPD OFFICERS CONTINUE TO PENALIZE THE PLAINTIFFS FOR POSSESSING DRUG-INJECTION EQUIPMENT.

In spite of the Court's injunction, BPD officers have continued to search, stop, arrest, punish, and otherwise penalize individuals based solely on their possession of drug-injection

equipment. Indeed, the plaintiffs not only have been threatened routinely, but also assaulted, for their possession of this legal paraphernalia.

BPD officers still use the van as a focal point for harassing Exchange clients. These officers are regularly seen parked or driving nearby the Exchange van. Doe Decl., Exh. A, at ¶ 5; Doe 2 Decl., Exh. B, at ¶ 5; Decl. of John Roe (July 11, 2005), Exh. D, at ¶ 4; Declaration of John Roe 4 (July 12, 2005), Exh. F, at ¶ 4; Roe 6 Decl., Exh. H, at ¶ 4. The officers surveil the Exchange van, identifying regular clients and stopping them after they leave the van, assuming that an Exchange participant must have drugs on their person due solely to their possession of drug-injection equipment. Doe Decl., Exh. A, at ¶ 5; Doe 2 Decl., Exh. B, at ¶ 5; John Roe Decl., Exh. D, at ¶ 4; John Roe 4 Decl., Exh. F, at ¶ 4; Declaration of John Roe 5 (July 12, 2005), Exh. G, at ¶ 4. Exchange clients are frequently stopped, sometimes threatened and arrested, and often told to produce their injection equipment, which the officers then frequently confiscate. Doe Decl., Exh. A, at ¶¶ 5-9; Doe 2 Decl., Exh. B, at ¶¶ 5-7; Declaration of John Doe 4 (April 30, 2004), Exh. C, at ¶¶ 6-7; Roe Decl., Exh. D, at ¶¶ 5-6; Declaration of John Roe 2 (July 12, 2005), Exh. E, at ¶¶ 4-9; Roe 4 Decl., Exh. F, at ¶¶ 4-6; Roe 5 Decl., Exh. G, at ¶ 4; Roe 6 Decl., Exh. H at ¶¶ 5-9. It is also common for BPD officers to rip up and confiscate the plaintiffs' Exchange identification cards. Roe 5 Decl., Exh. G, at ¶ 4; Roe 4 Decl., Exh. F, at ¶ 5; Doe Decl., Exh. A, at ¶ 8; Doe 4 Decl., Exh. C, at ¶ 6. The defendants even have committed assault and battery on the plaintiffs for participating in the Exchange and asserting their rights to possess drug-injection equipment. Doe 4 Decl., Exh. C, at ¶ 7; Roe Decl., Exh. D, at ¶ 6.

The plaintiffs' declarations demonstrate that this conduct continues to occur on a regular basis. For instance, one declarant recounted that he was followed by BPD officers after emerging from the Exchange van, was seized by the officers, and was verbally humiliated by the

officers, who tore up his Exchange identification card. Roe 4 Decl., Exh. F, at ¶ 6. He noted further: "The Bridgeport police watch the van, wait until people get a few blocks away and then stop people. Once they know you, they begin to harass you consistently." *Id.* at ¶ 5.

BPD officers' targeting of Exchange participants has had deleterious effects. In addition to subjecting the plaintiffs to unwarranted criminal sanctions and humiliating encounters with BPD officers—serious consequences in and of themselves—the officers' conduct has had a chilling effect on the participants' willingness to use the Exchange. Many clients are afraid to frequent the Exchange, and in fact use the Exchange less than they would otherwise because they fear harassment from BPD officers. Doe Decl., Exh. A, at ¶ 10; Doe 2 Decl., Exh. B, at ¶¶ 5-6; Doe 4 Decl., Exh. C, at ¶ 8; Roe 2 Decl., Exh. E, at ¶ 4.

