

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE | : | |
| Plaintiff, | : | CIV. NO: 3:00CV2167 (JCH) |
| v. | : | |
| BRIDGEPORT POLICE DEPARTMENT, ET AL | : | |
| Defendants | : | OCTOBER 20, 2005 |

### AFFIDAVIT

I, Barbara Brazzel-Massaro, being of sound mind do hereby depose and say:

1. I am over the age of eighteen and believe in the obligation of an oath.

2. I am making this affidavit of my own personal knowledge.

3. I am an Associate City Attorney for the City of Bridgeport and, in that capacity, I am representing the City of Bridgeport Police Department and its employees in the above captioned matter.

4. I was one of the attorneys who represented the Bridgeport Police Department in the action filed in 2000 regarding the interpretation of the Connecticut State Law and the actions of the Bridgeport Police Department pursuant to Connecticut General Statute §21a-240.

BMF05118                                1

5.  As a result of the January, 2001 decision of the court, the Bridgeport Police Department immediately implemented the Court Order by reading it at line-ups and, at the same time, placing the Order on the bulletin board within the Police Department for all officers to review. The Training Office of the Bridgeport Police Department created a Training Bulletin to be used in regard to this subject. Additionally, I, as one of the Department's certified instructors, have conducted training that includes this area directly with the Narcotics and Vice Division of the Police Department, as well as incorporating the action into any training I conduct through the Bridgeport Police Training Academy.

6.  At some time, towards the end of August 2005 I reviewed, for the first time, allegations that the Police Department was not complying with the Order that was entered by the court in January 2001. The notice was based upon a letter authored by Rebecca Bernhardt who is associated with the ACLU. In the letter there are four references to instances in which she alleges officers were "stopping, searching, or harassing persons solely for possession of up to 30 sterile or previously-used sets of injection equipment."

7.  The letter which I received was a copy of correspondence addressed to Chief Armeno and City Attorney Anastasi.

8.  At the request of the City Attorney, I began to contact the health officials and police officials who were responsible for monitoring the police conduct to determine if there was any validity to the allegations and, if so, what recourse the City should take as to any individual who violated, either mistakenly or otherwise, the 2001 Order of the court.

9.  The Police Department officials scheduled a meeting with the City Attorney's Office to discuss the correspondence. There was a meeting on September 9, 2005.

10. As a result of the September 9, 2005 meeting, the Police Department officials determined with the Office of the City Attorney that, although the letter did not include specific evidence of a violation nor enough information to research the allegations, they would immediately begin a prophylactic two step process to address what little information they had and, at the same time, seek more specific information to assist them in developing additional education, oversight, guidance or discipline if necessary.

11. The Deputy Chief of the Department, along with the Chief of Police, immediately issued an order, as well as an updated training bulletin, that was read at

every shift line-up for five days including, also, the Narcotics and Vice Division. Additionally, each officer in the Department was given a copy of the bulletin and the policy for their information (see attached Exhibit A - Letter dated September 13, 2005 with attachments).

12. The Police Department followed this action with attempts to determine whether the complaints involved specific officers or areas that could be targeted for more intensive training or discipline. The police officials researched the complaints filed with the Office of Internal Affairs that, by Court directive, directly receives and investigates any complaint against a police officer in what is termed a "Barros" complaint. No complaints were filed with the Bridgeport Police Department. I spoke by telephone to Adam Wolf on September 13, 2005 about the action taken by the Police Department to address the August correspondence. He expressed displeasure with the Bridgeport Police Department's efforts to immediately address the allegations. In order to more effectively address the specific concerns, the Office of the City Attorney requested more specific information, as well as suggestions from counsel for the Plaintiffs, as to how the Bridgeport Police Department could rectify any improper conduct if it really did exist. The Plaintiffs refused to provide additional information or corrective action, but simply stated that the Plaintiffs wanted

to meet with the Mayor of the City of Bridgeport, the Chief of Police and Commander of the Tactical Narcotics (Exhibit B - Letter of September 13, 2005).

13.     On September 14, 2005, the Chief of Police, along with the Deputy Chief, the Captain assigned as the Commander of Narcotics and Vice, the Lieutenant assigned as Commander of the Training Division, the Lieutenant in charge of Internal Affairs, the City Attorney, Mark Anastasi, and myself conducted another meeting to review the allegations in the letter. Because of the vagueness of the letter, the police officials requested additional information so that they could go beyond a general proactive approach and investigate specific claims to determine what, if any, action was improper behavior of individually identifiable *but as yet unspecified) police officers. At the conclusion of the meeting, the attendees placed a telephone call to Adam Wolf to discuss the allegations and to obtain more specific information so that if there was any possible improper actions the Department could at least counsel any individual officer(s) who may have been involved in the alleged incidents. Mr. Wolf was not available. A message was left with him by voicemail that the officials in the City wanted to have a telephone conference immediately. The City officials stated they would call again between 2:00 p.m. and 2:30 p.m. on that date.

14. On September 14, 2005 at about 1:55 p.m. Mr. Wolf returned the call and left a message with counsel that he had discussed our correspondence with his colleagues and that he would get back in touch with us once he was able to get in touch with his clients but that they had a number of meetings that day and he did not know specifically when he could get back in touch with us.

