GRAHAM A. BOYD (CBN 18419)
REBECCA BERNHARDT (PHV 0616)
ADAM B. WOLF (PHV 0617)
AMERICAN CIVIL LIBERTIES UNION
    DRUG LAW REFORM PROJECT
1101 Pacific Ave., Suite 333
Santa Cruz, CA  95060
Tel:  (831) 471-9000
Fax:  (831) 471-9676

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN DOE, JOHN ROE, & CONNECTICUT HARM REDUCTION COALITION,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRIDGEPORT POLICE DEPARTMENT & ANTHONY ARMENO,[*] Acting Chief of the Bridgeport Police Department, in his official capacity only,<br><br>    Defendants. | Case No. 3-00-cv-2167 (JCH)<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR CONTEMPT**<br><br>Court: Hon. Janet C. Hall<br>Filed: November 9, 2005 |

      As plaintiffs predicted in their contempt motion, defendants' opposition brief attacks plaintiffs' declarants who described violations of this Court's injunction and insists that plaintiffs use a civilian-complaint procedure that would be ineffective to report future violations of the injunction. In their opposition, defendants also materially misinterpret the Court's injunction to permit the harassment of plaintiffs for possessing drug-injection equipment such as cookers.  Defendants'

---

[*]     The plaintiffs request that Anthony Armeno, Acting Chief of Police of the Bridgeport Police Department, be substituted for Wilber Chapman, the former Chief of Police of the Bridgeport Police Department.

opposition plainly does not rebut plaintiffs' demonstration that defendants have consistently violated the Court's clear and unambiguous injunction.

## I. THE COURT'S INJUNCTION CLEARLY AND UNAMBIGUOUSLY PROHIBITS PENALIZING PLAINTIFFS FOR POSSESSING SYRINGES AND OTHER DRUG-INJECTION EQUIPMENT.

Defendants erroneously argue that the Court issued an unclear and ambiguous injunction. The Court's carefully crafted injunction, however, is quite clear: defendants may not penalize plaintiffs for possessing "up to thirty sets of injection equipment."

### A. The Court's Injunction Clearly and Unambiguously Prohibits Defendants from Penalizing Plaintiffs for Possessing Syringes

Defendants do not contest that the Court's injunction prohibits them from penalizing plaintiffs for possessing syringes. However, because plaintiffs' evidence demonstrates numerous instances of defendants penalizing plaintiffs solely for their possession of syringes, plaintiffs begin by noting the clarity of the injunction as to this issue.

The injunction states, in relevant part: "Defendants . . . are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way . . . any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix) . . . ." *Doe v. Bridgeport Police Dep't*, 198 F.R.D. 325, 350 (D. Conn. 2001). The referenced statute, in turn, defines the scope of legal injection equipment. It provides that one may possess up to thirty "syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." Conn. Gen. Stat. § 21a-240(20)(A)(ix).

The injunction clearly and unambiguously prevents Bridgeport Police Department ("BPD") officers from "penalizing in any way" plaintiffs solely for possessing syringes. Accordingly, defendants may not, for instance, confiscate fewer than thirty-one syringes from any individual. Likewise, BPD officers may not arrest someone for possessing a syringe. Nor may the officers commit assault or battery against an individual for possessing syringes or asserting his or her right to possess syringes. Indeed, the Court's injunction could not be more clear in prohibiting officers from penalizing individuals based on their possession of syringes.

**B.     The Court's Injunction Clearly and Unambiguously Prohibits Defendants from Penalizing Plaintiffs for Possessing Injection Equipment**

The Court's injunction clearly prohibits defendants from penalizing plaintiffs for possessing "up to thirty sets of injection equipment," which includes "cookers." Defendants now proffer an interpretation of the injunction, however, that would allow BPD officers to arrest and otherwise penalize plaintiffs for possessing cookers and other necessary injection equipment. This cramped reading of the injunction does not jibe with the plain language of the statute upon which the injunction was based, undermines the statutory scheme that informed the injunction, poses a risk to public health, eviscerates the effectiveness of the injunction, and renders illegal certain aspects of the Exchange program itself.

