### PubMed

A service of the National Library of Medicine and the National Institutes of Health

**1:** J Acquir Immune Defic Syndr. 1999 Oct 1;22(2):194-9.   Related Articles, Links

## HIV-1 transmission in injection paraphernalia: heating drug solutions may inactivate HIV-1.

Clatts MC, Heimer R, Abdala N, Goldsamt LA, Sotheran JL, Anderson KT, Gallo TM, Hoffer LD, Luciano PA, Kyriakides T.

National Development and Research Institutes, Inc., New York, New York 10048, USA. michael.clatts@ndri.org

In response to recent concerns about risk of HIV-1 transmission from drug injection paraphernalia such as cookers, ethnographic methods were used to develop a descriptive typology of the paraphernalia and practices used to prepare and inject illegal drugs. Observational data were then applied in laboratory studies in which a quantitative HIV-1 microculture assay was used to measure the recovery of infectious HIV-1 in cookers. HIV-1 survival inside cookers was a function of the temperature achieved during preparation of drug solutions; HIV-1 was inactivated once temperature exceeded, on average, 65 degrees C. Although different types of cookers, volumes, and heat sources affected survival times, heating cookers 15 seconds or longer reduced viable HIV-1 below detectable levels.

PMID: 10843535 [PubMed - indexed for MEDLINE]

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Nov 29 2005 11:19:28



http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstra...   12/5/2005

 

A service of the National Library of Medicine and the National Institutes of Health

My NCBI
[Sign In] [Regis

All Databases   PubMed   Nucleotide   Protein   Genome   Structure   OMIM   PMC   Journals   Bool

Search PubMed for [_____] Go  Clear

Limits   Preview/Index   History   Clipboard   Details

Display Abstract  Show 20  Sort by  Send to

About Entrez

Text Version

All: 1   Review: 0

Entrez PubMed
Overview
Help | FAQ
Tutorial
New/Noteworthy
E-Utilities

PubMed Services
Journals Database
MeSH Database
Single Citation Matcher
Batch Citation Matcher
Clinical Queries
Special Queries
LinkOut
My NCBI

Related Resources
Order Documents
NLM Mobile
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

1: J Acquir Immune Defic Syndr. 1999 Oct 1;22(2):194-9.   Related Articles, Links

LWWonline
LIPPINCOTT WILLIAMS & WILKINS

### HIV-1 transmission in injection paraphernalia: heating drug solutions may inactivate HIV-1.

Clatts MC, Heimer R, Abdala N, Goldsamt LA, Sotheran JL, Anderson KT, Gallo TM, Hoffer LD, Luciano PA, Kyriakides T.

National Development and Research Institutes, Inc., New York, New York 10048, USA. michael.clatts@ndri.org

In response to recent concerns about risk of HIV-1 transmission from drug injection paraphernalia such as cookers, ethnographic methods were used to develop a descriptive typology of the paraphernalia and practices used to prepare and inject illegal drugs. Observational data were then applied in laboratory studies in which a quantitative HIV-1 microculture assay was used to measure the recovery of infectious HIV-1 in cookers. HIV-1 survival inside cookers was a function of the temperature achieved during preparation of drug solutions; HIV-1 was inactivated once temperature exceeded, on average, 65 degrees C. Although different types of cookers, volumes, and heat sources affected survival times, heating cookers 15 seconds or longer reduced viable HIV-1 below detectable levels.

PMID: 10843535 [PubMed - indexed for MEDLINE]

Display Abstract  Show 20  Sort by  Send to

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Nov 29 2005 11:19:28



TUESDAY
May 5, 1992

003375
196
tcc

further --? Yes, Senator Genuario.

SENATOR GENUARIO:

Madam President, a question to Senator Avallone, through you, if I may.

THE CHAIR:

Certainly, sir.

SENATOR GENUARIO:

Senator Avallone, I don't have a copy of the House Amendment. I wonder if you might just tell us what the House Amendment says.

SENATOR AVALLONE:

Yes, House "B" limits the decriminalization to needles and syringes in quantities of eight or less. House "D" specifies that hypodermic needles and syringes may only be sold in quantities of eight or less without a prescription.

