FILED

2005 DEC 16 P 4: 08

US DISTRICT COURT
BRIDGEPORT CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE | : | |
| Plaintiff, | : | CIV. NO: 3:00CV2167 (JCH) |
| v. | : | |
| BRIDGEPORT POLICE DEPARTMENT, ET AL | : | |
| Defendants | : | DECEMBER 15, 2005 |

**DEFENDANTS' RESPONSE TO MOTION FOR CLARIFICATION
AND THE DEFENDANTS' REQUEST TO CLARIFY "INJECTION EQUIPMENT"**

<u>Introduction</u>

The Plaintiffs have noted in their response to Defendants' position regarding the Motion for Contempt that the Court has included "cookers" as excluded within the definition of drug paraphernalia based upon the January 2001 Order. The Defendants contend that this was not a clear intention of the Court and that the Court should clarify its Order that the police not stop, arrest, punish or penalize a person based solely upon the person's possession of up to thirty sets of needles and syringes as permitted by C.G.S. Section 19a-124(b) and as reflected in C.G.S Section 21a-240(20)(A)(ix). The Defendants argue that this clarification should be made by the Court because: (1) it is consistent with the testimony, evidence and claims for relief in the original action heard by this Court and the plaintiffs present

BMF05150                                1

interpretation goes beyond the facts and intention of the original action; (2) limiting the ruling to solely hypodermic syringes and needles is consistent with the purpose of the 1992 legislation amending C.G.S. Section 19a-124 and Section 21a-240(20)(A)(ix); (3) the interpretation of Section 21a-240 does not lead to a conclusion that the statute exempts from drug paraphernalia "cookers" or any other injecting drug equipment other than the 30 hypodermic syringes and needles; and (4) the Plaintiff has misinterpreted the meaning of injection equipment enunciated by the Court in the January 2001 Order.

## The Prior Court Documents Do Not Support The Plaintiffs' Request For Inclusion Of Cookers Or Other Objects As Part Of Injection Equipment

In the original action filed by the Plaintiffs, the parties submitted to the Court numerous memoranda regarding the requested ruling by the Court. The complaints by the original John Does as set froth in the Plaintiffs Memorandum was that the Bridgeport Police Department was "making illegal arrests based on syringe possession," or "stopped, searched and arrested people for possession of syringes." (Exhibit A - Plaintiffs' Memorandum in Support of Motion at pages 9-10.) The Plaintiffs further indicate that the action was despite the efforts to educate that the exchange permits the legality of syringe possession (Id.). The Plaintiffs further discuss the fear of clients carrying syringes (Id. at 10). In the Plaintiffs 2000 memorandum there is a consistent use of the terms syringes and injection

equipment as if they are interchangeable. In response to the Plaintiffs claims, the Defendants raised issues related directly to the syringes, the Program participants, and the drug residue contained in used syringes. The Memorandum of Decision dated January 18, 2001 does not address the issue of cookers. In fact, the Court referred to the issue in the action at least eight times within the Memorandum (Exhibit B - Ruling at pages 7,13,15, 17, 18, 21, 26,and 44.) The Court noted on each instance that the issue involved the arrest of drug users for possession solely of "less than thirty-one hypodermic syringes and needles whether sterile of previously used or for the possession of trace amounts of narcotic substances contained therein as residue." (Id. at page 13).

The Ruling by the Court did not address the issue of arrests for an item referred to as a "cooker." The Ruling did not even use the word "cooker". However, the Plaintiffs argue that the Court included this as an item within the exclusion for arrest as drug paraphernalia and, as such, the stopping, arresting, or penalizing for the possession of a cooker is contrary to the Court's Order of January 18, 2001. Given the issues raised in 2000 and 2001, the Defendants contend this was not a clear ruling of the Court and, in fact, cooker or other objects were not intended to be included within the Court ruling. The Defendants further contend, as set forth below, that such an extension would be inconsistent with the criminal laws of the State of Connecticut and beyond the scope and intent of the legislation establishing a needle

exchange program that provides clean needles to individuals in exchange for used needles to prevent the sharing of needles and the spread of HIV and hepatitis.

