among users is high, the typical user is focused on preventing the painful process of withdrawal. *See* Kinzley Dec. at ¶5; Heimer Dec. at ¶ 23. Users know that one false move can land them in jail, and that within a few hours in jail – even if the charges are dropped – the painful process of withdrawal will begin. *See* Kinsley Dec. at ¶ 10; Heimer Dec. at ¶ 23. Users who fear arrest stop visiting the Exchange, begin reusing syringes, and thereby end up in a situation where they transmit or contract HIV. *See* Bluthenthal Dec. at ¶ 13. Police harassment discourages users from employing safe injection practices. *See* Heimer Dec. at ¶ 23; Bluthenthal Dec. at ¶ 14; Kinzley Dec. at ¶ 10. As one user put starkly explained, "I would rather get AIDS than go to jail." Ricky Bluthenthal et. al., *Collateral Damage in the War on Drugs*, 10 International J. of Drug Policy 25, 28 (1999) (attached as Exh. D to Heimer Dec.). Based on their knowledge of Department practices, users are much more likely to share syringes and discard syringes in public places where third parties might injure themselves and risk infection. *See* 33 Conn. H. Proceedings, H-575, at 7809 (1990) (Rep. Grabarz).

### C. Bridgeport Police Department Interference with Bridgeport Exchange Program

The defendant Police Department undermines a crucial public health initiative and endangers the health of users and the larger Bridgeport community, as well as violating constitutional rights, by making illegal arrests based on syringe possession. For the past eight years, the Department has stopped, searched, and arrested people for possession of syringes. *See* Kinzley Dec. at ¶ 8-9; Clark-Smith Dec. at ¶ 6; Givens Dec. at ¶ 7. These arrests have involved many different officers and have occurred at various locations in the city. The arrests have continued despite many attempts by Exchange workers to educate the police on the legality of Exchanges and syringe possession. *See* Givens Dec. at ¶ 8. The police have refused to allow Exchange workers to address police officers in their formal training sessions. *See* Kinsley Dec.

MEMO OF P&A IN SUPP. MOTION FOR T.R.O.  9

at ¶ 11. While some police officers understand the status of the Exchange and safe injection equipment, many officers continue to harass and arrest users for possession of injection equipment, in violation of the statute directly on point. *See* Kinzley Dec. at ¶ 8-9; Clark-Smith Dec. at ¶ 6; Givens Dec. at ¶ 7. This pattern of illegal arrests has continued for many years and is not being controlled by training. Only a court order can put an immediate stop to this practice and protect the health of thousands of users in Bridgeport.

Officers use the fear of arrest to discourage clients from carrying syringes. For instance, the officer who arrested Mr. Doe on September 11, 2000, told Mr. Doe he would arrest him every time he saw Mr. Doe in the area of the park. *See* Doe Dec. at ¶ 16. That this threat was more than mere words is evidenced by the officer's subsequent behavior. During the week of September 25, 2000, Doe was stopped again by a Bridgeport police officer. This time, he was not charged with a crime, but the officer told Doe that he would be arrested if the officer found Doe in the neighborhood again. *See* Doe Dec. at ¶ 17. This incident, along with the prior arrest, made Doe afraid to carry injection equipment. *See id.* Although no arrest was made or summons issued, he was subject to a seizure as defined by the Supreme Court. *See Terry v. Ohio*, 392 U.S. 1 (1968). There is thus a credible and direct threat to Doe's continued constitutional right to be free of searches and seizures absent probable cause. Equally important, the entire user community knows about this verified police practice and fears arrest. *See* Givens Dec. at ¶ 9; Kinzley Dec. at ¶ 8.

## III.   ARGUMENT

The standard for issuing a temporary restraining order is well-settled: a party seeking a TRO must demonstrate irreparable harm should the relief not be granted, and "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Able v.*

MEMO OF P&A IN SUPP. MOTION FOR T.R.O.

10

Exchange takes previously-used, potentially-infectious syringes out of circulation and thereby reduces the spread of HIV and other blood-borne diseases by increasing the availability of injection equipment and of access to medical services and substance abuse treatment for injecting drug users. Declaration of Dr. Robert Heimer (Dkt. No. 7) at ¶¶ 24, 28. The Exchange requires injecting drug users to provide the Exchange with a previously-used syringe or needle in order to obtain new injection equipment. Declaration of Mark Kinzly (Dkt. No. 6) at ¶ 7; see also Bridgeport Health Department Needle Exchange Protocol (Dkt. No. 23, Ex. 2) at ¶ 7.

The plaintiffs argue in their Application for Temporary Restraining Order that the defendants continue to arrest and harass injecting drug users in Bridgeport, Connecticut, solely on the basis of the users' possession of hypodermic syringes and needles, whether sterile or previously-used. Dkt. No. 3 at 2. Givens states in his declaration that, "[w]hile working on the Bridgeport Exchange van, I frequently observed police harassment of Exchange clients." Dkt. No. 11 at ¶ 7.

The plaintiffs Doe and Roe are both injecting drug users and participants in the Exchange. Dkt. No. 1 at ¶¶ 5-6; Dkt. No. 10 at ¶¶ 4-6. Doe alleges that the

---

Id.

