GRAHAM A. BOYD (CBN 18419)
REBECCA BERNHARDT (PHV 0616)
ADAM B. WOLF (PHV 0617)
ALYSE BERTENTHAL (PHV granted without number)
American Civil Liberties Union
    Drug Law Reform Project
1101 Pacific Avenue, Ste. 333
Santa Cruz, CA  95060
Telephone:  (831) 471-9000
Fax:  (831) 471-9676


Attorneys for Plaintiffs


| | |
|---|---|
| JOHN DOE, JOHN ROE, & CONNECTICUT HARM REDUCTION COALITION, | Case No. 3-00-cv-2167 (JCH) |
| Plaintiffs, | **PLAINTIFFS' POST-TRIAL BRIEF IN SUPPORT OF MOTION FOR CONTEMPT** |
| vs. | |
| BRIDGEPORT POLICE DEPARTMENT & ANTHONY ARMENO, Acting Chief of the Bridgeport Police Department, in his official capacity only, | **Court: Hon. Janet C. Hall** <br> **Filed:  February 3, 2006** |
| Defendant. | |

    This Court issued a permanent injunction in January 2001 that clearly prohibits Bridgeport Police Department ("BPD") officers from confiscating fewer than 30 syringes or Bridgeport Syringe Exchange ("Exchange") identification cards.  The injunction also clearly prohibits BPD officers from seizing an individual based solely on his participation in the Exchange.  However, the testimony elicited during this contempt proceeding established that BPD officers have flouted these clear proscriptions.  Officers have continued to confiscate syringes and identification cards, in addition to seizing individuals upon exiting the Exchange.  The evidence also demonstrates that

BPD officers, in a further display of contempt for the Court's authority, have taunted plaintiff class members and mocked the Exchange while violating the injunction.

Plaintiff class members did what was reasonable: they apprised the Exchange employees of these violations of the Court's injunction. The supervisor of Exchange then told her boss, the Director of the Bridgeport Health Department, about multiple violations of the injunction. Finally, the Director called the Chief of the BPD, a defendant in this action, to discuss the violations. There was just one problem with this approach: the Chief did not return this phone call. Nor did he return similar, subsequent phone calls from the Health Department.

Defendants' actions, or lack thereof, fall well short of the requisite diligence and energy to ensure compliance with the Court's injunction. After issuing one training bulletin, which defendants never produced to plaintiffs or submitted as evidence and which, as discussed below, plaintiffs have reason to believe materially narrowed the scope of the injunction, defendants did virtually nothing to police their compliance with the injunction. As a result, the record shows, BPD officers have conducted business as usual with—up to this point—impunity. A finding of contempt, however, along with the imposition of coercive and compensatory sanctions, will force defendants to abide by the Court's injunction. Plaintiffs, whose syringes have been routinely confiscated, cannot afford business as usual. Nothing less than their lives are at stake.

**PROCEDURAL BACKGROUND**

Two individuals and a concerned organization filed a lawsuit in this Court five years ago against the BPD, as well as Chief of Police Wilber Chapman, because BPD officers were interfering with injection drug users' ("IDUs'") right to possess injection equipment and to utilize the Exchange's services. Plaintiffs, who represented a putative class of IDUs in Bridgeport, Connecticut, alleged that BPD officers violated their constitutional rights by "searching, stopping,

arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment." Complaint (Dkt. No. 1, filed Nov. 9, 2000), at pp.15-16, ¶ A.

John Doe was one of the individual plaintiffs. Mr. Doe's declaration stated that BPD officers interfered with his ability to access safe, clean injection equipment by (1) hovering close to the Exchange, (2) threatening to arrest him for being near the Exchange and utilizing the Exchange, and (3) confiscating the injection equipment he received from the Exchange. Decl. of John Doe (Dkt. No. 10, filed Nov. 13, 2000), at ¶ 7. The declaration described two specific encounters he had with BPD officers, both of which involved the officers confiscating the injection equipment he received from the Exchange. *Id.* at ¶¶ 16-17. As a result, Mr. Doe became "very afraid to carry injection equipment . . . ." *Id.* at ¶ 17.

At the time that plaintiffs filed their complaint, Robin Clark-Smith was (as she is now) the City's AIDS Program Coordinator for the Exchange. Decl. of Robin Clark-Smith (Dkt. No. 8, filed Nov. 13, 2000), at ¶ 2. In this capacity, she personally interacted with Exchange clients. *Id.* at ¶ 4. Ms. Clark-Smith signed a declaration describing interactions between BPD officers and IDUs in 2000:

> Most often, the police do not actually arrest or detain users when they find injection equipment: they take the equipment, break it and throw it away. Because the user then has no equipment to exchange, he/she might be forced to reuse old equipment or to look for dirty, broken syringes that were not disposed of properly. . . . Our program and the police should be helping each other to do this smoothly. However, as long as users fear the police, they will avoid holding onto their injection equipment.

*Id.* at ¶ 7; *see also id.* at ¶ 8 ("We know that police officers regularly take injection equipment away from users . . . .").

Another of plaintiffs' declarants was Mark Kinzly, a researcher who studied the effectiveness of syringe exchange programs throughout the country and a former employee of the Exchange.

Decl. of Mark Kinzly (Dkt. No. 6, filed Nov. 13, 2000), at ¶¶ 2-4.  Mr. Kinzly's employment placed

him in daily contact with Bridgeport IDUs, who advised him of their experiences with BPD officers.

*Id.* at ¶¶ 4, 9.  He summarized as follows:

> [M]any users lose access to sterile injection equipment because the police
> take their equipment from them.  Users are then unable to go back to the
> exchange programs because they have no injection equipment to exchange.
> Users may then resort to sharing their injection equipment, and face the
> possibility of contracting HIV.  This is the problem facing users.  They are
> not only scared that the police will take their injection equipment, but they
> are also scared of simply being harassed by the police. . . . Almost every day,
> [injection drug] users tell me about the problems they have with police in
> Bridgeport.  These users tell me about how the police consistently rip up
> their user identity cards, take away their injection equipment, both clean and
> dirty, and accuse them of being a drain on society.  The police have no
> respect for the user identity cards, which are presented by Exchange clients
> to outreach workers in order to get a clean syringe.  Additionally, users have
> told me that police will take their injection equipment away from them,
> whether it is clean or dirty, and not even arrest them. . . . It is my impression
> that the police are simply harassing the users because they think that users
> are bad, but they know that they could never convict these users of a crime.

*Id.* at ¶¶ 8, 9.

On January 18, 2001, this Court certified plaintiffs' class, found that defendants' conduct

violated plaintiffs' Fourth Amendment rights, and issued a permanent injunction prohibiting BPD

officers from, *inter alia*, penalizing IDUs based on their possession of injection equipment, including

their use of the Exchange.  *Doe v. BPD*, 198 F.R.D. 325 (D. Conn. 2001).

Plaintiffs expected that defendants would abide by the Court's permanent injunction.  They

anticipated that BPD officers would no longer confiscate their syringes, rip up their Exchange

identification cards, and threaten to arrest them for using the Exchange and possessing injection

equipment.  Recent testimony has shown, however, that this is far from what has transpired.  The

content of Mr. Doe's, Ms. Clark-Smith's, and Mr. Kinzly's declarations remain basically as true today

as when they were signed five years ago: BPD officers have continued to confiscate syringes, rip up

Exchange identification cards, and threaten arrest for using the Exchange and possessing these items.  Accordingly, plaintiffs filed the instant motion to hold defendants in contempt of court.

## ARGUMENT

A court may hold a party in civil contempt for failure to abide by a court order if (1) the order being enforced is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party against whom contempt is sought has not been reasonably diligent and energetic in attempting to accomplish what was ordered.  *United States v. O'Rourke*, 943 F.2d 180, 189 (2d Cir. 1991); *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 594 (2d Cir. 1991) (affirming order granting motion for contempt because the district court's findings were not clearly erroneous).  Because plaintiffs' evidence satisfies all three prongs of the contempt standard, plaintiffs respectfully request that the Court grant their motion to hold defendants in contempt and provide relief that will both ensure long-term compliance with the permanent injunction and compensate plaintiffs for defendants' contumacy.

I.    **THE COURT'S INJUNCTION CLEARLY AND UNAMBIGUOUSLY PREVENTS BPD OFFICERS FROM CONFISCATING FEWER THAN 30 SYRINGES, RIPPING UP EXCHANGE IDENTIFICATION CARDS, AND STOPPING EXCHANGE CLIENTS DUE SOLELY TO THEIR USE OF THE EXCHANGE.**

The Court's injunction clearly and unambiguously prohibits BPD officers from, among other actions, confiscating fewer than 31 syringes, ripping up Exchange identification cards, and stopping Exchange clients due solely to their use of the Exchange.  The injunction is likewise clear that it is immaterial whether the syringes are new or used and whether the syringes were obtained from the Exchange, a pharmacy, or any other source.