Accordingly, the plaintiffs file this motion pursuant to 18 U.S.C. § 401 and the Court's inherent power, *In re Martin-Trigona*, 732 F.2d 170, 173 (2d Cir. 1984), in order to compensate victims of the defendants' unlawful conduct and to coerce the defendants to comply with the Court's injunction.

## ARGUMENT

A party shall be held in contempt for failure to abide by an order of the court if "the order being enforced is clear and unambiguous, the proof of compliance is clear and convincing, and [the defendants] have not been reasonably diligent and energetic in attempting to accomplish what was ordered." *United States v. O'Rourke*, 943 F.2d 180, 189 (2d Cir. 1991); *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 594 (2d Cir. 1991). The defendants should be held in contempt because the Court's injunction is unambiguous; the BPD's own incident reports and

the attached nine declarations, which the plaintiffs gathered in only nine days[2] and are far from an exhaustive account of the defendants' ongoing violations, demonstrate clear violations of the injunction; and the defendants consistently have failed to comply with the Court's injunction nearly five years after it issued.

I.     **THIS COURT'S ORDER WAS CLEAR AND UNAMBIGUOUS.**

An order is "clear and ambiguous" for purposes of a contempt motion if it is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) (clarifying further that this element is satisfied if "the party enjoined [is] able to ascertain from the four corners of the order precisely what acts are forbidden") (citing *Sanders v. Air Line Pilots Ass'n*, 473 F.2d 244, 247 (2d Cir.1972)) (internal quotations omitted).

This Court's injunction more than adequately provided specific and definite notice to the defendants of their proscribed conduct. The injunction stated, in relevant part, that the defendants were to cease "searching, stopping, arresting, punishing or penalizing in any way, . . . any person based solely upon that person's possession of up to thirty sets of injection equipment, . . . whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue." 198 F.R.D. at 350. This language is plainly clear and unambiguous. *Cf. The Bridgeport Guardians v. Delmonte*, 371 F. Supp. 2d 115, 119 (D. Conn. 2005) (holding the Bridgeport Police Department in contempt for violating the court's injunction prohibiting racial

---

[2]     Declaration of Michael Perez (Sept. 27, 2005), at ¶ 2 (stating that he spent approximately 30 hours over six days interviewing Exchange clients); Declaration of Mollie Lee (Sept. 27, 2005), at ¶ 2 (stating that she spent approximately 15 hours over three days interviewing Exchange clients).

and sexual harassment, noting that the court's orders were clear and unambiguous because BPD "understood [its] duty under those orders").

## II. THE PROOF OF DEFENDANTS' NONCOMPLIANCE IS CLEAR AND CONVINCING.

The evidence submitted with this motion demonstrates, notwithstanding the Court's injunction to the contrary, the defendants' routine searching, stopping, arresting, punishing and penalizing the plaintiffs based solely upon their possession of up to thirty sets of drug-injection equipment. BPD's arrest records and the attached declarations, prepared after plaintiffs' counsel talked with Exchange clients for a mere nine days over the past two years, prove dozens of such violations of the injunction. *See supra* page 5 n.2 (explaining that the plaintiffs gathered the declarations over nine days, or 45 hours).

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (internal quotations omitted). Not only is there a reasonable certainty that "a violation occurred," but the evidence demonstrates that a plethora of violations have occurred.

Violations include, but are not limited to, the following BPD officers' actions:

- ripping up Exchange identification cards (E.g., Doe 4 Decl., Exh. C, at ¶ 7; Roe Decl., Exh. D, at ¶ 6)

- confiscating syringes—both clean and dirty needles—and throwing them in the street (E.g., Doe Decl., Exh. A, at ¶ 8; Doe 2 Decl., Exh. B, at ¶ 7; Doe 4 Decl.,

Exh. C, at ¶ 6; Roe 2 Decl., Exh. E, at ¶ 9; Roe 5 Decl., Exh. G, at ¶ 4; Roe 6 Decl., Exh. H, at ¶¶ 5 & 9)