15. On September 14, 2005 at approximately 2:30 p.m. counsel along, with Chief Armeno, Deputy Chief Honis, Captain Chapman, Lt. LaMaine of Narcotics and Vice, City Attorney Mark Anastasi, and myself placed a conference call to Adam Wolf in an effort to again discuss the issues and to ask for any specific action his clients believed would prevent disagreements or interference with the Needle Exchange Program in accordance with the Court's 2001 Order other than what the Department had done to date to be certain that there were no violations of the Order of the court regarding individuals found to have solely hypodermic needles. Attorney Wolf responded to the call and requested that Attorney Bernhardt also take part in the discussion. Chief Armeno was the first to speak and stated to everyone that he was "very sensitive" to the issues raised by the Plaintiffs and had acted swiftly to eliminate and prevent any behavior as described by the Plaintiffs. Chief Armeno also indicated that he had been in the role as Acting Chief for a short period of time

and he had no knowledge of the events described by the Plaintiffs in their letter. Chief Armeno made it clear that no action of that nature would be tolerated and he would enforce discipline if he determined the officers actions were out of line. Chief Armeno outlined some of the steps taken. The City officials once again reminded the Plaintiffs that if individuals believed their civil rights were violated and they wanted corrective action by the Department, a civilian complaint should be filed with the Office of Internal Affairs in accordance with a long-standing Court sanctioned procedure. The Plaintiffs indicated that their clients would not do this because they were afraid of retribution. Counsel for the City made it clear that it was impossible to directly address the alleged behavior if there was no specific information at the time of the alleged events. During the telephone conversation the City officials asked numerous times for specific suggestions to address the allegations brought forward by Plaintiffs' counsel. The Plaintiffs refused to provide any more information to aid the City in identifying the conduct they believed violative of the Order or to assist in developing other avenues to prevent the alleged behavior. The Plaintiffs only request was a meeting with no rationale or goals with the Mayor of the City of Bridgeport, the Chief of Police, and possibly their unidentified clients. At the conclusion of the telephone conference, the Chief and City officials requested an

outline of any suggestions or programs the Plaintiffs would like implemented to address their concerns (Exhibit C - Letter dated September 15, 2005).

16. After the telephone conference, counsel for the Plaintiffs refused to offer any solutions or suggestions to their claims. In spite of the continued refusal to cooperate with the efforts of the Bridgeport Police Department, the Bridgeport Police Department and the Health Department immediately initiated additional steps to address the concerns of the Plaintiffs by creating a number of initiatives for a working alliance between the Health Department and the Police Department. The Police Department Training Division communicated with the Director of the Needle Exchange Program to have her submit an application for certification as a police instructor in this area as well as to educate about other related health issues that officers may confront. The Director of Health, Dr. Marian Evans, authorized her employee, Ms. Robin Clark-Smith, to apply for the State of Connecticut certification. Additionally, Dr. Evans agreed that Ms. Clark-Smith would place forms in English and in Spanish for Barros complaints through the Office of Internal Affairs on the needle exchange van that could be given to clients in the event of complaints. Dr. Evans, with the help of Robin Clark-Smith, is to initiate an internal reporting procedure by developing a form for any complaints by the clientele that can be

documented by the health department employees. Any of these complaints, whether through the formal Barros Decree procedure or an informal notation by the health employee, will be provided to a liaison appointed by the Chief of Police to work with the health department (Exhibit D - Letter dated September 23, 2005).

17. On September 21, 2005, Ms. Robin Clark-Smith met with the Chief of Police, Deputy Chief Honis and myself in an effort to better understand the complaints and attempt to determine if she had specific information to help the Department adequately address and investigate the allegations as well as assist the Department in continuing their education of the health programs. Ms. Clark-Smith was scheduled to begin training and discussion of the Program with the Narcotics and Vice Division of the Police Department on an informal basis. This was cancelled because of the scheduling problems of Ms. Clark-Smith. The Division has rescheduled, with her approval, a training session on November 15, 2005 (see Exhibit E - Letter of September 26, 2005 and E-Mail).

18. Even after the efforts made by the City of Bridgeport, the Bridgeport Police Department and the Public Health Department, and despite the lack of evidence, the Plaintiffs have repeatedly refused to offer any construction methods for solution of the non-descript incidents. On September 22, 2005, the Office of the City Attorney

sent a letter outlining all of the above efforts and procedures to counsel for the ACLU. The Plaintiffs never responded and, instead, filed an action alleging the Defendants are in contempt for failing to abide by the Order of 2001. The allegations by the Plaintiffs have been denied by the Defendants. However, the Defendants have immediately extensively and proactively addressed any potential violation. The correspondence by the Defendants dated September 22, 2005 and the actions of the Defendant since the notice dated August 15, 2005 were taken to address any improper conduct, to prevent any future alleged failure to follow the court Order, and to create a better line of communication so as to prevent future allegations (Exhibit F - Letter of September 22, 2005).

Barbara Brazzel-Massaro

Sworn and subscribed before me

this 20th day of October, 2005

John H. Barton
Commissioner of the Superior Court