Drug injection is a complicated process that requires the combined use of several pieces of equipment. *See, e.g.*, Decl. of Robert Heimer, Ph.D. (Dkt. No. 7, filed Nov. 13, 2000), at ¶ 25. A cooker, or a container in which an injectable drug is mixed with water or other liquids, is one such indispensable device. *Id.* An injection drug user cannot safely inject without a cooker, and the use of a new cooker is important for preventing the transmission of infectious diseases, including HIV and hepatitis, because blood is often transferred from a syringe to a cooker during use. *See, e.g.*, Decl. of Ricky Blumenthal, Ph.D. (Dkt. No. 5, filed Nov. 13, 2000), at ¶ 12; Heimer Decl. (Dkt. No. 7), at ¶ 25; Decl. of Anthony Givens (Dkt. No. 11, filed Nov. 13, 2000), at ¶ 4; *see generally* Centers for Disease Control and Prevention, *HIV Prevention Bulletin: Medical Advice for Persons Who Inject Illicit Drugs*, *available at* http://www.cdc.gov/idu/pubs/hiv_prev.htm (last visited Nov. 8, 2005) (noting that "blood and blood-borne infections can be introduced into drug solutions by the use of . . . 'cookers'" and stating that "[u]se [of] a new or disinfected container ('cooker') [will] reduce personal and public health risks").

Cookers are, quite clearly, "objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." Conn. Gen. Stat. § 21a-240(20)(A)(ix). According to the relevant statutory language, cookers, like syringes, are "injection equipment" within the meaning of the injunction.

Beyond the plain language of the injunction, there are four reasons that the possession of cookers and other injection equipment must be included within the scope of the Court's injunction.

1   First, the Exchange, run by the City of Bridgeport's own Health Department, provides its clients
2   with kits that include injection equipment like cookers. Givens Decl. (Dkt. No. 11), at ¶ 4. Upon
3   information and belief—and contrary to defendants' assertions, *see* Defs.' Mem. in Opp. to Pls.'
4   Mot. for Contempt (filed Oct. 26, 2005), at 10—that practice remains true. If the injunction did not
5   cover the possession of cookers under the theory that cookers are not injection equipment pursuant
6   to the state statute, then the Exchange itself would be providing items that subject its clients to
7   arrest and imprisonment.
8          Second, excluding cookers from the Court's injunction would pose a significant public-
9   health risk. The Exchange provides cookers because the use of sterile cookers decreases the
10  transmission of infectious diseases like HIV and hepatitis. *See, e.g.*, Blumenthal Decl. (Dkt. No. 5), at
11  ¶ 12; Heimer Decl. (Dkt. No. 7), at ¶ 25; Givens Decl. (Dkt. No. 11), at ¶ 12; CDC, *HIV Prevention*
12  *Bulletin, at* http://www.cdc.gov/idu/pubs/hiv_prev.htm. Therefore, defendants' interpretation of
13  the injunction would produce one of two harmful effects: Exchange clients would dispose of the
14  new cookers they receive from the Exchange out of fear that possessing the cookers would subject
15  them to arrest, or the Exchange would cease providing cookers to its clients. Either result would
16  undermine the mission of the Exchange and increase the rate of infectious-disease contraction
17  among the Exchange's clients.
18         Third, refusing to recognize that cookers are injection equipment would frustrate the
19  legislative framework and policies upon which the injunction was based. The state statutes that led
20  the Court to issue the injunction were enacted to mitigate the public-health risks associated with
21  injecting controlled substances. By authorizing needle exchanges—and legalizing the possession of
22  the injection equipment these exchanges provide—the legislature adopted the harm-reduction
23  principle that injection drug users should use sterile injection equipment to decrease the spread of
24  infectious diseases. Interpreting "injection equipment" to exclude injection equipment like cookers
25  runs counter to the legislation that animated the Court's injunction and the important policy goals it
26  sought to effectuate.
27         Fourth, interpreting the Court's injunction to exclude items like cookers is the City's attempt
28  to do an end-run around the injunction by stripping it of any force. Because cookers are necessary
    components of drug-injection equipment, plaintiffs often carry cookers along with their syringes.

Pls.' Reply Br. in Support of Mot. for Contempt                                                          4
Case No. 3-00-cv-2167 (JCH)

Moreover, the Exchange provides both syringes and cookers to its clients, who leave the Exchange with this injection equipment. If BPD officers could penalize plaintiffs for possessing cookers, the officers could lie in wait outside the Exchange and arrest plaintiffs upon exiting. (The officers also could board the Exchange van and prevent anyone from availing themselves of the Exchange's services by threatening to arrest anyone who touched a cooker.) Moreover, under defendants' improbable interpretation of the injunction, BPD officers could arrest the Exchange's employees, who are City officials, for conspiracy to distribute "illegal" injection equipment. Defendants' misunderstanding of the injunction would make the Court's order largely ineffectual.