SENATOR GENUARIO:

Thank you very much. Thank you, Madam President.

THE CHAIR:

You're welcome. Senator Nickerson.

SENATOR NICKERSON:

Yes, if I may just pursue again, through you, Madam President, essentially the same question that Senator Upson asked and direct the attention, if I may, to Senator Avallone to lines 45 through 54. My



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, JOHN ROE, and CONNECTICUT HARM REDUCTION COALITION<br><br>Plaintiffs,<br>v.<br><br>BRIDGEPORT POLICE DEPARTMENT and WILBUR L. CHAPMAN, CHIEF OF THE BRIDGEPORT POLICE DEPARTMENT, in his official capacity only<br><br>Defendants. | CASE NO. 3-00-cv-2167 (JCH) |

### EXHIBITS TO
### PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION



HOUSE OF REPRESENTATIVES          Saturday May 2, 1992

such as activity that looked like a drug deal that was going down or something like that.

If they just find, a diabetic as an example, and they stopped them and found it, I'm not so sure they would bother charging at that point in time. They just don't do it.

DEPUTY SPEAKER POLINSKY:

Representative Cocco.

REP. COCCO: (127th)

Thank you, Madam Speaker. So in reality, unless through you, Madam Speaker, there is some evidence that would leave the police to believe that drug activity was occurring, even though they did stop the person for probable cause, but perhaps for a motor vehicle violation, if there's no evidence that they see that leads them to believe that drug activity was present, despite the fact that they find the needles and syringes which are no longer drug paraphernalia if we pass this law, they cannot seize them and test the residue for substance abuse.

REP. TULISANO: (29th)

Through you, Madam Speaker, if we pass the law and they just happen to see them, that is correct. But I think that's one of the reasons we're trying to pass the law. Individuals who use intravenous drug



Become a card-carrying member of the ACLU: **JOIN**

Search

ADVANCED
HELP

# Drug Policy



**HOME | ABOUT THE ACLU | SUPREME COURT | LEGISLATIVE UPDATE | ACTION CENTER | DONATE NOW | NEWSROOM | ISSUES**

Drug Policy
Harm Redu

🖨 Printer-Friendly
✉ Email Article

CT Court is First in Nation to Protect Needle Exchange
Program from Police Harassment
January 19, 2001

**FOR IMMEDIATE RELEASE**

BRIDGEPORT, CT--In a national test case challenging the illegal harassment and arrest of participants in a Needle Exchange Program, a federal court in Connecticut has ruled that police may not interfere with a public health initiative that effectively combats disease through education and prevention.

"This ruling marks the first time a court has put its stamp of approval on a drug intervention method that has quietly succeeded for more than a decade," said Alicia Young, an attorney with the ACLU's Drug Policy Litigation Project, which together with the Connecticut ACLU affiliate filed a lawsuit on behalf of the Connecticut Harm Reduction Coalition and two anonymous clients of the Bridgeport Needle Exchange.

"The court's ruling sends a clear message to police officers that such harassment will not be tolerated, and assures needle exchange programs and anyone who carries a syringe that they can stand up for their rights and win," Young added.

The state had claimed that Exchange Program participants carrying used syringes with trace amounts of narcotics were criminally liable for possession. But the court found this conclusion "absurd and unworkable," saying that such arrests would "thwart the intended purpose" of the legislature.

Allowing criminal liability for possession, the court said, "would invite the Bridgeport police to abuse the fourth amendment," by arresting any injecting drug user found with previously used injection equipment.

According to the Centers for Disease Control, three out of four AIDS cases among women are due to injection drug use or heterosexual contact with someone infected with HIV through injection drug use, and over 75 percent of new infections in children result from the consequences of injection drug use in a

**TAKE ACTION**

Support the
Necessity" I
Medical Ma

Repeal Ban
Financial Ai
Students Wi
Convictions

More >>

**LATEST NEWS**

Drug Polici
Destroying
Groups Cha

ACLU of V
Offers Lega
Methadone
Barred Fror
Under New

More >>

**RELATED INFO**

Press Releas
Action Item
Position Pap
Publications
Legal Docu
Legislative
Speeches
Newsletters
General Iter
Additional I
Resources
Fact Sheets



parent.