## Limiting The Ruling To Needles And Syringes Is Consistent With The Legislative Intent And The Law As It Has Been Amended

This Court presented an extensive analysis of the law as it relates to the possession of needles and syringes in Connecticut as part of the Ruling of January 18, 2001 (See pages 44-71). The final conclusion of the Court related to The residue that was remaining in the used syringes in conjunction with the Establishment of the Needle Exchange Program pursuant to C.G. Section 19-a 124 as well as the availability of syringes and needles pursuant to C.G.S Section 21a-65 (b). In reviewing each of the statutes with the ensuing amendments, the Court remarked as to the changes that followed the legislation of hypodermic Syringes and needles without the threat of arrest because of the health concern to Remove used syringes and needles and to encourage the exchange for clean syringes and needles. There was never a whisper in the legislative hearings or through the Introduction of any amendment that the Needle Exchange Program was now a Needle and cooker program. None of the criteria of the Program require that the Participant ever return the object that they may have utilized as a cooker. The Needle Exchange Program is adamant that there must be an equal exchange of Syringes and needles for the same. This can probably be easily explained when the

BMF05150

4

Court is able to hear testimony as to what is actually a "cooker." Unlike the syringes and needles that at one point required a prescription and are still controlled by the pharmacist, physician or Needle Exchange Program, any object can be used as a cooker that can withstand the heat. Therefore, the legal protections that surround the syringes and needles has never existed in relation to what may be termed a cooker.

This Court can also compare the extent of a needle program with the neighboring state of Massachusetts that in 2002 had a challenge regarding the carrying of needles and syringes. While the issue in Massachusetts was a little different, the facts involved the operation of the Needle Exchange Program and its parameters. Attorney Alicia Young, as counsel for the ACLU, argued in her memorandum about the protections of the Needle Exchange Statutes. She indicated that the law was to permit the possession of syringes (Exhibit C - Memorandum in <u>Commonwealth v. Landry</u>, NO. SJC-08757 at pages 11-12). Attorney Young also specifically argued that the needle exchange statute aims to curb the spread of the blood borne diseases through contaminated syringes. There was nothing in the Massachusetts case about the extension of the program to the so called cooker or any other item. The Connecticut version of Massachusetts' Needle Exchange law provides that, as part of the Needle Exchange Program, an individual can receive up to thirty needles and syringes per exchange [C.G.S. Section 19a-

124(b)(1)(A)]. Nothing in the law speaks to the legality of carrying "cookers" or any other items utilized in the illegal use of drugs. The criminal statute referred to by the Court, and also the focus of a portion of the Plaintiffs' arguments, does not define the term "injection equipment." In fact, nowhere in the statutes is there a reference or listing as to what is injection equipment. Yet the Plaintiffs are arguing that this term, at least right now, was intended to include an item described as a "cooker." The reference to the statute utilized by the Plaintiffs is in regard to the definition of "drug paraphernalia." C.G.S. Section 21a-240 actually describes the illegal equipment, products, and materials that fall within the definition of drug paraphernalia. In this regard section (ix) indicates very clearly that if there are more than 30 hypodermic syringes, the equipment is drug paraphernalia. The section also states that other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body are considered drug paraphernalia. The Plaintiffs indicate that this portion of the statute is intended to exclude from drug paraphernalia any items such as cookers utilized for the narcotic substance. In viewing this portion of the statute, however, it does not refer to the items that may be utilized for the preparation of the narcotic substance or for the storage of the product but it is exclusively designed to exclude the object that is utilized to inject the substance. This interpretation would be consistent with the Needle Exchange Program.

There is no referral in C. G. S. 19a-124 that includes the exchange of any other equipment for public health considerations within the statute. This is not to say that the use of a number of other devices may not create a health risk for the spread of hepatitis or HIV, but the purpose of the program was never intended to have such a broad reach to include every possible method of the spread of the disease. The main purpose was to address the sharing of needles and reusing needles that may be infected. In this regard the needle exchange program contained a provision that the client was required to return the needles and syringes for an equal number up to thirty to be provided. There is no provision within the legislation enacted to promote this Program that requires the client to return any other equipment. This is so because the studies that were conducted to justify this Program targeted and identified the needles and the syringes as the cause of the spread of disease, the same as the Massachusetts program. The Plaintiff referred to numerous articles and studies throughout the memorandum but no specific studies were ever introduced to the Connecticut legislature that support the position that cookers and other objects should be exempt from the drug paraphernalia statute other than the exclusion of a quantity under 31 syringes or needles that is permitted as a menas to promote public health concerns.