-7-



Kathleen Burke (Dkt. No. 23, Ex. 5) at ¶¶ 3-4. As such, the court finds that this element is satisfied with respect to a putative class of injecting drug users in Bridgeport.

B.  Commonality

Rule 23(a)(2) requires the court to find that "there are questions of law or fact common to the class." "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." Marisol A., 126 F.3d at 376 (citations omitted).

Here, the case involves a question of law common to all injecting drug users in Bridgeport: whether the defendants violate injecting drug users' fourth amendment rights by arresting them solely for the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, or for the possession of trace amounts of narcotic substances contained therein as residue. This issue, in turn, depends upon the court's resolution of the issue of the legality of the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, and of trace amounts of narcotic substances contained therein as residue. Accordingly, the court finds that the plaintiffs have satisfied the

-13-

interests will also be protecting the interests of the class." Consol. Rail, 47 F.3d at 483-84 (citation omitted).

First, as to the adequacy of the putative class counsel, the court finds that a sufficient showing has been made in the plaintiffs' filings as well as at oral arguments that the plaintiffs' attorneys are qualified, experienced and well able to conduct this litigation as a class action. See Plaintiffs' Motion for Class Certification and Memo. of Points and Authorities in Support (Dkt. No. 24) at 6. Second, the court finds that the plaintiffs are adequate representatives of a class of all injecting drug users in Bridgeport. As discussed above regarding typicality, because there are legal issues common to the class, the plaintiff Roe and Doe will be protecting the interests of the class by advancing their own legal interests in the case, i.e., to establish that possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, and of trace amounts of narcotic substances contained therein as residue, is legal in Connecticut and therefore that the defendants violate the fourth amendment rights of drug users by arresting users for such possession. Moreover, in a putative class action seeking only declaratory and injunctive relief, as here, the court finds very little reason for concern that the class representatives will have so

little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.

E.  Requirements of Rule 23(b)(2)

"Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class. Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997) (citations omitted). "Class actions under Rule 23(b)(2) are proper if injunctive or declaratory relief would be appropriate for the entire class." Duprey v. Conn. Dep't of Motor Vehicles, 191 F.R.D. 329, 338 (D. Conn. 2000) (citing 5 Moore's Federal Practice 3d § 23.42[1][a]). Here, the court finds that "the plaintiffs satisfy the requirements of Rule 23(b)(2) because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" injecting drug users in Bridgeport. Comer v. Cisneros, 37 F.3d 775, 796 (2d Cir. 1994). The plaintiffs' claims are predicated on the actions of the defendants in stopping and arresting injecting drug users for

-18-

arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, non-exchange-program-participants requires an interpretation of the Connecticut needle and syringe exchange program and criminal drug enforcement statutes that "was never intended by the legislature in enacting § 21a-240(20)(A)(ix) and Connecticut General Statutes § 19a-124," and "such an interpretation would frustrate the enforcement of drug violations and encourage the spread of drug use by society."[7]  Id.

The defendants thus concede that it is legal in Connecticut for any injecting drug user to possess less than thirty-one sterile hypodermic syringes and needles and for Exchange participants to possess less than thirty-one previously-used hypodermic syringes and needles, including any trace amounts of narcotic substances contained therein as residue.  The primary issue facing the court, therefore, is whether it is legal for any injecting drug user, whether a participant in the Exchange or not, to

---

[7] The defendants also argue that the court should make a finding that they have qualified immunity from the plaintiffs' claims and "that any past actions [by the defendants] are immune from liability." Memo. of Law of Defendants (Dkt. No. 23) at 10; see also id. at 10-15. This argument is inapposite because the plaintiff class seeks only injunctive and declaratory relief. Qualified immunity will not shield government defendants from suits for equitable relief, such as the plaintiffs' instant suit. Adler v. Pataki, 185 F.3d 35, 48 (2d Cir. 1999).

-21-

Here, the plaintiffs allege the same legal arguments to prove the defendants' liability for violating the fourth amendment rights of injecting drug users in Bridgeport. The plaintiffs argue that the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used and whether empty or containing trace amounts of narcotic substances as residue, is legal under Connecticut law. Therefore, the plaintiffs argue, any arrest that is made solely on the basis of such possession violates the fourth amendment. The fact that some injecting drug users are active participants in the Exchange while others are not does not alter this analysis. Plaintiff Roe alleges that he was arrested for possession of less than thirty-one hypodermic syringes or needles after identifying himself as a participant in the exchange. See Declaration of John Doe (Dkt. No. 9) at ¶¶ 10, 13. However, plaintiff Doe did not seek to protect himself by identifying himself as a participant in the Exchange when he was arrested for possession of less than thirty-one hypodermic needles or syringes. See Declaration of John Doe (Dkt. No. 10). Accordingly, Doe placed himself in the same position legally as a non-exchange-program-participant with regard to the legal arguments made to support the putative class's Fourth Amendment claims. The plaintiffs Roe and Doe, injecting

-15-

Conn. 1999) (citing Conn. Gen. Stat. § 54-1f(a); State v. Santiago, 224 Conn. 494, 498 (1994)).