For purposes of a contempt motion, "an injunction must be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989); *see also  S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001); *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) (noting that an injunction is sufficiently clear if "the party enjoined [is] able to ascertain from the four concerns of the order precisely what acts are forbidden") (citing *Sanders v. Air Line Pilots Ass'n*, 473 F.2d 244, 247 (2d Cir. 1972)).  These requirements are "designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed . . . ." *S.C. Johnson*, 241 F.3d at 241; *New York State N.O.W.*, 886 F.2d at 1351-52.

The Court's injunction states as follows:

> Defendants Bridgeport Police Department and Wilber L. Chapman, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from search, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

*Doe v. BPD*, 198 F.R.D. at 350.

The language of the injunction clearly prohibits BPD officers from confiscating 30 or fewer syringes, as well as Exchange identification cards.  Likewise, the injunction unambiguously prevents BPD officers from "stopping" and otherwise "penalizing" the individual for frequenting the Exchange and acquiring syringes from the Exchange.  *Cf. New York State N.O.W.*, 886 F.2d at 1352 (affirming finding of contempt and holding that injunction prohibiting "tortuous harassment," but allowing "reasonably quiet and nonthreatening" counseling, was sufficiently clear for purposes of contempt).

Furthermore, defendants have not disputed that the Court's injunction is clear and unambiguous as to this conduct. *Cf. The Bridgeport Guardians v. Delmonte*, 371 F. Supp. 2d 115, 119 (D. Conn. 2005) (granting plaintiff's motion for contempt against defendant BPD where the BPD admitted that the orders it had violated were "clear and unambiguous"). In fact, defendants' counsel acknowledged at the November 17, 2005, contempt hearing that "police do not have a right under your order to tear up the I.D. cards. . . . Nor confiscating needles unless the situation involves the arrest of an individual or taking into custody of an individual." Hrg. (Nov. 17, 2005), at 23:17-19, 22-24; *see also* Defs', Exh. 509, at 2 (September 2005 BPD memorandum stating that confiscating syringes and identification cards from Exchange clients would violate the injunction).[1]

## II. THE EVIDENCE CLEARLY AND CONVINCINGLY DEMONSTRATES THAT BPD OFFICERS HAVE REPEATEDLY CONFISCATED FEWER THAN 30 SYRINGES, RIPPED UP EXCHANGE IDENTIFICATION CARDS, AND STOPPED EXCHANGE CLIENTS DUE SOLELY TO THEIR USE OF THE EXCHANGE AFTER THE COURT ISSUED ITS INJUNCTION.

The evidence clearly demonstrates that BPD officers, on a multitude of occasions, confiscated fewer than 31 syringes, ripped up Exchange identification cards, and stopped Exchange clients due solely to their use of the Exchange, all of which violate the injunction. But defendants did not stop there: the record shows that BPD officers repeatedly and expressly mocked plaintiff class members and the Exchange while violating the injunction.

---

[1]    Unlike defendants, plaintiffs understand the order to clearly prohibit the permanent confiscation of an individual's syringes *even if the person is arrested*. Syringes, which are possessed lawfully (so long as there are fewer than 31 of them), should be returned to the individual upon his or her release from confinement, along with the person's wallet and other personal effects. *See* Hrg. (Nov. 17, 2005), at 36:13 – 38:24 (discussing this hypothetical situation). However, because the harassment and other penalizing of plaintiffs' witnesses occurred without arrest, the clarity of the injunction with respect to such a scenario need not be resolved here.

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Teiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (internal quotation marks omitted). This quantum of proof does not require a party to demonstrate violations of a court order beyond a reasonable doubt, but rather merely to show that it is "highly probable" that the violations occurred. *See, e.g., Colorado v. New Mexico*, 467 U.S. 310, 316 (1983); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 562 (S.D.N.Y. 2002); *Ethicon, Inc. v. United States Surgical Corp.*, 971 F. Supp. 1015, 1019 (D. Conn. 1996). Moreover, the violations need not have been willful for a court to hold a party in civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of willfulness does not relieve from civil contempt. . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act."); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004); *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 2 (2d Cir. 1989).

Plaintiffs' evidence more than adequately satisfies the requisite quantum of proof. The violations of the injunction described below, it is worth noting, were recounted mostly by Bridgeport IDUs who were brave enough to testify in a courtroom against the City. These are individuals, the evidence demonstrates, whom plaintiffs' counsel fortuitously met on the streets of Bridgeport or at the pleading of the City's Exchange employees. Their testimony, corroborated by one of the City's health officials, demonstrates that there is at the very least a "high probability" that BPD officers have been violating the Court's injunction.

### A.    Mr. Roe 6

John Roe 6 was the first of plaintiffs' witnesses. Mr. Roe 6 explained that he uses the Exchange to access treatment programs and to receive clean injection equipment, particularly because many pharmacies refuse to sell syringes to individuals without a medical prescription. Tr. (Dec 15, 2005),

at 41:19-24. He recounted two specific encounters he has had with BPD officers. The most recent incident occurred in the Spring of 2005, when Mr. Roe 6 was walking on a Bridgeport street with two of his friends. *Id.* at 42:20-25, 43:1-2, 43:7. Mr. Roe 6 and his friends were stopped and searched by BPD officers, *id.* at 43:7, who confiscated syringes from all three, *id.* at 43:8-11, 43:22 – 44:2. The officers refused to return the syringes, despite the pleas from the three individuals that they would not be able to obtain new syringes from the Exchange if the officers did not return these syringes. *Id.* at 43:10-11.

These officers were unconcerned with the fact that the three individuals were members of the Exchange and were carrying their Exchange identification cards at the time. The officers said to Mr. Roe 6 and his friends: "Tell the needle exchange that [the] Bridgeport Police Department took [your syringes]." *Id.* at 43:11-12.

The other episode occurred in the Summer 2004, when BPD officers pulled over Mr. Roe 6's Jeep. *Id.* at 42:9-17. The officers searched the vehicle and found a syringe, which they threw into a vacant lot. *Id.*

### B.     Mr. Doe 4

Mr. Doe 4 testified that he uses the Exchange because he does not want to contract HIV, much as he does not want others to contract Hepatitis C from him. *Id.* at 75:5-17. He also utilized the Exchange to facilitate his placement in drug-treatment programs. *Id.* at 75:18-22. Like Mr. Roe 6, Mr. Doe 4 testified about multiple occasions on which BPD officers violated the injunction.

The first of the incidents occurred at approximately 1:30 PM on January 15, 2004. *Id.* at 75:23 – 76:7. Mr. Doe 4 had stopped by the Exchange van to talk with the van's driver. *Id.* at 76:5-9. Shortly after exiting the van, approximately one block from the Exchange, Mr. Doe 4 was seized by BPD officers. *Id.* at 76:17-21. Upon stopping Mr. Doe 4 near the Exchange, the officers "indicated

that [when] . . . they see you coming out of the van, they assume that you are an addict . . . ."  *Id.* at 99:5-7.

The second incident transpired five months earlier, on July 14, 2003.  *Id.* at 78:5-8.  At about 2:00 PM, Mr. Doe 4 exchanged approximately seven syringes at the Exchange van.  *Id.* at 78:10-11.[2] He left the van, and two BPD officers stopped him after he had walked only one block away.  *Id.* at 78:13-23, 94:25 – 95:2.  These officers took Mr. Doe 4's syringes and Exchange identification card, which items they did not return.  78:24 – 79:1-8.

**C.  Mr. Roe 5**

Mr. Roe 5 also uses the Exchange to decrease his risk of contracting infectious diseases and to solicit the advice of the Exchange staff regarding health issues.  *Id.* at 105:3-21.  Mr. Roe 5 described an incident that occurred in the Summer of 2005 when BPD officers stopped him and a friend upon leaving the Exchange van, where Mr. Roe 5 had exchanged a used syringe for a new one.  *Id.* at 106:10-24.  The officers asked Mr. Roe 5 if he was carrying a syringe, and Mr. Roe 5 answered affirmatively, explaining that he had received it from the Exchange.  *Id.* at 106:20 – 107: 4, 107:15-18.  The officer then confiscated the syringe and threw it down the sewer, as he did with the syringes possessed by Mr. Roe 5's friend.  *Id.* at 107:19-24.  This officer asked them if they were diabetics who needed the syringes to deliver insulin, and then told Mr. Roe 5 and his friend that they "didn't need" syringes for any other purpose.  *Id.* at 107:12-14.  After confiscating the syringes, the officer threatened to arrest Mr. Roe 5 and his friend if they did not leave the area immediately.  *Id.* at 108:3-8.

---

[2]     In an effort to discredit Mr. Doe 4's testimony, Defendants noted that the Exchange's records indicate that nobody exchanged exactly seven syringes on July 14, 2003.  However, Mr. Doe 4 stated that he exchanged "about" seven syringes that day, *id.* at 78:10, and defendants' exhibit shows that somebody exchanged five syringes and another individual exchanged ten syringes that day.  Defs.' Exh. 510, at 1 (middle column showing five exchanges), 5 (left column showing 10 exchanges).

1    Mr. Roe 5 testified that there were "a few times" when he witnessed BPD officers taking

2    syringes from other people.  *Id.* at 108:9-12.  One such incident transpired when Mr. Roe 5 was

3    again stopped with a friend shortly after exiting the Exchange van.  *Id.* at 108:13 – 109:7.  This time,

4    the officer stopped both Mr. Roe 5 and his friend, but allowed Mr. Roe 5 to leave without

5    confiscating his syringes.  *Id.* at 109:13-14.  Mr. Roe 5's friend, who is HIV-positive, *id.* at 108:16,

6    was not so fortunate.  The officer seized Mr. Roe 5's friend, took his syringes, threw the syringes on

7    the floor, and scattered the syringes on the ground.  *Id.* at 109:11-24; *see also id.* at 109:13-24 (Mr. Roe

8    5 explaining that he witnessed the episode from a short distance away).

9    **D.  Mr. Doe 11**

10    Mr. Doe 11 has likewise personally suffered from BPD officers violating the Court's injunction.

11    A client of the Exchange, *id.* at 130:23-25, Mr. Doe 11 described an incident in mid-July 2005 when

12    he was stopped on a Bridgeport street by BPD officers.  *Id.* at 131:13 – 132:15.[3]  The officers asked

---

[3]    Defendants produced the timesheets of TNT officers on July 20-22, 2005 (Defs.' Exh. 505), as well as logs documenting some of these officers' actions on those dates (Defs.' Exh. 506), presumably to cast doubt on Mr. Doe 11's testimony regarding the mid-July 2005 incident. Defendants' evidence, however, does not implicate Mr. Doe 11's testimony for at least four reasons: First, Mr. Doe 11 did not testify that TNT officers, who are but a small subset of BPD officers, were the BPD officers involved in this incident. Second, Mr. Doe 11 testified that the incident occurred in "the middle of July like the 20, 22," Tr. (Dec. 15, 2005), at 131:21, and never stated that it definitely occurred sometime between July 20, 2005, and July 22, 2005, as opposed to, for instance, July 18 or 19, 2005. Third, Captain Radzmirski admitted on cross-examination that the officers' written activities on July 20-22, 2005, leave much unaccounted time on those days, Tr. (Dec. 16, 2005), at 269:11 – 282:14, including the time that the incident with Mr. Doe 11 occurred, *compare id.* at 136:21-22 (Mr. Doe 11 testifying that the incident occurred in the afternoon, in the vicinity of 2:30 or 2:45 PM), *with id.* at 282:6-14 (Captain Radzmirski testifying that neither the admitted documentary evidence nor his personal recollection can shed any light on the whereabouts of TNT officers from 11:30 AM until 4:00 PM). Lastly, plaintiffs note that the admission of Defendants' Exhibit 506 was conditioned upon plaintiffs' counsel receiving missing pages that would have made Exhibit 506 a complete document, *id.* at 237:19-25 ("But I think that the Plaintiffs are entitled to examine the whole day just to be certain that they couldn't have persuaded me [to sustain their objection to the admission of Exhibit 506] . . . .  With that condition, the Court will permit the introduction of 506 as a full exhibit."), which missing pages plaintiffs have not received from defendants.

if Mr. Doe 11 had any controlled substances on his person, to which he replied that he did not, but that he was carrying syringes and his Exchange identification card. *Id.* at 132:6-8. The officers then made him break his syringes and throw them down the sewer. *Id.* at 132:9-15. They also confiscated his Exchange identification card. *Id.* at 132:13-14.

The BPD officers expressed three noteworthy things during the incident: First, they explicitly told Mr. Doe 11 that he was not allowed to carry syringes, even after he showed them his Exchange identification card. *Id.* ("They said they didn't care about the card. They told me that I wasn't allowed to carry syringes."). Second, the officers told Mr. Doe 11 that they will arrest him if they find him with syringes in the future. *Id.* at 133:17-18, 22-23. Third, they laughed at Mr. Doe 11 when they forced him to break his syringes and throw them down the sewer with pedestrians watching. *Id.* at 132:21 - 133:14.

Mr. Doe 11 felt "uncomfortable, embarrassed, and ashamed" by the public spectacle. *Id.* at 132:21 - 133:14. Furthermore, the officers' threat of arrest has caused Mr. Doe 11 to throw his syringes into the sewer or onto the street whenever he sees a BPD officer in the vicinity. *Id.* at 133:20-22; *see also* 133:24 – 134:11 (Mr. Doe 11 testifying that he has shown plaintiffs' counsel some of the syringes that he had thrown into the sewer upon seeing BPD officers).

**E. Robin Clark-Smith**

Ms. Clark-Smith's testimony added to the mounting body of evidence that BPD officers have repeatedly violated the injunction. Ms. Clark-Smith testified that she is aware of BPD officers confiscating syringes and Exchange identification cards from her Exchange clients since the issuance of the injunction. *Id.* at 158:19 – 159:2; *see also id.* at 44:12-22 (Mr. Roe 6 told Exchange employee about officers confiscating syringes from him); 77:21-22, 100: 22-25 (Mr. Doe 4 told Exchange employee about being stopped due to his emerging from Exchange van, as well as BPD officers confiscating his syringes and Exchange identification card); 110:2-3 (Mr. Roe 5 told Exchange

employee about BPD's confiscation of his friend's syringes).[4]  In fact, Ms. Clark-Smith was able to recall the names of two particular officers who had allegedly violated the injunction because she had heard multiple complaints of these officers violating the injunction.  *Id.* at 161:6-14.

### F.     Summary of Select Violations of Court's Injunction

The evidence adduced at the contempt trial well exceeds the quantum of proof to "demonstrate a reasonable certainty that a violation occurred." *Levin*, 277 F.3d at 250.  This evidence reveals not only that a violation has occurred, and not only that many violations have occurred, but that BPD officers have violated the injunction multiple times during the majority of each of the respective incidents described above (e.g., stopping an individual based on his emerging from the Exchange and then confiscating the syringes he received from the Exchange).  In fact, BPD officers sometimes mocked plaintiff class members, the Exchange, and ultimately, this Court, during their contumacy.

Summarizing the testimony from plaintiffs' witnesses, provided in more detail above, the evidence demonstrates that BPD officers have repeatedly violated the injunction in the following ways:

- Confiscating syringes, including, but not limited to, throwing them to the ground, throwing them in vacant lots, throwing them down the sewer, and forcing Exchange clients to break their own syringes;
- Confiscating Exchange identification cards, including, but not limited to, taking them without returning them and forcing Exchange clients to rip up their own identification cards; and
- Seizing people because of their use of the Exchange van.

Faced with this significant evidence of having violated the injunction, defendants' cross-examination strategy was to revisit the incidents described during direct examination in an attempt to elicit contradictions in the testimony, often asking questions that jumped back and forth among

---

[4]     In fact, some Exchange staff were so concerned about defendants' violations of the injunction that they encouraged their clients to discuss the violations with plaintiffs' counsel.  *Id.* at 53:3-23 (Mr. Roe 6); *id.* at 99:9 – 100:3 (Mr. Doe 4).

multiple incidents.  Plaintiffs' witnesses were composed and candid throughout, and their testimony was detailed, precise, and internally consistent.  In sum, the testimony of each witness alone—and especially the testimony of all witnesses combined—shows a remarkable degree of consistency and detail that belies any claim by defendants that the testimony is invented or fabricated.  On the contrary, defendants were able to point to only a few, non-material discrepancies during the entirety of plaintiffs' witnesses' testimony—the sort of details that any person would be likely to confuse with the passage of time (e.g., the exact date of an incident, the precise number of syringes a witness had possessed at the time of an incident).  To the extent that defendants found any discrepancies in a particular witness' testimony, there should be no doubt that the central portion of the testimony was accurate: that BPD officers, on many occasions, confiscated syringes and Exchange identification cards, as well as stopped Exchange clients as a result of their having used the Exchange.

Moreover, plaintiffs' witnesses had no incentive to lie and every reason to tell the truth.  These witnesses had only one thing to gain by testifying: BPD officers respecting their right to possess injection equipment.  All of plaintiffs' witnesses talked about their interest in using clean injection equipment, and there is no reason to believe that these witnesses had any ulterior motive in testifying.[5]  *Cf., e.g.,* Tr. (Dec. 15, 2005), at 54:22 – 55:1 (Mr. Roe 6 testifying that he had reported the badge number of a particular BPD officer who had violated the injunction to an Exchange employee because doing so would "[h]opefully stop that officer from taking other people's syringes so they can get clean syringes when they need to").  Plaintiffs want access to clean injection equipment, which requires them to carry syringes to and from the Exchange (or from a pharmacy); to possess

---

[5]    This is not a case, of course, where plaintiffs' witnesses stand the chance to receive any significant amount of money as a result of their testimony.  *See infra* Part IV. B (requesting $1 per syringe confiscated as compensatory relief).  Nor did plaintiffs' witnesses use the opportunity to testify as a platform to exact retribution against any particular officer, as only one witness even mentioned any officer's name.

an Exchange identification card for this purpose; and to be able to use the Exchange without being stopped for doing so.

Plaintiffs' testimony, of course, was not limited to IDUs recounting their experiences with BPD officers. Employees of the Exchange, concerned about BPD officers' confiscations of Exchange clients' injection equipment and Exchange identification cards, encouraged their clients to talk with plaintiffs' counsel. *See supra* p. 13 n.4. It is hard to fathom why city employees would provide such advice unless they believed that violations of the injunction were occurring regularly.

Plaintiffs' witnesses' clear and consistent testimony more than adequately establishes a "high probability" that defendants have repeatedly violated the Court's injunction in multiple ways. The officers' conduct has made a mockery of plaintiff class members' rights and respect for the rule of law.

## III.    DEFENDANTS HAVE NOT BEEN REASONABLY DILIGENT AND ENERGETIC TO ENSURE THAT THEY WERE COMPLYING WITH THE COURT'S INJUNCTION.

The evidence demonstrates that defendants were not diligent and energetic to ensure that they would comply with the Court's injunction. Whatever diligent and energetic action means, it certainly entails returning multiple phone calls from the City official who oversees the program at issue, just as it requires ensuring that all BPD officers have received the only bulletin that addresses the Court's injunction. Moreover, diligence requires that defendants train their officers about the full scope of the injunction and police their compliance with the injunction, neither of which occurred. In the end, considering defendants' compliance efforts, or the lack thereof, it is not difficult to surmise why BPD officers have frequently violated the injunction.

A defendant against whom a permanent injunction has been issued by a federal court must take "diligent and energetic" steps to comply with the injunction. *Manhattan Indus.*, 885 F.2d at 5; *EEOC*

*v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir. 1985). This obligation is not necessarily discharged upon notice of the injunction being provided to employees; rather, a party is required to "energetically police compliance" with the court order. *Manhattan Indus.*, 885 F.2d at 5; *Cancer Research Inst., Inc. v. Cancer Research Soc'y, Inc.*, 744 F. Supp. 526, 530 (S.D.N.Y. 1990). Not only did defendants fail to take diligent and energetic steps to comply with the Court's injunction, but they most certainly did not energetically police their compliance with the injunction.

While plaintiffs bear the ultimate burden of establishing defendants' lack of diligent and energetic compliance with the injunction, they clear this hurdle initially by pointing out the lack of evidence regarding diligent and energetic compliance, at which point the burden shifts to defendants to come forward with sufficient and relevant affirmative steps they took to ensure compliance. Hrg. (Nov. 17, 2005), at 20:8 – 21:15 (noting how "the burden then shifts in effect to the defendant to come forward with evidence that we're all human, things happen, but here's the 87 things we did from January '01 to prevent these from happening and that I could find it on the record there wasn't a lack of diligence even though there were some violations or I could find they didn't do much and no wonder there's violations and therefore, the plaintiff met its burden."). *See generally S.E.C. v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D. D.C. 2000) ("Once the SEC has made a prima facie showing that Bilzerian did not comply with the Court's orders, the burden shifts to Bilzerian to produce evidence justifying his noncompliance."); *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 466 (S.D. Fla. 1998) ("Once a prima facie case [of a violation of a court order] is established, the burden shifts to the defendant to produce detailed evidence to explain its noncompliance."). Plaintiffs have satisfied their initial burden both through their direct testimony and by pointing out—both below and at the November 17, 2005, contempt hearing—defendants' lack of diligent and energetic steps to comply with the injunction, including the lack of evidence that

defendants energetically policed their compliance with the injunction. Because plaintiffs have met their burden and defendants have not satisfied their own burden, the Court should find that defendants failed to take reasonably diligent and energetic steps to ensure compliance with the injunction.

### A. Defendants' Steps to Comply with the Injunction from January 2001 until August 2005.

Defendants will presumably state that they have consistently trained their officers to comply with the Court's injunction, but their evidence falls far short of this mark. Instead, defendants proffered evidence that they conducted some amount of officer training concerning the operation of the Exchange and syringe-related officer safety. They offered very little evidence, however, about IDUs' legal rights, the Court's 2001 injunction, and how to comply with the injunction. Furthermore, the record is nearly silent with respect to efforts defendants undertook to police their compliance with the injunction.

The entirety of defendants' testimony regarding their efforts to comply with the Court's injunction from January 2001 until August 2005 consisted of the following: (1) the BPD's training officer drafted a bulletin that he sent out to various BPD divisions (although he did not check up on how many, or which, officers received the bulletin); (2) the training officer included this bulletin in some in-service legal trainings to some unknown number of officers until June 2003 and provided the bulletin to new recruits until June 2003;[6] and (3) a TNT supervisor told his particular officers about the ruling.

---

[6]     The officer who discussed the in-service legal trainings and new-recruit trainings, Lieutenant Viadero, left the training department in July 2003. Tr. (Dec. 16, 2005), at 310:19 – 311:2.

As for the 2001 training bulletin, defendants did not produce it or introduce it as evidence, and defendants' witnesses did not testify about its content.[7]  The entirety of the testimony by BPD's training officer, who was charged with drafting and disseminating the bulletin, regarding the content of the 2001 bulletin was as follows: "After being provided with a copy of the court order, I transcribed it, researched it and from that, I made a training bulletin . . . ."  Tr. (Dec. 16, 2005), at 314:14-17.  For all the evidence shows, the bulletin could have been silent as to the injunction and officers' obligations under the injunction.  Nor did this officer check to see how many, if any, officers received the bulletin.  *Id.* at 315:18 – 316:1.  That defendants, following the issuance of the injunction, drafted a bulletin of unknown content, which was provided to an unknown number of officers, hardly satisfies their burden with respect to establishing diligent compliance regarding even this initial compliance measure.

Similarly, there were a couple of passing references to in-service legal trainings, but no testimony at all regarding the content of such training.  To the extent that defendants offered classes on legal issues where the Exchange was mentioned, there is no testimony regarding which, or how many, officers attended these classes; how often such classes were offered; what was covered in these classes; and, if the injunction was discussed at all, whether it was discussed with respect to Exchange clients only, as defendants puzzlingly have done recently, *see infra* Part III.D.  The providing of trainings to an unknown number of officers, at unknown times, with unknown content does not satisfy defendants' burden of adducing testimony regarding their efforts to ensure compliance with the injunction.[8]

---

[7]     Defendants, who otherwise sought the admission of various documents, did not submit any documentary evidence regarding their measures to ensure compliance for the first four years and nine months—until September 2005—after the Court issued its injunction.

[8]     Ironically, some of the most direct testimony about *legal* training concerned a training that occurred *prior* to the issuance of the Court's injunction.  Tr. (Dec. 16, 2005), at 220:6-16

After all of defendants' testimony, we are left with the distinct possibility that some officers were not even aware of the injunction, let alone understand it to adjust their actions accordingly. Nor did defendants adduce testimony regarding measures they instituted to police their own compliance. As discussed more fully below, *infra* part III.C, defendants failed to demonstrate that they devised any reasonable plan of attack to ensure compliance with the injunction.

**B.    Defendants' Training Regarding Non-Legal Aspects of the Exchange, Such as the Operation of the Exchange and Officer Safety Dealing With Syringes, Are Not Efforts To Ensure Compliance With the Court's Injunction.**

The remainder of defendants' testimony on the subject of officer trainings contained a remarkably greater level of specificity, providing details of the content of training. The specified details of these trainings, however, made clear that officers learned nothing about the legal right to possess syringes or about the Court's injunction, let alone how to comply with the injunction. For instance, officers testified that they took annual bloodborne pathogen classes. However, this OSHA-mandated class deals only with officer safety and does not discuss the Court's injunction or how to comply with the injunction. *See, e.g.*, Tr. (Dec. 16, 2005), at 285:7- 286:25 (noting that the bloodborne pathogens class is a statewide training course about officer safety, including how to handle syringes and when to wear protective gloves, and *expressly stating that it does not include legal training*); 317:4-14 (BPD's training officer explaining that the bloodborne pathogens class is required by the Occupational Safety and Health Administration (OSHA)). While plaintiffs appreciate the need for OSHA trainings regarding officer safety, such trainings are irrelevant to defendants' compliance with the Court's injunction.

(Captain Radzmirski explaining that he took a "legal issues" or "search and seizure" class in the police academy *prior* to 2001).

In a similar manner, BPD officers testified that they had received training "in regard to the Needle Exchange Program." *See, e.g.*, Tr. (Dec. 15, 2005), at 206:9-15.  There was no testimony, however, so far as plaintiffs could discern, that these bulletins covered the Court's injunction or how to comply with the injunction.  *See, e.g.*, Tr. (Dec. 16, 2005), at 283:15 – 284:24 (Captain Radzmirski testifying that annual training bulletins did not discuss the Exchange, but rather were limited to safety-related bloodborne pathogens classes); *id.* at 363:24 – 364:2 (Lieutenant Sapiro—who has been a lieutenant for the past three years—when asked if he had "received any information regarding the Needle Exchange Program . . . [f]rom 2001 until today," mentioned only the September 2005 training bulletin and nothing further).  These trainings on officer safety when handling syringes have no bearing on officers' compliance with the injunction in this case.

## C.    Defendants Failed to Take Reasonable and Sufficient Steps to Comply with the Injunction and to Police Compliance with the Injunction.

In 370 pages of trial transcript, defendants adduced a paltry amount of testimony regarding their attempts to comply with the Court's injunction.  They proffered even less evidence regarding efforts to police their compliance with the injunction.  Through all of the testimony, defendants failed to demonstrate that they have implemented a thorough and considered plan of attack on compliance, which case law demands and plaintiffs desperately need.

BPD's failure to ensure initial compliance with the injunction and to monitor its compliance has its genesis in the very first action that defendants took after the Court issued its order.  While BPD's training department drafted a bulletin about the injunction sometime after its issuance, there was no testimony that anybody ever checked that all, or even any, officers actually received the bulletin.  In fact, BPD's training officer, who drafted the bulletin and was charged with its dissemination, testified that he never checked whether every, or even any, officer in fact received it.  Tr. (Dec. 16,

2005), at 315:16 – 316:1.  There is thus the distinct possibility that BPD officers—perhaps many officers—never received the bulletin.[9]

While the drafting of a training bulletin discussing a permanent injunction is theoretically a good initial step as part of a thorough plan for ensuring long-term compliance with the injunction, *but see* Part III.A (discussing how the evidence reveals nothing regarding the substance or recipients of defendants' 2001 bulletin), *supra* note 9 (discussing the inadequacy of the September 2005 training bulletin and the potential inadequacy of the 2001 training bulletin), it should not be the first and last measure undertaken by defendants to comply with the injunction.  Defendants' 2001 bulletin, however, was both the starting gate and nearly the finish line with respect to defendants' compliance efforts.  With the exception of new recruit training in 2002 and the first half of 2003, when new BPD officers received the 2001 training bulletin, there was virtually no testimony that defendants discussed the injunction for nearly the next five years.  *See, e.g.*, Tr. (Dec. 16, 2005), at 291:4-22 (Captain Radzmirski's testimony that a training memo regarding the injunction was not issued to BPD officers between 2002 and September 2005); *id.* at 363:24 – 364:2 (Lieutenant Sapiro's testimony regarding no compliance measures between 2001 and 2005).

In fact, there was affirmative testimony that defendants did virtually nothing to monitor their compliance with the Court's injunction.  For example, defendants turned their backs when the Director of the City Health Department attempted to discuss defendants' violations of the injunction.  After testifying that she was aware of BPD officers confiscating syringes and Exchange

---

[9]    As noted above, defendants did not admit into evidence the 2001 bulletin, nor was there testimony regarding its content, so its substance is unknown.  *See supra* Part III.A.  If the bulletin issued by defendants in 2001 resembled the bulletin it issued in September 2005, plaintiffs note that it would have been wholly insufficient to apprise BPD officers of the scope of the injunction.  As discussed above, the September 2005 bulletin gives the impression that the Court's injunction might be limited to Exchange clients and, therefore, BPD officers may legally confiscate fewer than 31 syringes from any IDU who is not an Exchange client or does not produce an Exchange identification card.  *See infra* Part III.D.

identification cards, Ms. Clark-Smith, who supervises the Exchange in her capacity as the City of

Bridgeport Health Department's AIDS Program Director, testified as follows:

> Q:  Have you ever informed any city employees about these incidents?
> A:  Yes.
> Q:  Who[m] have you informed?
> A:  The person who was my boss who was [City of Bridgeport Health Director] Jack McCarthy.
> ...
> Q:  What did Mr. McCarthy do once you informed him of this?
> A:  He called the person who was police chief at that point who was Chief Chapman.
> ...
> Q:  Did you call him once . . . ?
> A:  [McCarthy] called [Chief Chapman] more than once.

Tr. (Dec. 15, 2005), at 159:3 – 160:2.

On cross-examination, Ms. Clark-Smith stated that she was in the room with Mr. McCarthy

on the multiple occasions when he called Chief Chapman. *Id.* at 161:18-20.  She then testified that

Chief Chapman did not return any of Mr. McCarthy's phone calls:

> Q:  Do you know whether or not [Mr. McCarthy] spoke to anybody [when he placed his calls to Chief Chapman]?
> A:  I know that I kept bugging him and I would go has anyone returned your phone call and he would say no and he would try again.  [T]hey did not call him back.  He tried to set up a meeting.
> Q:  As far as you know, no one ever returned [Mr. McCarthy's] call?
> A:  Definitely no meeting was ever set up.

*Id.* at 161:21 – 162:3 (emphasis added).

Refusing to speak with the person ultimately responsible for the Exchange—or at the very

least not returning his calls—is a far cry from diligent and energetic policing of compliance with an

injunction concerning police practices relating to Exchange clients and other IDUs.  Defendants

cannot merely turn their backs in order to satisfy themselves that they are complying with a court

order.

The Second Circuit reached a similar conclusion in *Manhattan Industries*. The underlying dispute in *Manhattan Industries* revolved around two companies, Bayard Shirt Corporation (including its parent corporation, Manhattan Industries, Inc.) and Sweater Bee, that sought to use an identical mark. 885 F.2d at 2. The parties ultimately entered into a consent order that permitted both parties to use the mark, so long as it was accompanied by a source reference in close proximity to the mark. *Id.*

Bayard's Executive Vice President, who was responsible for ensuring compliance with the consent order, instructed Bayard's employees to use the source reference. *Id.* at 4. However, the employees did not use the source reference, and Sweater Bee moved for civil contempt against Bayard for violating the consent order. *Id.* at 3. Finding Bayard in contempt, the special master noted that, notwithstanding the Vice President's notice to his employees about the court order and instructions to abide by the order, Bayard was not energetic and diligent in complying with the order because it had "failed to develop and implement a 'thorough, considered . . . plan of attack on compliance' with the consent [order] 'that would have prevented the problems that occurred.'" *Id.* at 4 (quoting the special master's report, which was adopted in its entirety by the district court, *id.* at 5). The Second Circuit agreed, noting in particular Bayard's failure to "energetically police compliance" with the consent order. *Id.* at 5.

Assuming *arguendo* that defendants' lax initial compliance efforts were a satisfactory first step for complying with the Court's injunction—an assumption that plaintiffs contest—they made no effort to "police compliance," let alone to police their compliance energetically. Not only did Chief Chapman, a named defendant until his retirement, not return phone calls from Mr. McCarthy to discuss violations of the injunction, but defendants presented no testimony that they ever asked Exchange employees whether there were violations of the injunction. In fact, one of defendants' witnesses, Lieutenant Sapiro, testified that he was appointed as a BPD liaison with the Exchange,

but that BPD had not created this position until his appointment in November 2005, nearly five years after the Court issued its injunction.  Tr. (Dec. 16, 2005), at 366:17 – 367:5.  Regular BPD check-ins with the Exchange staff, who have daily contact with IDUs in Bridgeport—or even infrequent BPD inquiries of Exchange employees—would have apprised defendants of numerous violations of the injunction.  *See* Tr. (Dec. 15, 2005), at 158:19 – 159:2 (Ms. Clark-Smith, the City's Exchange Supervisor, testified that she was aware of BPD officers violating the injunction by confiscating IDUs' syringes and Exchange identification cards); *see also id.* at 44:12-22 (Mr. Roe 6 told Exchange employee about officers confiscating syringes from him); 77:21-22, 100: 22-25 (Mr. Doe 4 told Exchange employee about BPD officers stopping him due to his emerging from Exchange van, as well as about BPD officers confiscating his syringes and Exchange identification card); 110:2-3 (Mr. Roe 5 told Exchange employee about BPD officers confiscating his friend's syringes).

        In light of defendants' failure to return Mr. McCarthy's calls and to appoint a liaison with the Exchange after the Court issued its order, defendants' argument that they should avoid a finding of contempt because they were unaware of BPD officers' violations of the injunction is especially unappealing.  Moreover, case law is clear that defendants cannot shield themselves from contempt by claiming that their violations were inadvertent, *see, e.g.*, *McComb*, 336 U.S. at 191, or because they failed to implement reasonable measures that would have apprised them of their violations, *see, e.g.*, *Manhattan Industries*, 885 F.2d at 4-5.

        Defendants' lack of follow-up is analogous to defendants' inactions in *Cancer Research Institute*, in which the district court had issued a permanent injunction enjoining defendant Cancer Research Society from listing or advertising itself under this name in any United States telephone directory. 744 F. Supp. at 526.  Upon learning that Cancer Research Society was still listed in telephone books at some time subsequent to the issuance of the injunction, plaintiff Cancer Research Institute moved

for contempt.  Defendants did not contest that the Court's order was clear, *id.* at 529 n.2, and the Court found that defendants had violated the injunction, *id.* at 530.  Accordingly, the Court noted that it would hold defendants in contempt unless it had been reasonably diligent and energetic in complying with the injunction.  *Id.*

Defendant's main argument in support of its purported energetic and diligent efforts were that it had employed a company to cancel its telephone-book listings (because a direct advertiser could not do so itself), it had sent a copy of the injunction to the contracted company, it had advised an employee of the company about the terms of the injunction, and it had provided a company employee with a timetable for when the cancellation notices would have to be sent out.  *Id.* at 528. The court, nonetheless, found that defendant's actions were not diligent and energetic, not because these initial actions were insufficient, but rather because defendant had failed to inquire into whether the contracted company had satisfactorily performed these tasks.  *Id.* at 530.  It held defendants in contempt because there was "[n]o indication in the record that defendant ever followed up on what [the independent company] was doing to comply with the injunction."  *Id.* (noting further that defendant had "failed to develop and implement a 'thorough, considered . . . plan of attack on compliance that would have averted the violations of the injunction'") (quoting *Manhattan Indus.*, 885 F.2d at 4).

A party cannot wash its hands of a federal court's order by merely communicating once about the injunction, walking away, and hoping that its employees abide by the terms of the order. As in *Cancer Research Institute* and *Manhattan Industries*, defendants in the action at bar undertook "little follow-through once initial instructions" were provided to employees regarding compliance with the injunction.  *Manhattan Indus.*, 885 F.2d at 4; *Cancer Research Institute*, 744 F. Supp. at 530.  BPD's actions, quite simply, do not nearly rise to the level of diligence and energy with which a party must act to ensure compliance with a permanent injunction.

**D.      Defendants Cannot Avoid A Finding of Contempt by Attempting Half-Hearted Compliance Efforts Nearly Five Years After the Court Issued Its Injunction.**

Defendants elicited some testimony regarding its attempts to ensure compliance with the injunction over the past few months.  This evidence should not shield defendants from a finding of contempt because efforts to comply with an injunction five years after it issues and on the heels of a contempt motion is not diligent and energetic, and, in any event, even these recent efforts will not ensure compliance with the injunction.

Courts are skeptical of parties attempting to avoid contempt by acting only after being threatened with a contempt motion.  As the Southern District of New York has noted on at least two separate occasions when granting a contempt motion, "a spurt of activity on the heels of plaintiffs' motion for a finding of contempt is not evidence of a diligent effort to comply."  *EEOC v. Local 638 of Sheet Metal Workers' Int'l Ass'n*, 889 F. Supp. 642, 667-68 (S.D.N.Y. 1995), *modified on other grounds*, 921 F. Supp. 1126 (S.D.N.Y. 1996), *rev'd in part on other grounds*, *EEOC v. Local 638*, 81 F.3d 1162 (2d Cir. 1996); *Aspira of New York, Inc. v. Bd. of Educ. of City of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976).  This Court sounded a similar theme at the November 17, 2005, contempt hearing: "It isn't a matter of whether you know there's a violation.  [I]t's too late when you are talking about contempt that there's [been] a violation."  Hrg. (November 17, 2005), at 28:9-12.

Plaintiffs notified defendants of their violations of the injunction on August 15, 2005, and threatened to move for contempt on September 15, 2005.  Decl. of Adam B. Wolf in Supp. of Pltfs.' Mot. for Contempt (Dkt. No. 48, filed Sept. 28, 2005), at Exh. M.  BPD then drafted a training bulletin on September 13, 2005, regarding the Court's injunction and consequences to officers who violate the injunction.  Defs.' Exh. 509.  Furthermore, Officer Sapiro testified that he was appointed as a BPD liaison to the Exchange in November 2005, Tr. (Dec. 16, 2005), at 366:21-25, and Captain

Radzmirski testified that TNT officers received a training regarding the Exchange on November 15-16, 2005, *id.* at 221:16-17. Finally, Officer Otero testified that he talked with the City Attorney's office in November 2005 about how he was alleged to have violated the injunction. *Id.* at 214:11-13.[10] These actions all transpired at least one full month after plaintiffs had threatened to file a contempt motion, and, for the bulk of these activities, on the eve of the hearing on the contempt motion itself. In fact, the TNT training began two days before the hearing on the motion for contempt, and the City Attorney's Office talked with Officer Otero about allegedly violating the injunction sometime during the month of the contempt hearing—perhaps even after the hearing itself. Such actions are quintessential examples of alleged compliance activity on the heels of a contempt motion that should not allow a party to avoid contempt. *Cf. EEOC v. Local 638*, 889 F. Supp. at 667-68.

Defendants' recent actions are a particularly egregious attempt at showing compliance to avoid a contempt finding because they occurred nearly five years after the Court issued its injunction. Defendants do not have a five-year grace period for complying with an injunction. Waiting five years to comply with an injunction is simply not diligent and energetic.

Furthermore, defendants' post-August 2005 actions are substantively inadequate in any event. For example, there was no evidence adduced during the trial that non-TNT officers, who constitute the vast majority of BPD officers, received any training in complying with the Court's injunction. While plaintiffs appreciate that TNT officers received a training "going over the Needle Exchange Program," Tr. (Dec. 16, 2005), at 221:13-17, there was no testimony that non-TNT officers received any similar training, let alone a training designed to ensure compliance with the Court's injunction. Even assuming *arguendo* that this TNT training discussed the Court's injunction

---

[10]    Defendants appear to have taken Sergeant Otero's denials of these allegations at his word, as he was not questioned more than once about them and he is not aware of internal affairs having become involved. Tr. at 214:11 – 215:6.

and ways to comply with the injunction, defendants failed to present any evidence that non-TNT officers received any training with respect to complying with the injunction after plaintiffs contacted defendants regarding violations of the injunction.

Moreover, the aboverefereced September 2005 training memo, which puzzlingly and perhaps confusingly refers to the Court's *2002* injunction, limits the discussion of the Court's injunction to *Exchange clients*' rights to possess syringes and Exchange identification cards.  Defs.' Exh. 509, at 2.  However, the Court in 2001 expressly disagreed with defendants' attempts to confine plaintiffs' class to Exchange clients, instead certifying the class to include all IDUs in Bridgeport.  *See Doe v. BPD*, 198 F.R.D. at 331, 332 (rejecting defendants' argument that plaintiffs' putative class should be limited to Exchange clients and certifying the class to include all IDUs in Bridgeport, "whether participants in the Exchange or not").  While an officer listening to or reading this memorandum might understandably believe that he could lawfully confiscate syringes from Bridgeport IDUs who are not clients of the Exchange (e.g., IDUs who purchase syringes from the pharmacy or obtain syringes from a friend who is a secondary exchanger), the injunction clearly and unambiguously prohibits such conduct.

In sum, defendants' recent efforts to comply with the injunction are of little consequence to this motion because they occurred five years after the injunction issued and were instituted on the heels of plaintiffs' contempt motion.  To the extent that they are at all procedurally relevant, however, defendants' recent actions aimed at compliance in fact reveal that defendants continue to fail to ensure compliance with the injunction.

**IV.    A FINDING OF CONTEMPT, AS WELL AS AN ASSESSMENT OF COERCIVE SANCTIONS AND COMPENSABLE FINES, WILL BOTH ENSURE DEFENDANTS' FUTURE COMPLIANCE WITH THE INJUNCTION AND COMPENSATE THE VICTIMS OF DEFENDANTS' CONTUMACY.**

Relief ordered upon a finding of civil contempt should serve the purposes of compensating the victims of defendants' contumacy and coercing defendants to change their conduct. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ("Most contempt sanctions . . . to some extent punish a prior offense as well as coerce an offender's future obedience."); *Paramedics*, 369 F.3d at 657. Current compliance with a Court's order has no bearing on the appropriate compensable sanction, nor does it necessarily negate the effectiveness and importance of coercive remedies. *See, e.g.*, *Manhattan Indus.*, 885 F.2d at 6 n.2; *The Bridgeport Guardians*, 371 F. Supp. 2d at 120 ("Although the Department represents that it has now initiated training on the revised policies and has re-trained the active officers, the Department's repeated contempt suggests a likelihood of continued future noncompliance of some sort."). In fact, the Second Circuit has held that a contemnor that has discontinued its business, terminated its employees, and not violated the court's order "for several years" can have both compensable fines and coercive relief levied against it. *Manhattan Indus.*, 885 F.2d at 6 n.2 ("That such relief will have the added effect of vindicating the court's authority in no way suggests that sanctions awarded to [the party that brought the contempt motion] are punitive and not remedial").[11]

A finding of contempt, along with the coercive measures and compensatory fines discussed below, will serve both to ensure compliance with the injunction and to compensate plaintiffs.

**A. The Court Should Impose Plaintiffs' Proposed Coercive Remedy To Ensure Defendants' Long-Term Future Compliance with the Court's Injunction.**

---

[11] In any event, and as plaintiffs have demonstrated *supra*, defendants' recent purported compliance measures are insufficient to ensure compliance, *see supra* Part III.D (discussing how the September 2005 training memo potentially materially narrows the scope of the injunction and how there is no evidence that non-TNT officers have participated in any training regarding complying with the injunction). Even if these recent measures, however, could somehow demonstrate current compliance with the injunction, plaintiffs' evidence documents many violations of the injunction over the past couple years. There is nothing in the record that should serve to allay fears that defendants will continue to violate the injunction in the future.

A court has broad discretion to fashion a coercive remedy to ensure compliance with its order. *Paramedics*, 369 F.3d at 657; *see also EEOC v. Local 638*, 81 F.3d at 1177 (stating that a district court's coercive remedy "need only be reasonable" and is reviewed for abuse of discretion). In determining whether coercive sanctions are appropriate, the court "should consider (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *EEOC v. Local 638*, 81 F.3d at 1177; *New York State N.O.W.*, 886 F.2d at 1353.

Plaintiffs request the following three coercive sanctions, which should ensure compliance with the Court's injunction:

- No more than three members of plaintiffs' counsel are granted a meeting with Acting Chief Armeno, BPD's chief training officer, and representatives of the Exchange, among others Acting Chief Armeno would like to invite, to discuss future efforts for defendants to comply with the injunction.

- Defendants shall provide a report to plaintiffs' counsel every two months that documents all instances of alleged violations of the injunction of which they are aware. This report shall include all information known to defendants regarding each alleged violation, as well as all documentation collected by defendants regarding each incident, including, but not limited to, all actions taken by defendants as a result of their investigation into each incident.

- Defendants shall be assessed a fine of $250 / day, payable to the City of Bridgeport's Needle Exchange Program, if any of the abovereferenced reports are materially inaccurate, incomplete, or untimely without extreme good cause. *Cf. The Bridgeport Guardians*, 371 F. Supp. 2d at 121 (imposing similarly worded sanction on BPD for its contumacy).

All three coercive measures are reasonable in light of defendants' actions in violating the injunction, inaction in failing to ensure compliance with the injunction, effectiveness in ensuring compliance, and potential financial burdens. That is, these measures will prompt defendants to police their compliance with the injunction without imposing substantial obligations on defendants.

**1.  The Character and Magnitude of the Harm Threatened by Defendants' Continued Contumacy Are Grave.**

On the surface plaintiffs' contempt motion concerns whether BPD officers will respect IDUs' right to possess injection equipment.  In practical terms, however, the motion is motivated by a desire to protect public health.  After all, defendants' contumacy, which increases the likelihood IDUs will share syringes and discard used syringes on public streets, needlessly imperils lives of IDUs and non-IDUs alike.

As this Court recognized in granting its injunction in 2001, the legislature amended Connecticut law to mandate the operation of syringe exchanges in delineated cities that had a high rate of HIV infection and to allow the possession of syringes for personal use.  This legislation sought to protect the public health of Connecticut residents by "prevent[ing] the spread of HIV and other blood-borne diseases by encouraging the use of sterile injection equipment and preventing the improper disposal of previously-used injection equipment."  *Doe v. BPD*, 198 F.R.D. at 345. Defendants' actions in violating the injunction pose a significant obstacle in achieving this venerable goal.  By confiscating people's syringes, BPD officers encourage IDUs to leave their syringes at home or to discard them upon seeing the officers, which has two obvious effects: IDUs will be more likely to share needles with their friends (or even strangers), and public streets will be the receptacle for disease-carrying used syringes.  In confiscating Exchange clients' identification cards or seizing people because of their participation in the Exchange, a BPD officer makes it less likely that Exchange clients will return to the Exchange.  When defendants violate the injunction, they needlessly put people's lives in danger.  The character and magnitude of harm resulting from defendants' contumacy are grave.

**2.  Plaintiffs' Suggested Coercive Sanctions Will Likely Be Effective in Bringing About Defendants' Compliance With the Court's Injunction.**

Plaintiffs' evidence demonstrates that, five years after the Court issued its injunction, defendants are still not in compliance with the Court's order.  Officers continue to confiscate syringes and Exchange identification cards, and they persist in stopping individuals based upon their use of the Exchange van.  Moreover, defendants' recent compliance efforts will not in fact ensure compliance, *see supra* Part III.D.  Even if defendants' recent measures will result in short-term compliance, however, coercive sanctions are necessary, as discussed below, to assure long-term compliance with the Court's permanent injunction.

Defendants' actions prior to the issuance of the injunction provide necessary context—an important baseline—to assess the changes in their conduct due to the injunction.  The City admitted before the Court issued the injunction that state law permitted Exchange clients to possess new and used syringes, and it issued a bulletin to this effect to its officers.  *See, e.g.*, Tr. (Dec. 16, 2005), at 265:23 – 266:20 (Captain Radzmirski testifying that the City circulated a training bulletin in 1999 explaining that BPD officers could not arrest or even "bother" Exchange clients for possessing fewer than 11 syringes); Defs.' Mem. in Opp. to Pltfs.' App. for TRO (Dkt. No. 23, filed Dec. 4, 2000), at 4; *id.* at Exh. 1, p.2, ¶ 11; *id.* at Exh. 3, p.2, ¶¶ 8-9; Exh. 2 (1999 BPD bulletin explaining that 10 or fewer syringes are not illegal drug paraphernalia).  At the same time, defendants argued vehemently that non-Exchange clients do not have the right to possess syringes.  *See, e.g.*, Defs.' Mem. in Opp. to Pltfs.' App. for Prelim. Injunct. (Dkt. No. 23), at 4-5; *id.* at Exh. 3, pp.2-3, ¶ 10.  Yet we know that officers continued to confiscate syringes and arrest individuals, including Exchange clients, for possessing a lawful number of syringes, prompting plaintiffs to file this lawsuit.  Kinzly Decl. (Dkt. No. 6), at ¶¶ 8-9; Clark-Smith Decl. (Dkt. No. 8), at ¶¶ 7, 8; Doe Decl. (Dkt. No. 10), at ¶¶ 7, 16-17.  In other words, defendants correctly understood the law, at least with respect to Exchange clients, issued a training bulletin based upon this understanding, and violated it regardless.

With the initial litigation of this matter, defendants were on the clearest possible notice that they had a serious problem of officer defiance. The evidence showed overwhelmingly and without contradiction that officers routinely arrested Exchange clients whom defendants knew were within the law and routinely confiscated syringes from Exchange clients where defendants knew the syringes were legal. This pre-existing culture of resistance is perhaps not surprising; one might expect that police officers would feel some confusion about allowing known drug users to possess the very instruments they use to deliver drugs. For many officers, law enforcement goals are predictably a priority, and public health goals may be less present and compelling. But it is precisely this history of resistance to a binding public health statute (and police bulletins requiring compliance with that statute) that put defendants on notice of the task before them. Half-hearted measures – a vague bulletin here or a training on bloodborne pathogens there – would hardly suffice. Any reasonable police commander would have to know that the compliance steps taken by defendant here would virtually guarantee a continuation of the *status quo ante*: officers would continue to harass IDUs, confiscate their injection equipment, and pay no heed to a Court injunction with which they may well disagree.

Considering this pre-injunction history of BPD officers' non-compliance with paraphernalia law, defendants should have known that they would need to thoroughly engage in a plan to ensure long-term compliance with the injunction. It is against this backdrop that the Court must assess defendants' post-injunction actions and consider the imposition of coercive sanctions to ensure long-term compliance with the injunction.

Defendants' recent actions bear an uncanny resemblance to their conduct prior to the issuance of the injunction in two ways. First, BPD officers persist in confiscating syringes and Exchange identification cards, as well as in stopping Exchange clients for participating in the Exchange:

| BPD actions discussed in *year 2000* declarations in support of plaintiffs' application for injunction | Testimony regarding BPD's post-injunction actions in support of plaintiffs' motion for contempt |
|---|---|
| "[BPD officers] consistently . . . take away their injection equipment, both clean and dirty . . . . [U]sers have told me that police will take their injection equipment away from them, whether it is clean or dirty, and not even arrest them." (Kinzly Decl. (Dkt. No. 6), at ¶¶ 8-9; Clark-Smith Decl. (Dkt. No. 8), at ¶¶ 7, 8; Doe Decl. (Dkt. No. 10), at ¶¶ 7, 16-17.) | BPD officers confiscated syringes from Mr. Roe 6 and two of his friends, Tr. (Dec. 15, 2005), at 43:8-11, 43:22 – 44:2; BPD officers confiscated a syringe from Mr. Roe 6, *id.* at 42:9-17; BPD officers confiscated syringes from Mr. Doe 4, *id.* at 78:24 – 79:1-8; BPD officers confiscated syringes from Mr. Roe 5 and his friend, *id.* at 107:19-24; BPD officers confiscated syringes from Mr. Roe 5's HIV-positive friend, *id.* at 109:11-24; BPD officers confiscated syringes from Mr. Doe 11, *id.* at 132:9-15; *see also id.* at 158:20–23 (Ms. Clark-Smith aware of BPD officers confiscating her clients' syringes). |
| "[P]olice consistently rip up their user identity cards . . . ." (Kinzly Decl. (Dkt. No. 6), at ¶¶ 8-9.) | BPD officers confiscated Exchange identification card from Mr. Doe 4, *id.* at 78:24 – 79:1-8; BPD officers confiscated Exchange identification card from Mr. Doe 11, *id.* at 132:13; *see also id.* at 158:24 – 159:2 (Ms. Clark-Smith aware of BPD officers confiscating her clients' Exchange identification cards). |
| BPD officers interfere with Exchange clients' ability to use the Exchange by hovering close to the Exchange and threatening to arrest clients for being near the Exchange and using the Exchange. Doe Decl. (Dkt. No. 10), at ¶ 7. | Mr. Doe 4 seized by BPD officers solely because he emerged from the Exchange van, *id.* at 76:17-21, 99:5-7; Mr. Doe 4 seized by BPD officers solely because he emerged from the Exchange van, *id.* at 78:13-23, 94:25 – 95:2; Mr. Roe 5 seized by BPD officers solely because he emerged from the Exchange van, *id.* at 106:10-24; Mr. Roe 5 seized by BPD officers solely because he emerged from the Exchange van, id. at 108:13 – 109:7 |

The Court's injunction might have ceased BPD officers' practice of *arresting* IDUs for possessing

syringes, but otherwise the officers have acted as if the injunction were not in place.

Second, defendants continue to insist on discussing the legal rights of Exchange clients at the

expense of mentioning that the Court's injunction applies with equal force to IDUs in Bridgeport

who are not Exchange participants.  Defs. Exh. 509.  As discussed above, the distinction between

Exchange clients and non-Exchange IDUs is irrelevant and could very well give the impression to BPD officers that they may target non-Exchange IDUs in Bridgeport for carrying syringes.

In these two ways, defendants have acted as if the Court has not issued an injunction. Defendants' business-as-usual approach in the face of a federal court's permanent injunction should not be countenanced and must be rectified. Coercive sanctions will send a needed message to defendants that they cannot continue to violate the injunction because there are consequences to their unconstitutional and contumacious conduct. This message is not about punishing the police, but instead ensuring that defendants' contumacy will not continue.

Equally important is the message that BPD officers would receive by an order finding that defendants are not in contempt. A denial of plaintiffs' motion, even if accompanied by a stern admonishment of defendants' actions, would send a signal to BPD officers that they may violate the injunction with impunity. At the very least, defendants would translate such an order as a clear message that they are afforded a free pass to violate an injunction until plaintiffs' counsel becomes apprised of the violations and files a contempt motion.[12]

Ordering defendants to meet with plaintiffs' counsel to hammer out a "thorough [and] considered plan of attack on compliance" with the Court's injunction will go a long way toward ensuring long-term compliance with the injunction. *Cf. Manhattan Indus.*, 885 F.2d at 4 (noting that a party must implement such a plan to ensure compliance with a court order); *Cancer Research Inst.*, 744 F. Supp. at 530 (same). Similarly, imposing an affirmative obligation on defendants to report to plaintiffs' counsel regarding not only alleged violations of the injunction, but also follow-up actions that they took for each alleged incident, will prompt defendants to act thoroughly and promptly. *Cf.*

---

[12]    Defendants undoubtedly recognize the challenge in finding injection-drug-using witnesses in Bridgeport who will testify against BPD for violating a court order, even if the witnesses are afforded a good deal of anonymity. It cannot be lost on defendants that the prospect of plaintiffs filing another contempt motion in this case in the near future is remote.

*The Bridgeport Guardians*, 371 F. Supp. 2d at 121 (imposing a similar obligation on BPD to remedy its contumacy and to ensure compliance with the court's order). Plaintiffs expect that such coercive sanctions will ensure long-term compliance with the injunction. Respect for the Court's authority, plaintiffs' rights, and public health in Bridgeport deserve no less.

### 3. Plaintiffs' Suggested Coercive Sanctions Will Not Financially Burden Defendants.

While plaintiffs' suggestive coercive sanctions will hopefully ensure defendants' future compliance with the injunction, this relief will impose a minimal burden on defendants. The only way that plaintiffs' suggested coercive relief could result in a significant financial burden on defendants is if they provide numerous inaccurate or untimely reports of alleged violations of the injunction. Defendants have the exclusive power to ensure that the proposed coercive sanctions are not onerous. In no way should these sanctions be financially burdensome.

### B. The Court Should Award a Compensatory Sanction, However Small, to Compensate Plaintiffs for their Demonstrated Losses.

Civil contempt sanctions can be awarded for "losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). A party who prevails on a contempt motion and seeks monetary compensation should generally demonstrate at least "some proof of loss to justify its compensatory aspects." *Paramedics*, 369 F.3d at 658; *EEOC v. Local 638*, 81 F.3d at 1177. The compensatory-loss rule does not contain a *de minimus* exception; if a party loses one dollar—or even one penny—as a result of defendants' contumacious actions, it should be compensated accordingly.

While the bulk of plaintiffs' injuries resulting from defendants violating the injunction are non-quantifiable, plaintiffs have suffered at least some quantifiable loss: the cost of the syringes confiscated by defendants. This sanction, albeit small in economic value, is important. It will allow plaintiffs to purchase the syringes that were unlawfully confiscated by BPD officers, which plaintiffs may then trade in for new syringes at the Exchange.

Although syringes cost approximately $1 each when purchased at a pharmacy, the symbolism of receiving this money—or the appropriate number of new syringe themselves, if the City prefers—will send an important signal to plaintiffs: (1) they are receiving some form of compensation from the City, and (2) BPD will be forced to take action to try to undo some of the harm caused by their contumacy.

## CONCLUSION

The record demonstrates that defendants have repeatedly violated the Court's clear and unambiguous permanent injunction by confiscating syringes and Exchange identification cards, as well as by seizing individuals based on their association with the Exchange. With a modicum of forethought, defendants could have implemented a strategy to comply with the Court's injunction, as opposed to scrambling around five years later to hastily concoct a still-insufficient method to ensure compliance with the injunction. Five years later, unfortunately, much damage has already been done: plaintiffs have been forced to dispense with their injection equipment, creating a public health problem that the legislature and this Court have attempted to avoid; and officers have learned that, at least in the short term, they can get away with violating plaintiffs' constitutional rights and this Court's orders.

Granting plaintiffs' motion will show that defendants cannot carry on business as usual with impunity and that there are consequences for their unconstitutional and contumacious actions. Plaintiffs cannot afford business as usual. Nothing less than their lives are at stake.

Accordingly, plaintiffs respectfully request that the Court grant their motion for civil contempt.

Dated: February 2, 2006                    Respectfully submitted,


                                           Adam B. Wolf
                                           Graham A. Boyd
                                           Rebecca Bernhardt
                                           Alyse Bertenthal
                                           AMERICAN CIVIL LIBERTIES UNION
                                                   DRUG LAW REFORM PROJECT
                                           1101 Pacific Ave., Suite 333
                                           Santa Cruz, CA  95060
                                           Tel: (831) 471-9000
                                           Fax: (831) 471-9676


                                           By: _____
                                               Adam B. Wolf (PHV 0617)

                                           Attorneys for Plaintiffs


                                           GRAHAM A. BOYD
                                           REBECCA BERNHARDT
                                           ADAM B. WOLF
                                           ALYSE BERTENTHAL

                                           American Civil Liberties Union
                                                   Drug Law Reform Project
                                           1101 Pacific Avenue, Ste. 333
                                           Santa Cruz, CA  95060