- arresting plaintiffs for possession of less than thirty-one sets of injection equipment (E.g., Exhibit K, Exhibit L)

- surveiling and following plaintiffs after they leave the Exchange van (E.g., Doe Decl., Exh. A, at ¶¶ 8-9; Doe 2 Decl., Exh. B, at ¶ 5; Roe Decl., Exh. D, at ¶ 4; Roe 4 Decl., Exh. F, at ¶¶ 4, 7; Roe 5 Decl., Exh. G, at ¶ 4)

- committing battery—thrice slapping the face of an Exchange client after stopping him upon exiting the Exchange van (E.g., Doe 4 Decl., Exh. C, at ¶ 7)

- committing assault—yelling "Don't get smart, I'll knock your teeth out," to a plaintiff for asserting that his possession of drug-injection equipment was legal (Roe Decl., Exh. D, at ¶ 6)

The declarations provide an abundance of violations of the injunction. To be sure, the vast majority of the defendants' violations do not involve arrests, but rather humiliating searches and seizures by BPD officers that do not appear in arrest reports but nonetheless intimidate the plaintiffs so that they will no longer frequent the Exchange van.

However, even the defendants' own arrest reports demonstrate violations of the injunction. For instance, Francisco Rodriguez and Matthew Bauby were arrested on August 27, 2004 and January 7, 2002, respectively, for possessing nothing more than drug-injection equipment. *See* Exhibit K (Rodriguez), Exhibit L (Bauby).[3] These arrests corroborate the

---

[3] Mr. Rodriguez and Mr. Bauby also possessed a small amount of illegal narcotics, but they were not arrested for possession of narcotics. Their arrests were premised solely upon possession of legal drug-injection equipment.

declarants' accounts by providing clear documentation of the defendants "arresting, punishing, [and] penalizing" the plaintiffs for their legal conduct.

The plaintiffs encourage the Court to consider all of the declarations filed with this motion, but, for the sake of brevity, will recount in detail only the following episodes, which are representative of the documented BPD violations:

In approximately June 2005, John Roe 4 was stopped by a BPD officer in a police cruiser while he was walking away from the Exchange van on East Main Street. Roe 4 Decl., Exh. F, at ¶ 5. The officer immediately demanded, "Give me the needles." *Id.* Mr. Roe 4 replied that he had an Exchange identification card and that his possession of the needles was legal. *Id.* The officer grabbed the Exchange card from Mr. Roe 4, ripped it, and told Mr. Roe 4 to "Get the f--- out of here." *Id.*

Mr. Roe 5 has regularly used the Exchange since its inception twelve years ago. Roe 5 Decl., Exh. G, at ¶ 2. During the winter of 2004-05, BPD officers stopped Mr. Roe 5 near the Exchange van. *Id.* at ¶ 4. At the time, Mr. Roe 5 was riding his bicycle approximately one block from the van, near a supermarket on the corner of East Main Street and Maple Street. *Id.* The officers told Mr. Roe 5 not to move and asked him where he was coming from. *Id.* Mr. Roe 5 responded that he had just left the Exchange van. *Id.* The officers then asked if he had any needles in his possession, and Mr. Roe 5 handed over the needles he had just obtained from the Exchange. *Id.* An officer put the syringes in the police cruiser and demanded Mr. Roe 5's Exchange identification card. *Id.* Upon receiving the Exchange card, the officer ripped it and told Mr. Roe 5 that he "wasn't supposed to use the card for drugs." *Id.* Mr. Roe 5 replied that he "was using the card for exactly what it was for, getting stuff from the needle exchange van." *Id;*

*see also id.* at ¶ 6 (recounting how Mr. Roe 5 was approached by a different BPD officer on the same street near the Exchange van five days later).

Mr. Doe drove to the Bridgeport Health Department in mid-January 2004 at approximately 1:30 P.M. Doe Decl., Exh. A, at ¶ 6. He exchanged used syringes for sterile ones and left the Exchange in his car. *Id.* at 6. As he was approximately one block from the Health Department, Mr. Doe noticed a police car following him. *Id.* at 7. Two blocks later, a police cruiser pulled up directly in front of him and another pulled up behind him, forcing him to stop his car. *Id.* Four officers of the Bridgeport Police Narcotics Division emerged from the cars. *Id.* One of the officers ordered Mr. Doe to get out of his car and then searched him. *Id.* at ¶ 8. During the search, Mr. Doe informed the officer that he had clean syringes in the car, and he presented his Exchange identification card. *Id.* The officer promptly tore up the identification card. *Id.* The officers then searched his car, removing the sterile injection equipment and finding no drugs. *Id.* at 9. When Mr. Doe asked the officers why they had stopped him, they replied, "It's none of your business." *Id.*

On approximately July 14, 2003, at 2:30 P.M., Mr. Doe 4 was walking home after exchanging seven needles at the Exchange van. Doe 4 Decl., Exh. C, at ¶ 6. BPD officers stopped him when he had walked one block from the van. *Id.* They made him stand against a wall, searched him, confiscated his clean needles, and took his exchange card before releasing him. *Id.*

BPD officers have searched the plaintiffs based on their participation in the Exchange program, have stopped the plaintiffs due to their possession of drug-injection equipment, have arrested the plaintiffs for their possession of this equipment, and have similarly punished and penalized injection drug users throughout Bridgeport. The evidence lodged with this motion

demonstrates defendants' overwhelming noncompliance with the Court's order, more than adequately satisfying the quantum of proof necessary to show clear and convincing violations of the Court's injunction.

### III. THE DEFENDANTS HAVE NOT BEEN REASONABLY DILIGENT AND ENERGETIC IN ATTEMPTING TO ACCOMPLISH WHAT WAS ORDERED.

Nearly five full years after the Court issued its injunction, the defendants are still stopping, searching, arresting, punishing, and penalizing the plaintiffs for their possession of drug-injection equipment. Far from being diligent and energetic in ensuring respect for the plaintiffs' Fourth Amendment rights and this Court's order, the defendants have routinely and persistently continued to violate the injunction.

The defendants have suggested in communications with the plaintiffs that they will not deny the fact that they have consistently violated the Court's injunction or justify these violations. Rather, they will (1) claim that they were ignorant of their officers' violations until the plaintiffs brought this misconduct to their attention, (2) blame the plaintiffs—the victims of the BPD's misconduct—for not filing citizen complaints with the Department, and (3) allege that they are now implementing measures to rectify this significant problem.

As to their first contention, monitoring the defendants' compliance with federal-court injunctions should not be the plaintiffs' burden. The defendants, having been found to have violated the plaintiffs' Fourth Amendment rights and currently operating under an explicit injunction, cannot turn a blind eye to the Court's order. They, not the plaintiffs, should assume primary responsibility for taking affirmative steps to ascertain whether, and to what extent, they are violating the Court's order.

Clearly there were measures that the defendants could have implemented in the past to investigate whether the defendants were complying with the Court's injunction and to ensure officer compliance with that order. For instance, the defendants could have periodically reviewed the arrest incident reports to discover whether the plaintiffs were being arrested for possessing drug-injection equipment; interviewed representatives of the Exchange to determine whether BPD officers were harassing or otherwise penalizing Exchange clients in violation of the injunction; and disciplined against any officer who had violated the injunction.

Second, relying on the submission of citizen-complaint forms—and concluding that officers have not violated the injunction based on the absence of such completed forms—is inadequate because the defendants are aware of the community's understanding that submitting a form to BPD that alleges misconduct by a BPD officer is a ticket to retaliation against the complainant. Concern over retaliation was, after all, one reason that the plaintiffs in this action received permission to proceed under fictitious names. *See supra* page 1 n.1.

Lastly, the defendants will urge the Court to stay out of this issue by making specific promises that will purportedly cure the defendants' violations. Notwithstanding the fact that this Court needed to issue a permanent injunction in this case, and despite the fact that the defendants have been violating the Court's order for years, the defendants will say, in effect: "Trust us, we can take care of this problem now."

It is against this backdrop that the defendants have repeatedly refused the plaintiffs' multiple offers to meet in order to hammer out a joint solution.[4] Accordingly, the defendants

---

[4] The defendants' stated reasons for refusing to meet with the plaintiffs are that the plaintiffs had provided insufficient details of the defendants' violations, *but see* Declaration of Adam B. Wolf (Sept. 27, 2005), Exhibit M (providing the defendants with details of many of the violations discussed in this motion), and that the plaintiffs would not propose a specific enforcement scheme without receiving a firm agreement by the defendants for such a meeting,

will *unilaterally* propose to consider and implement any compliance measures. Considering the defendants' track record of constitutional violations and inability to comply with the Court's injunction, the plaintiffs are troubled by the suggestion that the defendants' voluntary and unilateral actions will actually remedy this significant problem.

If the plaintiffs in nine days can uncover all of the violations detailed in the attached declarations, the defendants in five years should have realized that they were in serious violation of the Court's injunction. The defendants' lack of diligence in ensuring compliance with the Court's order should not be countenanced.

IV.  **RELIEF SOUGHT FOR DEFENDANTS' VIOLATIONS OF THE COURT'S INJUNCTION.**

While the plaintiffs and their counsel still fervently desire a meeting with BPD's Chief of Police, BPD's Commander of Tactical Narcotics, and a representative of the Bridgeport Syringe Exchange Program, so that the parties can negotiate a stipulated and enforceable set of reforms, the plaintiffs request this Court's intervention for assuring future compliance from a recalcitrant defendant. Specifically, the plaintiffs respectfully request the following relief, which would compensate the victims for BPD's past violations and coerce the defendants to comply with the Court's injunction:

- A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the defendants are in contempt of court;

---

*see* Wolf Decl. (Sept. 27, 2005), Exhibit N (asking, for the second time, for a meeting with the defendants, and noting that "it should be incumbent on the police department," as opposed to the plaintiffs, "to propose new measures that will satisfy the court's injunction").

- A court-ordered meeting between the plaintiffs and their counsel and the defendants and their counsel;

- Monetary fines payable to the individuals who provided declarations in support of this motion. For each violation of the Court's injunction that is demonstrated in the attached declarations and arrest-incident sheets, the defendants should pay that particular individual $100 for the first violation, $250 for the second, $500 for the third, $800 for the fourth, and $1,000 for the fifth and each subsequent violation.[5]

- Plaintiffs' reasonable attorneys' fees and costs;

- Such other relief as this Court may deem necessary and proper.

## CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court grant their motion for contempt and order relief that will both compensate the victims of the defendants' unlawful conduct and ensure the defendants' future compliance with the Court's injunction.

---

[5] Because the plaintiffs have proceeded anonymously, they suggest that the defendants send checks written in the proper amount to the plaintiffs' counsel, who will give them to the individuals whose rights were violated. In the event that plaintiffs' counsel cannot track down any particular plaintiff, counsel would provide the check to the associational plaintiff.

| | |
|---|---|
| 1  Dated: September 27, 2005 | Respectfully submitted, |

Adam B. Wolf
Graham A. Boyd
Rebecca Bernhardt
Michael Perez
AMERICAN CIVIL LIBERTIES UNION
    DRUG LAW REFORM PROJECT
1101 Pacific Ave., Suite 333
Santa Cruz, CA 95060
Telephone: (831) 471-9000
Fax: (831) 471-9676

By: _/s/ Adam Wolf_
    Adam B. Wolf

Attorneys for Plaintiffs