Contrary to defendants' remonstrations, plaintiffs do not argue that the Court's injunction shields Exchange clients from arrest for committing any and all drug offenses. For example, plaintiffs do not contend that the injunction covers their possession of crack pipes or usable amounts of controlled substances, since these items are not injection equipment. Plaintiffs merely seek to establish that the Court's injunction means what it says: "Defendants . . . are enjoined . . . from . . . penalizing in any way . . . any person based solely upon that person's possession of up to thirty sets of injection equipment." The Court's order plainly extends to injection equipment, which includes cookers.

## II. PLAINTIFFS' PROOF OF DEFENDANTS' NONCOMPLIANCE IS CLEAR AND CONVINCING.

Plaintiffs have clearly and convincingly demonstrated that defendants have violated the Court's injunction and plaintiffs' constitutional rights. Defendants' response—that they allegedly have not violated the Court's injunction because they have not independently verified plaintiffs' declarations and because plaintiffs were purportedly violating other criminal laws (e.g., loitering ordinances) when they were penalized by BPD officers—does not rebut plaintiffs' clear and convincing proof.

Defendants fundamentally misconstrue how their actions violate the injunction. For example, they apparently believe that they violate the injunction only when they harass and otherwise penalize plaintiffs in the Exchange van itself. Defs.' Opp. Br. at 11 ("What is significant in many of the declarations is that a stop or investigation was not made while the individual was engaged in or even in the van."). Moreover, they apparently still do not grasp that confiscating

syringes and ripping up ID cards, among other illegal actions, violate the Court's injunction. Plaintiffs' declarations demonstrate that BPD officers frequently engage in such blatant violations of the injunction.

Furthermore, it is a red herring to attack plaintiffs by alleging they were violating traffic laws or quality-of-life ordinances when defendants were harassing them for possessing injection equipment. It is simply irrelevant that plaintiffs might have been violating a loitering ordinance, for instance, at the time that BPD officers penalized plaintiffs for possessing injection equipment. For example, defendants imply that BPD officers might not have violated the Court's injunction when they stopped John Roe 5 on his bicycle because Mr. Roe 5 might have been violating a traffic law at the time. Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 11. Notwithstanding the fact that a traffic violation is pure conjecture on the part of defendants, a traffic violation does not justify the officers confiscating Mr. Roe 5's syringes. Confiscating the syringes penalized Mr. Roe 5 based solely on possession of injection equipment, even if he was potentially violating a traffic law at the time he possessed the syringes.

Likewise, defendants suggest that BPD officers did not violate the Court's injunction with respect to John Roe because he was standing in a drug-trafficking area with a few friends when the officers assaulted him for possessing syringes. Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 9. However, threatening John Roe with bodily harm ("Don't get smart, I'll knock your teeth out") for asserting that his possession of injection equipment was legal is a clear violation of the injunction.[1]

---

[1] Plaintiffs also attached two exhibits to their motion demonstrating that officers arrest individuals solely for possessing injection equipment. Pls.' Mot. for Contempt, Exhs. K & L (filed Sept. 28, 2005); *see also* Pls' P&As in Supp. of Mot. for Contempt, at 8 & n.3 (filed Sept. 28, 2005) (discussing these arrests). Defendants attempt to distance themselves from the first of these exhibits by noting that the arresting officer is a "park police officer." Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 9. However, plaintiffs received this exhibit from defendants themselves pursuant to plaintiffs' FOIA request for "police reports of arrests made for possession of injection drug paraphernalia . . . *by the Bridgeport Police Department*." Pls.' Mot. for Contempt, Exh. J, at 1 (emphasis added).

As to the second of these exhibits, defendants state that the officer arrested the individual because he was "suspected of other criminal violations including carrying a bag thought to be narcotics." Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 9-10. However, the fact that the officer believed this person was carrying a usable amount of a controlled substance—an alleged

Throwing syringes in the street, ripping up ID cards, and arresting individuals for possessing injection equipment, among other actions discussed in plaintiffs' declarations, are all blatant violations of this Court's order.  BPD officers were not confiscating plaintiffs' syringes because plaintiffs were loitering, but rather because they were possessing the syringes.  Even if plaintiffs were engaging in other illegal actions at the time, the officers were nonetheless penalizing plaintiffs solely for their possession of injection equipment.

### III. DEFENDANTS HAVE NOT BEEN REASONABLY DILIGENT AND ENERGETIC IN COMPLYING WITH THE COURT'S INJUNCTION BY ALLOWING OFFICERS TO ROUTINELY VIOLATE THE INJUNCTION AND WAITING FIVE YEARS TO IMPLEMENT MEASURES THAT WILL NOT ENSURE COMPLIANCE WITH THE INJUNCTION.

Defendants maintain that they have reasonably and diligently complied with the Court's injunction because they are now instituting policies that will allegedly stem their violations.  Their claims of reasonableness and diligence, however, are belied by the facts that defendants have violated the Court's injunction for years, have waited five years after the issuance of the injunction to implement policies that purportedly will prevent future violations, and have formulated an interpretation of the injunction that provides a roadmap for how they plan to continue to violate the injunction.

Defendants' argument is rooted, in part, in their misunderstanding that "[a]n Order to grant a Motion to Compel [*sic*] on a [*sic*] civil contempt requires some ongoing non-compliance." Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 12.  They cite no case law for this proposition, which cannot possibly be the standard to prevail on a contempt motion.  If defendants were correct in their unsupported assertion, they could consistently violate an injunction until plaintiffs file a contempt motion, at which point defendants could avoid a finding of contempt by briefly ceasing their contumacious conduct.  In other words, defendants fashion a legal proposition that would allow them to violate the Court's injunction with impunity.

---

offense with which the individual was neither arrested nor charged—does not permit the officer to arrest him for possessing legal paraphernalia, in contravention of the Court's injunction.

Instead, the time to comply with a permanent injunction is when the court issues the injunction.  Five years after the Court issued its injunction and after years of violations, defendants cannot say that they have been reasonably diligent and energetic by initiating policies aimed at compliance for the first time.

As for defendants' proposed remedial measures, it is apparent that defendants' actions will not result in future compliance with the permanent injunction absent a finding of contempt.  Indeed, defendants' opposition brief makes clear that defendants plan to continue to violate the injunction by penalizing plaintiffs for possessing injection equipment such as cookers.  No amount of training and other proposed remedies will stem the violations if defendants continue to tell BPD officers that they may harass plaintiffs for possessing injection equipment in violation of the injunction.

Plaintiffs note that some of defendants' proposed remedial measures, such as directing employees of the Exchange to report violations of the injunction, are beneficial.  However, other proposed remedies will decidedly not help ensure compliance with the injunction.  For example, and as plaintiffs have discussed repeatedly with defendants, the civilian-complaint process is an ineffective tool for recording violations of the injunction.  It should be obvious that plaintiffs, who are a sensitive population based on their use of controlled substances and all-too-frequent encounters with BPD officers, will not consistently invoke the civilian-complaint process.  Based on their status as drug users, plaintiffs do everything possible to avoid unnecessary contact with the police.  It is quite understandable that plaintiffs are fearful of accusing the police of wrongdoing and providing their names and addresses for follow-up investigations, which might subject them to retaliation.  After all, fear of retribution is the reason that plaintiffs received permission from the Court to proceed under fictitious names in this action.

Furthermore, defendants cannot avoid responsibility for their violations of the Court's injunction by disclaiming any knowledge of their having repeatedly violated the injunction.  Indeed, one of the problems with defendants' conduct over the past five years is that the Bridgeport Police Department did not implement a scheme that made it aware of its officers' violations of the Court's injunction.  A permanent injunction requires defendants to take affirmative action to ensure

1  compliance; it should not be the responsibility of plaintiffs to monitor and apprise defendants of
2  violations of the injunction.[2]
3       In order to coerce defendants' future compliance with the injunction and to compensate
4  plaintiffs for suffering years of constitutional violations, plaintiffs respectfully request that the Court
5  grant their motion for contempt.

Dated: November 8, 2005                Respectfully submitted,

                                       Adam B. Wolf
                                       Graham A. Boyd
                                       Rebecca Bernhardt
                                       AMERICAN CIVIL LIBERTIES UNION
                                           DRUG LAW REFORM PROJECT
                                       1101 Pacific Ave., Suite 333
                                       Santa Cruz, CA  95060
                                       Telephone:  (831) 471-9000
                                       Fax:  (831) 471-9676


                                       By: _____
                                           Adam B. Wolf (PHV 0617)

                                       Attorneys for Plaintiffs

---

[2] Defendants criticize plaintiffs' counsel in the opposition brief by asserting that counsel discovered that the injunction was being violated more than one year ago, but chose to "sit by and allow what they allege are violative acts to continue." Defs.' Mem. in Opp. to Pls.' Mot. for Contempt, at 19. However, plaintiffs' timing for filing the contempt motion was deliberately cautious. Plaintiffs withheld filing for contempt in 2004 when they first uncovered the violations of the injunction, not for nefarious reasons, but rather because they were hoping that these violations were anomalous acts of individual officers. Plaintiffs filed the motion later, in fall 2005, because by that time they had ascertained that the violations were the product of widespread flouting of the Court's injunction and disrespect for plaintiffs' constitutional rights.