Mark Kinzly, a founding member of the Connecticut Harm Reduction Coalition, welcomed the court's ruling. "Needle exchange programs have been successful for years, and they have also been harassed for years," he said. "Fear of arrest for carrying or using life-saving instruments undermines a proven means of reducing the risk of transmitting blood-borne diseases like HIV and Hepatitis C."

State-established Needle Exchange programs currently operate in California, Colorado, Connecticut, Illinois, Maryland Massachusetts, Minnesota, New York, Ohio, Pennsylvania, Rhode Island, Washington and Wisconsin. Each of these 13 states has passed laws exempting program participants from criminal liability for carrying hypodermic syringes. According to AIDS Action, a leading advocacy group, there are currently 140 needle exchange programs operating in 39 states, the District of Columbia and the territories (including the 13 states where the programs are legal).

The ACLU's Young said that litigation on behalf of needle exchange participants has been filed in only one other state, New York, where the lawsuit is still at the preliminary stages.

"Participants in needle exchange programs have come to expect police harassment even when the law is on their side. We hope today's decision will change that point of view."

In 1990, Connecticut decriminalized possession of injection drug equipment and established Syringe Exchange Programs to stop the growing rates of HIV infection and AIDS-related deaths among members of the injecting drug user community and their partners and children. Exchanges operate by getting used, dangerous needles off the streets and replacing them with sterile, clean ones.

The program was legally mandated by the state. But the ACLU said in court papers, the Bridgeport police routinely destroyed syringes found on drug users and ripped up clients' Syringe Exchange Program identification cards, which are issued by the Health Department.

Such illegal intimidation, the ACLU argued, not only discourages drug users from participating in legal programs that get dirty needles off the streets, it sabotages the counseling and public education components of Syringe Exchange Programs that encourage drug users to enter treatment.

In a declaration before the court, Dr. Robert Heimer of the Yale

University School of Medicine and a leading expert on HIV transmission among injecting drug users, described a case study he conducted for the state on New Haven's Exchange Program.

The program, Heimer found, decreased the rates of blood-borne diseases like HIV infection by 33 percent, but a pattern of police harassment and arrest of injection drug users on possession charges discouraged them from visiting Exchanges.

The case, *John Doe et al. v. Bridgeport Police Department,* was filed in Connecticut District Court by Graham Boyd, Harry Williams and Young of the ACLU's Drug Policy Litigation Project and Philip Tegler from the ACLU of Connecticut.

| YOUR LOCAL ACLU | CONGRESSIONAL SCORECARD | MULTIMEDIA | FORUMS | PUBLICATIONS | SUPPORT US | STORE |

© ACLU, 125 Broad Street, 18th Floor New York, NY 10004 This is the Web site of the American Civ Union and the ACLU Foundation.
Learn more about the distinction between these two components of the ACLU.

User Agreement | Privacy Statement | FAQs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, JOHN ROE, and CONNECTICUT HARM REDUCTION COALITION<br><br>　　　　Plaintiffs,<br>　v.<br><br>BRIDGEPORT POLICE DEPARTMENT and WILBUR L. CHAPMAN, CHIEF OF THE BRIDGEPORT POLICE DEPARTMENT, in his official capacity only<br><br>　　　　Defendants. | CASE NO. 3-00-cv-2167 (JCH) |

### PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

PLS' REPLY MEMO IN SUPP. MOTION FOR PREL. INJ.



## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The issues before this Court have narrowed considerably based on defendants' concessions and this Court's opinion in granting a temporary restraining order. The following issues are no longer in dispute. First, Exchange Programs save lives by reducing the spread of incurable blood-borne diseases such as HIV/AIDS and Hepatitis C. Second, for the Exchange program to be effective, participants must be able to carry both clean and used injection equipment. Third, any citizen may carry clean injection equipment in a quantity up to 30. Finally, arrests of Exchange participants based solely on possession of new or used injection equipment, or of other citizens for possession of new injection equipment, is without a basis in Connecticut law and therefore is unconstitutional.

Only one issue remains before this Court: should individuals who are not registered Exchange participants be protected from searches, stops, arrests, or other punishments based solely upon their possession of used injection equipment that may (but does not necessarily) contain trace amounts of narcotics? The definitive answer to this question is provided by the plain language of statutes, careful comparison of the 1990 and 1992 versions of the legislative framework, the manifest intention of the legislature, and the practical realities of implementing the relevant laws: any person's possession of injection drug equipment, whether new or used, is legal under Connecticut law.

In its initial response to the epidemic, the Connecticut Legislature passed a 1990 measure to establish a pilot syringe exchange program in New Haven, where injecting drug users could trade sterile equipment for used equipment, as well as obtain counseling and treatment referrals. P.A. 90-214, §2 (1990) (Exh. A).[1] This same statute exempted injection equipment from the

---

[1] All referenced Connecticut statutes are attached hereto as Exhibits.

PLS' REPLY MEMO IN SUPP. MOTION FOR PREL. INJ.                                                    1

**Exchange** tools for harm reduction    search: www.exchangesup

HOME | NEEDLE EXCHANGE SUPPLIES | DRUG INFORMATION | CONFERENCES | OVERDOSE | WHAT'S NEW?

home > needle exchange supplies > background to paraphernalia supply

## Background to paraphernalia supply

Needle exchange has been one of the great public health success stories of the last 25 years. It has had a huge impact in terms of preventing an HIV epidemic amongst injecting drug users.

However, hepatitis C has been endemic amongst injecting drug users since long before the introduction of needle and syringe provision. In order to reduce the prevelance and incidence of hepatitis C, needle exchange must increase supply, reach more injectors more often, and change the understanding of the meaning of 'sharing' to included all items of injecting paraphernalia that may be contaminated by blood.

As activists in the harm reduction field we took the decision to coordinate and facilitate the supply of single use citric sachets to needle exchanges in the spring of 2001. This was prompted by increasing numbers of reports on our safer injecting courses of injecting drug users losing eyesight due to candidal fungal infections caught from using lemon juice and vinegar as acidifiers.

Since the successful lauch of citric sachets in September 2002, we have introduced Vit C sachets and stericups to the list of supplies available through needle exchange schemes in the UK.

The provision of these items has been evaluated and shown to increase the numbers of clients attending, and frequency of visits to, needle exchanges. They also encourage discussion between workers and clients about these key issues in reducing drug related harm.

We believe that the future of needle exchange, and the prevention of hepatitis C, will hinge upon improved needle exchange provision that includes the provision of drug preparation equipment with the potential to reduce drug related harm.

**Related pages**
Needle exchange su page

TOP | CONTACT US | TERMS OF USE | EMAIL UPDATES | ABOUT US | FEEDBACK | SITE MAP



Source: Legal > States Legal - U.S. > Connecticut > Cases > CT State Cases, Combined
Terms: **injection equipment** (Edit Search | Suggest Terms for My Search)

➔Select for FOCUS™ or Delivery

*1991 Conn. Super. LEXIS 2682, **

GEORGE ZABRECKY v. CONNECTICUT BOARD OF CHIROPRACTORS

No. 0702118

Superior Court of Connecticut, Judicial District of Hartford/New Britain, at Hartford

1991 Conn. Super. LEXIS 2682

November 15, 1991, Decided
November 19, 1991, Filed

**NOTICE:**  [*1]

THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff chiropractor appealed the decision of defendant, the Board of Chiropractic Examiners (Connecticut), which suspended his license and imposed other penalties pursuant to Conn. Gen. Stat. §§ 19a-17, 20-29, 20-45.

**OVERVIEW:** A hearing was held before the Board on charges brought against the chiropractor by the Department of Health Services related to the treatment rendered to a patient. The chiropractor requested a more definite statement of the charges, which was denied. The Board held that the chiropractor had rendered negligent or incompetent care in treating his patient, particularly in prescribing and dispensing the substances "Neythymin" and "Neytumorin." The chiropractor's license was subsequently suspended and a civil penalty was imposed. Upon careful review of the evidence, the court affirmed the Board's decision because there was ample evidence that the chiropractor approved the use of Neythymin and instructed and advised the patient how to inject the substance into his body. Thus, the record, the applicable law, and the chiropractor's own testimony, supported the Board's conclusion that the chiropractor's administering or advising and instructing the patient to take Neythymin and Neytumorin was outside the scope of legally allowable chiropractic practice. The court also found that the chiropractor was afforded a complete and adequate statement of the charges against him.

**OUTCOME:** The court affirmed the Board's decision to suspend the chiropractor's license.

**CORE TERMS:** patient, chiropractic, injection, chiropractice, definite, cancer, chiropractor, notice, dispensing, verified, license, food, own testimony, prescription, hypodermic, inject, needle, detailed statement, administering, incompetent, suspension, prejudiced, diagnosed, apprised, notified, treating, verify, oath, inappropriate, prescribed

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Administrative Law > Agency Adjudication > Hearings

HN1⭐ Conn. Gen. Stat. § 54-177(b) provides that notice shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; (4) a short and plain statement of the matters asserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter upon application a more definite and detailed statement shall be furnished. More Like This Headnote

Administrative Law > Agency Adjudication > Hearings

HN2⭐ A notice is adequate under Conn. Gen. Stat. 54-177(b) if it states the charges with sufficient particularity so that the plaintiff may be fairly apprised of the nature of the offense with which he is charged. More Like This Headnote

Administrative Law > Agency Adjudication > Hearings
Administrative Law > Judicial Review > Standards of Review > Standards Generally

HN3⭐ Conn. Gen. Stat. § 20-45 provides, in part, that proceedings relative to the revocation, suspension or annulment of a license or toward disciplinary action may be begun by the filing of written charges, verified by affidavit, by the commissioner of health services. Conn. Gen. Stat. 4-183(g) provides, in part, that the court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of statutory provisions; (3) made upon unlawful procedure; and (4) affected by other error of law. More Like This Headnote

**JUDGES:** Maloney, J.

**OPINIONBY:** MALONEY

**OPINION:** MEMORANDUM OF DECISION

The plaintiff appeals a decision of the Board of Chiropractic Examiners (the "Board") suspending his license and imposing other penalties pursuant to General Statutes §§ 19a-17, 20-29, and 20-45. This appeal is taken pursuant to General Statutes § 4-183.

On November 15, 1990, the defendant Board notified the plaintiff of a hearing on charges that had been brought against him by the Department of Health Services. The hearing was called pursuant to General Statutes § 20-29. The charges concerned treatment rendered to his patient, Donald Pereyra. The specific statement of charges read as follows:

> 3. The (plaintiff's) care and treatment of Donald Pereyra failed to conform to the standard of care for chiropractics in the State of Connecticut in one or more of the following ways:
>
>> a. he advised and instructed the patient in the use of the substance "Neythymin"; and/or
>>
>> b. he dispensed the substance "Neythymin" to the patient; and/or

    c. he advised and instructed the **[*2]** patient in the use and/or **injection** of the substance "Neytumorin"; and/or

    d. he provided hypodermic needles to the patient for the **injection** of the substances "Neytumorin", and/or "Neythymin"; and/or

    e. he instructed the patient in the use of hypodermic needles for the **injection** of "Neythymin" and/or "Neytumorin".

    4. The above conduct is a violation of the following sections of the Connecticut General Statutes:

    a. § 20-28; and/or

    b. § 20-29; and/or

    c. § 20-45

Upon receipt of these charges, the plaintiff applied for a more definite and detailed statement pursuant to General Statutes 4-177(b). The defendant Board responded to the application in part and objected in part.

The hearing was held on December 6, 1990, before a panel of Board members consisting of three members who were chiropractors and one lay member. The plaintiff appeared and was represented by counsel. At the commencement of the hearing, the plaintiff renewed his application for a more definite statement of the charges, but the Board sustained the objections previously filed by the Department of Health Services. During the hearing on the charges, both sides presented witnesses, whose testimony was **[*3]** taken under oath and subjected to cross-examination, as well as various documentary evidence. The plaintiff testified in his own behalf. Following the hearing, the Board issued a written decision holding that the plaintiff had rendered negligent or incompetent care in treating his patient, particularly in prescribing and dispensing the substances "Neythymin" and "Neytumorin." Pursuant to General Statutes §§ 19a-17, 20-29 and 20-45, the Board suspended the plaintiff's chiropractice license for six months; imposed a civil penalty of $ 4000; and imposed a one year probationary period with certain conditions following the suspension.

Inasmuch as the action of the defendant Board adversely affects the plaintiff's license to practice his profession as well as his property, the court finds that he is aggrieved and has legal standing to bring this appeal. See Light Rigging Co. v. Department of Public Utility Control, 219 Conn. 168, 173 (1991).

The plaintiff's appeal challenges the Board's findings and conclusions as well as some aspects of the procedure. The court will take up each claim separately.

Prescription of Neythymin and Neytumorin

The plaintiff claims **[*4]** (1) that there was insufficient evidence to support the Board's finding that the plaintiff "prescribed" the substance Neythymin and (2) that the Board did not adequately explain its conclusion that furnishing the substance to the patient was an inappropriate form of chiropractice treatment or outside the scope of chiropractic practice. The basis of the plaintiff's argument concerning the prescription of Neythymin is that the word "prescription" has a limited technical meaning which is restricted to a physician's

direction for the use of medicine. Since there was no evidence that Neythymin is a "medicine", the plaintiff argues, he could not have "prescribed" it. The plaintiff's exercise in semantics is without merit. The court has carefully examined the record, including the transcript of the plaintiff's own testimony. That contains ample evidence that the plaintiff approved the use of Neythymin and instructed and advised the patient how to inject the substance into his body. He also provided the patient with a schedule for taking the substance. In short, the plaintiff encouraged and assisted the patient in taking the substance. That is the essence of the Board's findings concerning [*5] the plaintiff's handling of Neythymin and also the other substance, Neytumorin. The Board's use of the words "prescribe" and "prescription" does not affect the plain meaning of its findings and conclusions and is of no significance.

The plaintiff's principal argument concerning the dispensing of these substances is that the Board failed to set forth the basis of its conclusion that such conduct was inappropriate or outside the scope of the practice of chiropractic. The court disagrees. A crucial, undisputed fact in this case is that the patient was suffering from cancer, which was diagnosed shortly after the plaintiff began treating him for neck and shoulder pains. The plaintiff was at all times aware of the cancer, having himself referred the patient to medical doctors for that diagnosis. The plaintiff began dispensing and assisting the patient to take the substances, Neythymin and Neytumorin, after the cancer was diagnosed. The plaintiff's own evidence, including in particular the affidavit of Bonnie R. Rabin, as well as the testimony of the patient's widow, clearly established that the purpose of administering the substances was to treat the patient's cancer rather than [*6] any condition legally treatable by the practice of chiropractic. General Statutes §§ 20-24 and 20-28, which set forth the definition and limitations of the practice of chiropractic, plainly do not permit a chiropractor to treat cancer. The evidence in the record and the applicable law, therefore, provide ample support for the Board's conclusion that the plaintiff's administering or advising and instructing the patient to take Neythymin and Neytumorin was outside the scope of legally allowable chiropractice practice. All of the evidence, in particular the plaintiff's own testimony, also established that these substances were not appropriate in chiropractic treatment.

Finally, the Board, being composed of a majority of licensed chiropractors, was entitled to rely on its own expertise in determining the scope of the practice of chiropractic and what constitutes appropriate practice in a particular case. Levinson v. Board of Chiropractic Examiners, 211 Conn. 508, 525 (1989). As indicated, in this case there was substantial evidence presented to the Board which supported its determinations.

**Injections** - Hypodermic Needles

The Board found that the plaintiff [*7] instructed the patient on the use of a hypodermic needle to inject himself with Neythymin and Neytumorin. It also found that this conduct was outside the scope of chiropractice practice. As indicated above, there was considerable evidence, including his own testimony, that the plaintiff instructed the patient on the use of hypodermic needles. General Statutes § 20-28 provides in part, that a chiropractice may "treat the human body . . . by the oral administration of foods, food concentrates, food extracts or vitamins." The statute does not provide that a chiropractor may inject any substance into a patient, and the plaintiff concedes that doing so would exceed the scope of chiropractic practice. The Board's conclusion that the plaintiff's instructions to his patient on how to perform an **injection** is as much in excess of the permissible scope of practice as would be performing the **injection** himself is logical, and not unreasonable or arbitrary. The court will not, therefore, disturb it. Levinson v. Board of Chiropractic Examiners, supra; Griffin Hospital v. Commission on Hospitals and Healthcare, 200 Conn. 489, 495-496 (1986).

Request [*8] for More Definite Statement

The court has examined the original statement of charges, the plaintiff's application for a

more definite statement, and the response of the Department of Health Services. <sup>HN1</sup> General Statutes 54-177(b) (Rev'd to 1989) provides as follows:

> (b) The notice shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; (4) a short and plain statement of the matters asserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter upon application a more definite and detailed statement shall be furnished.

<sup>HN2</sup> A notice is adequate under that statute if it states the charges "with sufficient particularity so that (the plaintiff) may be fairly apprised of the nature of the offense with which he is charged." Jaffe v. State Department of Health, 135 Conn. 339 (1949); Levinson v. Board of Chiropractic Examiners, supra. [*9] The original statement of charges, augmented by the Department of Health Service's response to the request for more definite statement, notified the plaintiff he was accused of violating General Statutes §§ 20-28, 20-29 and/or 20-45, in that he performed "illegal, incompetent or negligent conduct in the practice of chiropractic." More specifically, it focused on the care and treatment he provided his patient, Donald Pereyra, from May 1987 to December 1987. As indicated above, the statement of charges specified the precise misconduct as involving the handling of the substances "Neythymin" and "Neytumorin" in the treatment of that patient. The court concludes that the statement of charges furnished the plaintiff by the Department of Health Services was adequate in that it fairly apprised him of the nature of the offenses with which he was charged.

Affidavit

The plaintiff contends that the failure of the Department of Health Services to verify its statement of charges with an affidavit, as provided in General Statutes § 20-45, requires that the Board's decision be reversed. The court disagrees.

<sup>HN3</sup> Section 20-45 provides, in relevant part, that "proceedings relative to the revocation, [*10] suspension or annulment of a license or toward disciplinary action may be begun by the filing of written charges, verified by affidavit, by the commissioner of health services. . . ." No affidavit accompanied the statement of charges in this case. General Statutes 4-183(g) (Rev'd to 1989) provides, in relevant part, that "the court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of . . . statutory provisions; . . . (3) made upon unlawful procedure; (4) affected by other error of law. . . ." (Emphasis added).

Although the Department of Health Services did not comply with the provision in General Statutes § 20-45 concerning the affidavit in this case, it verified and supported its charges against the plaintiff during the hearing by testimony of witnesses under oath and the introduction of other evidence. The Board found, and the court concurs, that there was substantial evidence to support all of the original charges except the accusation that [*11] the plaintiff himself injected the substances into the patient. A remand of the case to verify

Search - 100 Results - injection equipment
Case 3:00-cv-02167-JCH   Document 85-3   Filed 12/16/2005   Page 17 of 17
Page 6 of 6

the charges would be unnecessary, therefore. The plaintiff was afforded a complete and adequate statement of the charges against him and was afforded all of his statutory and constitutional rights during the hearing when those charges were verified by the evidence. Under these circumstances, the court cannot conclude that "substantial rights of the (plaintiff) have been prejudiced" by the failure to comply with the affidavit requirement in section 20-45. The court may not reverse the agency decision on that account, therefore.

The plaintiff's appeal is dismissed.

Source:  Legal > States Legal - U.S. > Connecticut > Cases > **CT State Cases, Combined**
Terms:  **injection equipment** (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Friday, December 9, 2005 - 2:55 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🅐 - Citing Refs. With Analysis Available
🅘 - Citation information available
* Click on any Shepard's signal to Shepardize® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.