### The Needle Exchange Program Does Not Violate The Law By Distributing Educational Material And An Initial Packet

The Plaintiffs' assertions that the Needle Exchange Program provides illegal equipment is spurious. First of all, the Program provides what is described as an initial information kit. This kit contains educational material as well as various items, including cotton, alcohol, bleach and a metal type cap that is an example of the type of container a drug user may utilize. In the form provided by the Exchange, the object is nothing more than a metal container. It is the same as a bottle cap, a metal ashtray, aluminum foil or any other object that the drug user can heat the solid narcotic substance or reduce it to a liquid. The object actually becomes a cooker because of the way it is utilized. Without exposure to heat and the addition of narcotics, it is not a cooker. Therefore, for the Plaintiff to assume that the item in the packet given by the Health Department, in and of itself, is illegal, is misleading and an improper assumption. In 1999, the Act provided that the first time program participant may be given "an initial packet of thirty needles and syringes, educational material and a list of drug counseling services; and (c) . . . that a person receive only one such initial packet over the life of the program." The object is not illegal until drugs are placed in the object. However, this is unlike the placement of the narcotic in the syringe because the client in the Needle Exchange Program must return the syringe to the Program to receive a like exchange. No one requires the

object used as the cooker. There are several reasons for this. First of all, the legislation introduced in this State never mentioned the exemption for cookers. No one presented studies or documentation to the legislators that there is such a spread of disease from the cookers that a program should require their replacement. Additionally, although the Plaintiff includes an article that discusses the use of a cooker, there are no studies similar to those related to the syringes or needles that demonstrate without an exchange there is a public health risk or requiring the distribution of a new replacement for an exchange of cookers. It is interesting to note that although the program may distribute as many as 30 needles and syringes to first time participants, the package contains only one such metal cap that is utilized to educate as to the proper sterilization. The distribution of a metal cap is not in and of itself a violation of the law.

### "Cookers" Are Not Part Of The Public Health Concern That Caused Adoption Of Legislation For Needle Exchange

There are studies that provide information that the simple procedure of heating the object which may be utilized as the so called cooker reduces or eliminates the spread of disease that is obvious from the re-use or sharing of needles and syringes. For instance, in a 1999 study that included Dr. Heimer, there were theories that the survival of HIV-1 depended upon the temperature achieved. In that study there was a determination that temperatures exceeding on average 65

degrees C reduced for 15 seconds or longer "reduced viable HIV –1 below detectable levels." ["HIV –1 transmission in injection paraphernalia: heating drug solutions may inactivate HIV-1", Clatts MC, HeimerR., Abdala N., Goldsamt LA, Sotheran JL, Anderson KT, Gallo TM, Hoffer LD, Luciano PA, Kyriakides T., National Development and Research Institutes, Inc. New York, New York (October 1999) (Exhibit D). The studies and material introduced at the time of the original legislation and with the amendments consistently referred to the syringes and needles, but never addressed cookers or any other injection material that is tangentially referred to by the Plaintiffs in their memorandum as part of the protection afforded under the law. In fact, the affidavit of Dr. Heimer submitted by the Plaintiff dated November 8, 2000 did not include a requirement for the exchange of what is called a cooker by the client. Dr. Heimer specifically outlines why the Needle Exchange Program is necessary when he states, "Exchange programs remove used, potentially infectious syringes from circulation." (Heimer affidavit November 8, 2000 paragraph 28.) He also states that the fear from IDU's is the risk associated with sharing syringes, including HIV. For user's, however, this fear of the long term illness resulting from sharing syringes is secondary to the need to maintain drug use in order to avoid withdrawal (Heimer affidavit, paragraph 22). The affidavit of Dr. Heimer also indicates that the difficulty often encountered by the users is the fear of carrying the syringes because of arrest for drug paraphernalia laws. He stated, "safe access to

syringes is therefore crucial if IDU's are not to share syringes or engage in other risky behavior. Dr. Heimer never offered studies regarding the need to control and exclude cookers from the drug paraphernalia statutes because they may be the source of serious disease. Although he now discusses disease from a cooker, the law of the State of Connecticut never intended to exclude cookers or any other objects from drug paraphernalia and no such evidence or testimony was utilized during the legislative hearings that would give rise to this theory. Secondly, even if there is a chance that a "cooker" or other item could potentially spread disease, there are no studies introduced at this time and, more importantly, to the legislature that would permit the extension of the law to include "cooker" as part of the injection equipment in accordance with the January, 2001 Order. While it is true that an object used to heat the narcotics can, in some instances, be a source of disease, there is no documentation that there is the same risk because the object can be disinfected with bleach or through heating and as such is not at all similar to the needles that are injected into the body of the drug user. Additionally, the Item used by the drug user was never, in its initial form an illegal tem like a needle and syringe. Although a metal-like object is included in an initial packet to clients, this object looks like a bottle cap or could just as easily be a piece of aluminum foil, spoon or other innovative objective of which possession is not prohibited under the law. Lastly, the

legislative history and intent of the legal possession of needles and syringes included very specifically the use of needles and syringes only (Exhibit E – Remarks of Senator Avallone, May 5, 1992 at 3375).

The Plaintiffs are attempting at this time to extend the Court Order to include within the terminology used by the Court, cookers and other undefined items. This extension is not only an incorrect reading of the Court's Order, but is an attempt to usurp the authority of the legislature of Connecticut by asking this Court to extend the objects intended for exclusion from the criminal laws to those beyond the statute and beyond the intent set forth by the legislature to address the health concerns of people sharing needles and syringes. In this regard, every study referred to during the legislative hearings discussed the spread of disease through the sharing or re-use of syringes and needles. The very statute that was the impetus for the change in the law excluding up to 30 hypodermic syringes and needles from the durg paraphernalia statute never speaks to the other objects such as cookers. Jackie Cocco, in her comments, stated that if police stop an individual and "there's no evidence that they see that leads them to believe that drug activity was present, despite the fact that they find the needles and syringes which are no longer drug paraphernalia if we pass this law, they cannot seize them and test the residue for substance abuse." (Exhibit F - Legislative Hearings, Saturday, May 2, 1992 at page 128, Exhibit L to Plaintiffs exhibits for Preliminary Injunction). This statement clearly

demonstrates that the drug paraphernalia that was to be permitted included only the needles and the syringes or other injecting objects with or without narcotic substances. It is improper to ask this Court to not only clarify and Order, but to expand the parameters of the Order to objects that were not considered in the original legislation or thereafter to further reduce the potential for disease. The 2001 Court Order involved very narrow questions as to the authority to stop and arrest for residue in the syringe and whether officer could stop for solely the possession of needles and syringes (Exhibit G-ACLU Drug Policy Press Release, January 19, 2001). Even the comments of their representative that the ruling assures "needle exchange programs and anyone who carries a syringe that they can stand up for their rights and win" does not extend the Court's ruling to anything more than needles.

### The Plaintiffs' Have Misinterpreted C.G.S. 21a-240(20)(A)(Ix)

Connecticut General Statute 21a-240 contains definitions of drug paraphernalia under the criminal law. In particular, this section is referred to specifically by C.G.S. Section 21a-267 in the delineation of drug paraphernalia. The Plaintiffs contend that Subsection (20)(A)(ix) exempts from criminal prosecution a cooker that is utilized in conjunction with hypodermic syringe or needle. In particular, the Plaintiff contends that the referral in the section to other objects used, intended for "use or designed for use in parenternally injecting controlled substances

into the human body" are the controlling words to also exclude a cooker form drug paraphernalia. Not only does the language of the statute not refer to objects like a cooker, but the history of the amendment of this statute does not lend support to the Plaintiffs' position. The changes in C.G.S. Sections 21a-65 and 21a240(20)(A)(ix) consistently earmarked only the number of needles and syringes permitted to be given in conjunction with the legislation for needle exchange and the number of hypodermic needles and syringes that could be provided or sold in accordance with C.G.S. Section 21a-65.

This Court, in interpreting Connecticut law, determined that hypodermic syringes and needles are drug paraphernalia only if there is a quantity greater than 30 even if the syringe has drug residue. The Plaintiffs, without solid support, have contended that this section applies to objects such as "cookers" in excluding from a finding of drug paraphernalia. The Plaintiffs' contentions are misguided for at least two reasons. First of all, if the section was interpreted to refer to cookers, the exclusion would be inconsistent with the statutory amendments that permitted only possession of needles as a method of addressing health concerns. The exclusion in Section 21a240(20)(A)(ix) was based upon the fact that the legislature was permitting the distribution of syringes and needles to needle exchange programs pursuant to C.G.S. Section 19a-124 and also permitting pharmacies to distribute syringes and needles of up to 30 without a prescription. It was consistent to amend

the drug paraphernalia statute so as to remove from criminal liability objects that were now legally accessible. In that regard, the possession of up to 30 syringes and needles should be logically excluded. However, the statutory scheme that addressed the health concerns did not consider the legalization of other "objects" to prevent the spread of HIV or hepatitis. C.G.S. Section 19a-124 does not specifically refer to the distribution of a "cooker" requiring an exchange for health reasons. C.G.S. Section 21a-65 permits the distribution of syringes and needles to needle exchange programs and to an individual with a numerical limit by a pharmacist. Based upon this premise, it is not consistent to include a cooker with this section.

However, in viewing the language and examining the application of this section, it is clear that subsection (ix) does not refer to any object except one that is actually used for the injection into the human body. The cooker referred to by the Plaintiffs is an object used to mix the drug and not to inject it. The language in the statute refers to the use in parenterally injecting controlled substances. Webster's Ninth Collegiate Dictionary, 1986, defines parenterally as "situated or occurring outside the intestine . . . introduced otherwise than by way of the intestine." This phraseology refers specifically to the method of injecting the controlled substance into the body that is not through the digestive process. It is not a reference to the ancillary object used to prepare the narcotic by heating the narcotic substance to a liquid form to allow the substance to be drawn into a syringe. The interpretation of

this subsection includes only the object utilized as a means of actually injecting the narcotic substance. This would be consistent with the plain language. The Plaintiffs' analysis is also inconsistent with the amendments to the other statutes to permit the distribution of up to 30 syringes and needles. It is, therefore, the position of the Defendants that the use of subsection (ix) as a means to exempt cookers is inconsistent with the history of the amendments to the statutes concerning needles and syringes and an improper interpretation of the plain language to include an ancillary object.

### Injection Equipment Does Not Include Cookers Or Other Undefined Drug Paraphernalia

Although the Court, in it's January 18, 2001 Order, refers to "injection equipment," there is no such reference to this term in the statutes regarding the Needle Exchange Program. The statutes concerning the Needle exchange Program refers to "hypodermic syringes and needles . . ." C.G.S. Section 21a-267, which prohibits drug paraphernalia, refers to subdivision (20) of Section 21a-240. This section, as noted above, does not use the term injection equipment, but refers specifically to the "hypodermic syringes and needles or to objects . . . in parenterally injecting controlled substances."

The only documents which use the term "injection equipment" are the Memoranda of the Plaintiffs in this action in which they re-state the statutory

language with their own terminology of "injection equipment." (Exhibit H – page 1 of the Plaintiffs' Reply Memorandum). In fact, in this memorandum the Plaintiffs refer to the new and used equipment for the Exchange Program. Thereafter, the Plaintiffs continue to use interchangeably the distribution of syringes with the term injection equipment, although nowhere in the statute is this term specifically utilized. For instance, at page 7 of the Plaintiffs' Memorandum they refer to C.G.S. Section 19a-124 requiring the return of used "injection equipment," but the exact language of the statute requires the return of "an equal number of needles and syringes" for those provided. The Plaintiffs' substitution of their own language for that enunciated in the statute has created confusion. There is no requirement under the law or within the state policies for a return of any other objects, as the Plaintiffs' terminology would lead you to believe. Therefore, the only injection equipment that is designated by the statutes is "syringes or needles."

The Plaintiffs use of this terminology has improperly grouped together all objects or items used by the drug user. Even the ACLU, in its recent distributions, has recognized that not all of the equipment utilized by the drug user is part of the Needle Program and there is an effort to address and expand the Program in the future to include "drug preparation equipment" that may have a potential to cause harm (Exhibit I). However, to date no such efforts have been made, at least with the Connecticut legislature, to expand the present statutory exclusion of needles and

syringes to other objects as part of the injection equipment the Plaintiffs now include. Therefore, in reviewing specifically the concerns raised in the legal action before this Court in 2000-2001, the only materials addressed by the Court under the auspices of injection equipment were the syringes and needles, used or new, permitted pursuant to Connecticut State law.

The definitional section of Section 21a-240 does not include a specific definition of "injection equipment." Case law in Connecticut does not specifically define injection equipment. However, in George Zabrecky v. Ct. Bd. of Chiropractors, 1991 Conn. Super Lexis. 2682, 2685 (Nov. 15, 1991), the court discussed injections in conjunction with hypodermic needles (attached). Therefore, the injection equipment referred to by this Court in its Order has always been perceived by the Defendants as hypodermic syringes and needles consistent with the statutory scheme for the Needle Exchange Program. To expand the parameters of drug paraphernalia is contrary to the history and the plain language.

Therefore, the Defendants request that this Court find that the Order of January 18, 2001 addressed only the possession of syringes and needles that are new or contain residue.

Additionally, the Defendants request that this Court make a specific finding that C.G.S. 21a-240(20)(A)(ix) does not exclude cookers form items designated as drug paraphernalia.

THE DEFENDANTS

By: _____
Barbara Brazzel-Massaro
Associate City Attorney
OFFICE OF THE CITY ATTORNEY
999 Broad Street - 2nd Floor
Bridgeport, CT  06604
Telephone #203/576-7647
Fed. Bar No. 05746

BMF05150