According to the Second Circuit, "the Fourth Amendment provides the source for a § 1983 claim premised on a person's arrest." Singer v. Fulton County Sheriff, 63 F.3d 110, 115 (2d Cir. 1995) (footnote omitted). "The Fourth Amendment, of course, does not by its terms proscribe false arrests; it proscribes 'unreasonable . . . seizures.' An arrest, however, is a seizure, indeed it is the 'quintessential 'seizure of the person.''" Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991) (quoting Cal. v. Hodari D., 499 U.S. 621, 624 (1991)).

The plaintiffs' claims turn primarily upon allegedly illegal stops and arrests of injecting drug users for possession of less than thirty-one hypodermic syringes and needles. The injunctive relief that the plaintiff class seeks is the same for all of its fourth amendment claims. Consequently, the court limits its analysis to the plaintiffs' false arrest claim.

The plaintiffs argue that it is not a crime under Connecticut law for anyone to possess less than thirty-one sterile or previously-used hypodermic syringes and needles and any trace amounts of narcotic substances contained therein as residue. If

interpretation of them, and the effect that its action or nonaction will have on them. Dodd v. Middlesex Mut. Assurance Co., 242 Conn. 375, 386 (1997); see also In re Valerie D., 223 Conn. 492, 524 (1992) ("Furthermore, the legislature in enacting statutes is presumed to be aware of the existence of other legislation on the same or related issues; . . . and '[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law.'" (citations omitted)). "And it is always presumed to have intended that effect which its action or non-action produces." Civardi v. City of Norwich, 231 Conn. 287, 298 (1994) (citation and internal quotation marks omitted).

3. Interpretation of the Connecticut needle and syringe exchange program and criminal drug enforcement statutes

Applying these principles, the court must determine whether the possession by any injecting drug user of sterile or previously-used hypodermic syringes and needles, or the possession of trace amounts of drugs contained as residue within previously-used syringes or needles, constitutes illegal activity under Connecticut law. The court notes initially that hypodermic syringes and needles are potentially criminalized only as illegal "drug paraphernalia" under section 21a-267(a). The term "drug paraphernalia" used in section 21a-267(a) is explicitly defined in section

-44-

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

Essex, ss.                                        No. SJC-08757

---

COMMONWEALTH

v.

MARIA LANDRY
*Defendant, Appelant.*

---

ON A REPORT FROM THE
LYNN DISTRICT COURT

---

APPELLANT'S AMMENDED BRIEF,
ADDENDUM AND APPENDIX

---

ALICIA L. YOUNG
American Civil Liberties
Union Foundation
125 Broad Street
New York, NY 20004
212-549-2642
(admitted pro hac vice in the
Appeals Court)

SARAH R. WUNSCH, BB) # 548767
American Civil Liberties
Union Foundation of
Massachusetts
99 Chauncy Street, Suite 310
Boston, MA 02111
617-482-3170, ext. 323

Dated: April 24, 2002



other blood-borne diseases. As a public health initiative, the statutes must be construed broadly and liberally to achieve the Legislature's goals to curb the epidemic of AIDS and HIV transmission between injection drug users and their sexual partners and children. (Pp. 20-25). Inferring and imposing a geographic limitation on where members of a needle exchange program may possess needles and syringes would seriously undermine the purposes the Legislature sought to achieve.

In construing G.L. c. 94C, § 27(f), this Court should also consider that the Department of Public Health, the agency with the legislatively delegated responsibility to carry out the needle exchange laws and with expertise of AIDS, HIV transmission, and drug addiction treatment and prevention, has consistently and reasonably interpreted the law to impose no geographic limitation on where members of the programs could possess needles in Massachusetts. This agency interpretation is entitled to deference by the Court. (Pp. 25-31).

This Court should answer the second reported question by holding that "a person who claims to the police to be enrolled in a pilot needle exchange program and produces a facially-valid enrollment card cannot be arrested, summonsed or otherwise charged with a violation of G.L. c.

11

94C, § 27(a)." The language of § 27(f), "it shall not be a crime," means that the police do not have probable cause to arrest a pilot program enrollee, especially where the individual affirms his or her enrollment status to the police and proffers an enrollment card. To construe the statute to mean that enrollment in a needle exchange program is only an affirmative defense to be proven at trial would undermine the purposes of the needle exchange statutes and would violate the Fourth Amendment and state constitutional prohibitions on arrests without probable cause. (Pp. 31-41).

## ARGUMENT

I. THE NEEDLE EXCHANGE STATUTES PERMIT STATEWIDE POSSESSION OF SYRINGES.

    A. The Legislature Included a Geographic Restriction Only for the Siting of Pilot Exchange Programs, but Not for the Possession of Syringes.

When the Legislature legalized needle exchange programs as a public health initiative to reduce the transmission of HIV, it did so by simultaneously passing two statutory provisions: 1993 Mass. Acts c. 110, § 142 (codified at G.L. c. 94C, § 27(f))(Addend. at 4), and 1993 Mass. Acts c. 110, § 148 (codified at G.L. c. 111, § 215)(Addend. at 5). Section 27(f) as added in 1993 provided: