UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, ET AL | : | |
| | : | |
| Plaintiffs | : | CIV. NO. 3:00CV2167 (JCH) |
| | : | |
| v. | : | |
| | : | |
| BRIDGEPORT POLICE | : | |
| DEPARTMENT, ET AL | : | |
| | : | |
| Defendants | : | FEBRUARY 13, 2006 |

## POST TRIAL MEMORANDUM OF DEFENDANTS

### Introduction

On January 18, 2001, this Court entered an Order concerning the application of C. G. S. Section 21a -240(20)(A)(9) in regard to stops, arrests and seizures of hypodermic needles and syringes by the Bridgeport Police Department.

In August of 2005, some 4½ years later, the Plaintiffs, for the first time, wrote to the Acting Police Chief, Anthony Armeno, alleging without specifics that some members of the Department were not abiding by the January, 2001 Court Order (see Plaintiffs Motion for Contempt and Supporting Documentation). Thereafter, the Bridgeport Police Department initiated a review of the allegations, provided a five

BMF06020

1

day reading of the training bulletin to each police officer as well as receipt of the bulletin to each officer, and incorporated additional training and a liaison from the Bridgeport Police Department to Health Department personnel for the Needle Exchange Program. Despite this response, the Plaintiffs filed a Motion for Contempt alleging specifically that: "Over the past three years, the Bridgeport Police Department officers have routinely stopped, searched, arrested and otherwise penalized individuals based on nothing more than their possession of drug injection equipment (Plaintiffs' Points and Authorities in Support of Motion for Contempt dated September 27, 2005 at page 1). The Plaintiffs in their points have substituted the terminology "based solely upon" to "based on nothing more," for purposes of their Motion. The Defendants have earlier addressed the legal criteria of the instant Motion and now have the opportunity to address the testimony and evidence that was provided to this Court on December 15 and December 16, 2006.

In support of the allegations in their Points and Authorities of the Motion for Contempt, the Plaintiffs elicited testimony from four individuals who described, to a limited extent, the actions of the Defendants that they contend violated the Order. The Defendants have contended that the actions alleged by the Plaintiffs did not occur as alleged and that the City of Bridgeport acted in a reasonably diligent

manner in enforcing the Order as demonstrated by the testimony of the continuous training and supervision and the response by the City to ensure compliance when allegations surfaced from the Plaintiffs in August, 2005.  The Defendants provided testimony from several supervisory officers including the commanding officer of the Narcotics and Vice and TNT Division and the Training Executive Director of the Police Department regarding the Department procedures, training and supervision to ensure the compliance with this Order as well as oversight of the duties of the officers.

### The Plaintiffs Have Offered  Sketchy And Questionable Circumstances In Their Testimony In Support Of A Contempt By The City Of Bridgeport

Four years and eight months after the Court Order regarding the interpretation of the law concerning the intent of the Needle Exchange Program and the establishment of a mandate about proper police action, the Plaintiffs have filed this Motion for Contempt alleging that the City of Bridgeport Police Department has violated the Order to such an extent that the Court should find it in contempt.  In support of the allegations that there have been three years of routinely stopping, searching and arresting based on nothing more than the possession of drug injection equipment, the Plaintiffs have provided testimony of four individuals and the hearsay

of Robin Clark-Smith that she was told about instances but herself had no direct knowledge.[1]

Of the four witnesses, not one of them could provide to the Court a description, a name, a badge number or any method of identifying an officer they allege violated the Court Order. Although the testimony of Robin Clark-Smith provides two names that she is familiar with, none of the four John Does or John Roes could point to an officer as the one who allegedly took needles. This is significant. For example, Sergeant Otero ("Pabablito"), who was a fixture in the area, testified that when working he talks to a lot of the people in the community and he tries to have the drug users get into a program. He was only tangentially identified by one John Roe but he could not specify. Based upon his own testimony, Sergeant Otero's actions in the community would logically make him known by name to all of the Plaintiffs. The fact that none of the Plaintiffs have specifically named him would certainly eliminate him as the individual alleged to violate the Order (12/15/05 Tr. at page 203).    Additionally, based upon the testimony as to the timing of the

---

[1] Robin Clark-Smith related a conversation with Jack McCarthy, former Director of Health, regarding a call to the Office of the Chief of Police, She, herself, did not speak and does not relate who Jack McCarthy spoke to, but testifies Mr. McCarthy asked for a meeting with the Chief and no one contacted him as best as she knows to schedule a meeting. There was no testimony that Mr. McCarthy related the purpose of the meeting or the fact that it was based solely on hearsay (12/15/05 Tr. at pages 160-162).

alleged violations, there is an inconsistency that negates the hearsay testimony by Ms. Robin Clark-Smith that he may be involved. Ms. Robin Clark-Smith testified that the contact by Sergeant Otero, "Pabalito", was at a time under "Chief Chapman's jurisdiction" (12/15/05 Tr. at page 161). However, Captain Radzmirski testified that by December, 2004 – January, 2005 Chief Chapman was not acting in the position but Anthony Armeno was in the position of Acting Chief (12/16/05 Tr. at page 223). Sergeant Otero relates that he was assigned to the Patrol Division in August, 2004 but that he was not on the road between August, 2004 and March, 2005 because he had a heart attack (12/15/05 Tr. at 198 and 203). Therefore, Ms. Robin Clark-Smith's assumption that he was involved based upon hearsay is incorrect. There was no testimony by Ms. Clark-Smith as to dates because she could not remember a specific date except that the Chief at the time was Chapman. There was also no testimony by Ms. Clark-Smith that she attempted to contact Acting Chief Armeno during his appointment from January, 2005 until August, 2005. Additionally, she names a second officer called "Berreta" who has never been named by any of the John Does or John Roes.    Sergeant Villegas, who retired from the Police Department a year and four months before the letter regarding the alleged violations, indicated his nickname is "Beretta." He also testified that he did not take hypodermic

syringes or needles nor did the officers he supervises (12/16/05 Tr. at 293 –294, 297). Her testimony in this regard cannot be given any weight.

John Roe 6 indicated that he has been a client of the needle exchange for a couple of years (12/15/05 Tr. at page 52 ). He does not use the van to obtain his syringes but goes directly to the Health Department (12/15/05 Tr. at page 60). He was very clear that the facts surrounding the encounters with two different police officers in the Pembroke area where not related in any way to his participation in the Needle Exchange Program. Although John Roe 6 originally testified in a manner that lead the court to believe there was no basis for the stop the facts changed as the defendants inquired during cross-examination. He contends that in the summer of 2004 he was stopped while driving his Jeep. What the Court learned is that he was driving in an area that is known for drug trafficking. He admitted that he had no particular destination and was "just traveling around the neighborhood." (12/15/05 Tr. at page 46). The stop was actually for a seat belt violation (12/15/05 Tr. at 45, 67-68). Although he was with other individuals at this time, no others testified in this action. He stated that there were other cars but only his was stopped at this time by one police officer in a police uniform and driving a marked car (12/15/05 Tr. at 58-59). He then describes that with a number of people in the area and other cars this

one officer confiscates the one needle which he had concealed in his console in the event he wanted to return it (12/15/05 Tr. at page 69). What makes his recitation of the facts unbelievable is that he indicates one lone officer doing a search with as many as four occupants, does it by himself without back up or notification simply based upon a seat belt violation. He indicates that this stop took approximately 15 - 20 minutes, yet he cannot describe the officer. What is simply not believable is that the officer, with all of the people in the area, decides to toss a used needle in a vacant lot nearby (12/15/05 Tr. at 42). Additionally, he is not arrested as a result of this stop and he knows that he needs the needle to exchange but does not do what would be simple; that is, pick up this needle that was tossed to return it. Instead he wants the Court to believe that the testimony of Robin Clark-Smith and Ann Trojanowski is untruthful because he claims that, against protocol, one of them provided him with a needle without a needle to exchange (12/15/05 Tr. at pages 56 and 71). These claims that some unidentified officer at some unidentified time period took his needle leaves little opportunity for the defendants to fully explore the veracity of Mr. Roe 6. However, the lack of consistency of his events, as well as his obvious spin of the events, should leave the Court doubtful as to the occurrences.

BMF06020

John Roe 6 describes a second encounter with the police when he was simply walking around the neighborhood with, again, no particular location in mind (12/15/05 Tr. at page 127). This activity is exactly the conduct that, as noted below by Sergeant Otero, will draw the attention of the police in this area of high drug activity. Even Mr. John Roe 6 had to admit that the area of Pembroke here is one where drugs could be purchased (12/15/05 Tr. at page 49). Once again, the basis of the stop in the summer of 2005 was not because the officer was aware of his involvement in the needle exchange but because, as he described it, he was homeless and simply walking around with no particular location or destination (12/15/05 at page 126-127). On this day in 2005, John Roe 6 indicated that he did not live on Pembroke but lived on the streets and parks, per se. He stated that although there were plenty of people in the area, it was he and his friends who were stopped and questioned by the officers (12/15/05 Tr. at page 61). Again, Mr. Roe indicates the officers took their syringes and did not return them. He indicates that he gave a badge number to the exchange employees, either Anne Trojanowski or Robin (12/15/05 Tr. at 44). Even though he indicates that he provided the information of the alleged improper confiscation of his syringe in the Spring of 2005, there is no testimony to support this statement (12/16/05 Tr. at page 357). Neither

Anne nor Robin had received any badge numbers in accordance with their testimony. In particular Anne indicated that other than two experiences with police, of which one was actually the officer bringing a client with used needles to the van, she did not have any knowledge of such (12/16/05 at page 357). The testimony of Robin Clark–Smith was based upon hearsay information she claims was given prior to November, 2004. This information with a badge number in the Spring of 2005 could not be the basis and Ms. Robin Clark–Smith did not convey any knowledge of a badge number as testified to by the Plaintiff.

Lastly, the quarterly reports of the Syringe Program, Exhibit 510, do not show an exchange where no needle was returned to get a clean needle because, as was the testimony, this is not permitted (12/16/05 Tr. at pages 173, 177, 248). Given the inconsistencies along with the gaps of information to pinpoint more about the encounters, it is more likely that John Roe 6, who is a convicted felon and is presently involved in a dispute with the Shelton Police, has been less than accurate and forthright with his testimony.

John Doe 11 never came forward to make any complaints about the Bridgeport Police Department until he met Attorney Wolf at the Bridgeport Needle Exchange van (12-15-05 TR. at 136). He indicated that he showed syringes in the

sewer to Attorney Wolf, but also indicated that the incident with the police occurred after he had received needles, went back to his apartment to leave needles, and then was standing on East Main Street for about 35 minutes (12/15/05 Tr. at 137-138). Nether John Doe 11 or Mr. Wolf took photos of any needles and, given that the evidence does not connect the meeting of Mr. Wolf to the time of the incident, it cannot be assumed that they were needles from Mr. John Doe 11 if, in fact, in the sewer.

What may be more plausible is that John Doe 11 knew he was on probation and had every intention with his 2 needles to purchase narcotics. He either purchased or was attempting to purchase when the police arrived so he voluntarily threw the needles that would be connected to drugs. This is so because Mr. John Doe 11 testified that he now throws the needles and syringes out when he sees a police officer (12/15/05 Tr. at 140). John Doe testified that he has seen the police officers because they patrol but never got a badge number or a name to provide to counsel, the Bridgeport Police Department, or the Court for purposes of his testimony (12/15/05 Tr. at pages 136, 139). Instead of reporting the officer (s) for discipline, John Doe 11 signed a declaration to be kept by Plaintiffs' counsel.

Mr. John Doe 4 has one of the most obvious reasons for testifying against the Bridgeport Police Department. He was arrested and charged with possession of narcotics on the evening of July 14, 2003 by the Bridgeport Police Department while he was on East Main Street at approximately 7:10 p.m. (12/15/05 Tr. at page 80-81). Although arrested on this evening and having a perfect opportunity to address what he claims was the improper seizure of his needles, he does nothing until suddenly he appears as a Plaintiff in support of this contempt. He served a six month sentence for the arrest of July 14, 2003. He contends that the driver of the van, Anne, encouraged him to bring the action but there is no testimony by Anne that supports this statement (12/15/05 Tr. at page 99). Mr. John Doe 4 also has an arrest record other than the allegations of July 14, 2003, including April 16, 2004 for sale of illegal drugs and possession of narcotics and April 2, 2003 for the possession of narcotics. His arrests seem to occur in the area of East Main Street and, in fact, he tells the Court it is a "drug infected area" (12/15/05 Tr. at page 94). He testified that he does mostly purchase of drugs in that area (ID). On the day of the incident of July 14, 2003, he testified that other people were in the area but only he was stopped (12/15/05 Tr. at page 101). What is more incredible is his testimony that out of the blue an officer in uniform asked him to be an informant or a buyer for him

without any knowledge of him or without any prior contact.  Captain Radzimirski testified that there are ordinarily two methods utilized to get informants.  The first way is from people who are outraged at the drug use and the second is for monetary motives because they pay confidential informants (12/16/05 Tr. at 260).  Captain Radzimirski also testified that there are rules and regulations in the Department that you will not recruit a confidential informant at the time of their arrests (12/16/05 Tr. at page 265).  The Plaintiff, John Doe 4, certainly has a motive to provide untruthful or exaggerated testimony concerning the Police Department, just as he obviously has testified that he talked to the driver of the van or that he was asked by some unknown officer to be a confidential informant.

The testimony of Mr. John Roe 5 was inconsistent and confusing from question to question.  It was not until he was asked on cross examination about his declaration that it became obvious that he just simply had no solid information about any interaction he had with the Police Department.  He stated that: "I couldn't recall exactly what year it was. I know I had the incident there because the person that did this, I told him that the only way I can find out the exact date when the incident happen was when I had to pay the $98 ticket for loitering. I can't really say if it was 2005, 2004, or 2003 because most of time I was under the influence of drugs."

(12/15/05 Tr. at page 111). Unfortunately, Mr. John Roe 5 had an extensive drug involvement because he visited the needle exchange van every time they came around, five times a week (12/15/05 Tr. at 121). He could not recall the events noted in his declaration, but then agreed that he was not walking but had a bicycle (12/15/05 Tr. at page 114). Although early on in his testimony he was nebulous about whether he was stopped while walking away from the van, he actually indicates that he was stopped on a side street, Jane Street, and from there he could not see the van. He talks about an Officer Papalito who he knows from growing up but, as is consistent with his testimony, he is not clear (12/15/05 Tr. at page 116). Sergeant Otero did indicate to the Court that he is called Pabalito, but denies stopping or taking needles from any person. Sergeant Otero did indicate that he knows a lot of people in the community and has tried to get them into programs (12/16/05 Tr. at page 203). John Roe 5 testified that he also remembered in one instance he paid a ticket for loitering but again he could not provide any concrete information to support the claims other than his own vague recollection that his needles were taken.

**The Defendants Have Been Reasonably Diligent In Enforcing The Court Order Of January 18, 2001**

The Defendants contend that the Plaintiffs have not satisfied their burden of demonstrating that the Bridgeport Police Department ignored the Court Order. However, if the Court should determine that the testimony of any of the Plaintiffs has risen to the level of minimal proof of a violation, the Defendants contend that the testimony of the Bridgeport Police Officers and the van driver demonstrate that the Bridgeport Police Department acted in good faith and with reasonably diligent efforts to inform, educate and supervise its officers to comply with Court Order and the actions to be followed in circumstances that involve the possession of needles pursuant to the order and state law.

In support of the Defendants' position, they have submitted the testimony of six police officers in the City of Bridgeport regarding the actions immediately after the Order was entered by the Court, the response of Training Division in developing bulletins and class instruction concerning the issue, the ongoing training, the recent update as a result of the August allegations, the supervision of officers, the continuation of educational efforts from the supervisory level, and the response and oversight of the Division of Narcotics and Vice that was targeted as the Division responsible for some of the alleged violations.

**Training**

During the time immediately after the Court Order the City of Bridgeport immediately prepared what was called a training bulletin. Lt. Viadiero testified that in January, 2001 he was assigned to the Police Training Academy that is certified by the State of Connecticut POST (12/16/05 Tr. at pages 310-312). In his capacity in the training academy he was provided with a copy of the Court Order that he transcribed, researched, and made a training bulletin that issued (12/16/05 at page 314). After the bulletin was written, Lt. Viadiero ensured that it was distributed throughout the whole Department. He stated there is a sign-in sheet that is given to each officer and they sign that they have received the document so that training assures it has been distributed (12/16/05 Tr. at page 315). Sergeant Straubel, who is a supervisor in Patrol, testified that the Training bulletins are sent through the Academy and actually read to the officers before they go on the road. Additionally, when the bulletins are issued they are to be signed and, as a supervisor, he is responsible to read, get signatures, and send Training gets a copy (12/16/05 Tr. at page 340-341). He testified that he was familiar with the Order of the Court in 2000 and the Taining bulletin regarding the operation of the Needle Exchange Program (12/16/05 Tr. at 331). Lt. Sapiro  confirmed that the Taining bulletins are sent by the

Training Academy and it was his responsibility to read the training bulletin for one weeks time (12/16/05 Tr. at page 364). He indicated that the 2001 Court Order was put out to Patrol although he does not specifically recall the method (12/16/05 Tr. at page 363). Sergeant Otero described the Training bulletin that also contained a letter was "to the point in telling us that it would not be tolerated" in describing the awareness to the rights of the needle exchange participants (12/16/05 Tr. at page 214). Each of the officers who testified specifically recalled the notification and the parameters of the Court Order that was issued after the decision in this case (12/16/05 Tr. at pages 296, 315).

Sergeant Villegas, who is now retired, testified at the time of the January, 2001 Order that he was a supervisor in Narcotics and Vice and, as a result of the ruling, he advised his officers in the Unit about the ruling. He stated "There's also training bulletins put out by the Bridgeport Police Department I believe your office gave us some training in regard to the Needle Exchange Program and the ruling." (12/16/06 Tr. at pages 296, 299-300). He stated that after the ruling he was also involved in testifying before the State Legislative Committee about the Program. Id.

Captain Radzimirski, who is in charge of Narcotics and Vice, stated that in January, 2001 he was made aware through training bulletins about the actions and

behavior related to needles and syringes (12/16/05 Tr. at pages 219-220). He testified that he has had further training in blood borne pathogens class that they take annually and other "classes in the academy. I think it is legal issues or excuse me. I don't know whether it is search and seizure or those types of related classes you know, we touch on that also." (12/16/05 Tr. at page 220).

Thereafter, the officers testified as to supplementary training. Officer Stolze, who is a supervisor of Narcotics and Vice, testified that "On several occasions through Training bulletins, through remedial courses in the Training Academy as far as police and the law, legal updates, hazmat. That's done annually. At any time occasionally came where there was incident to training, it would be brought up." (12/16/05 Tr. at page 137).

Sergeant Otero testified that he knows he received a training bulletin in early 2005 and again in September, 2005 related to the Needle Exchange Program (12/16/05 Tr. at page 215). Thereafter, he also summarized his training from 2003 to 2005 in this regard as: "Every year we have to go through blood borne pathogens. During that class, they pass out again the training bulletin which lists, you know, the whole needle program, police in the law, civil liability classes, those

are a few of the classes from that time so an officer could actually get that training anywhere from two to three to four times a year." (12/16/05 Tr. At page 217).

Sergeant Otero, who is one of the Patrol supervisors, stated that every year we sign off for our training bulletins "plus we get in other courses in the blood pathogen we have to take it every year.  We're taught about it there.  Police in the law and there's a couple of other classes we have to take during the year that we get that this gets brought up to us.  Plus I, as a supervisor, have to read it when it comes out.  Read it to my officers for five days in a row and they have to sign up for it." (12/15/05 Tr. at 206).

This testimony demonstrates that the training is ongoing for all officers, and that the City has not ignored its obligation to continually train and refresh officers as to their responsibilities.

**Police Enforcement and Supervision**

Sergeant Otero also testified that in the last year,  because of an increase in street robberies and the complaints from the businesses, the Patrol Division had stepped up efforts to prevent crime in the area of East Main and Shelton and Ogden (12/15/05 Tr. at pages 204-205).   These activities of the officers included encouraging business owners to place no trespassing signs on their business and to

require that the police enforce the loitering laws (12/05/06 ID).   The stepped up enforcement is not related to the Needle Exchange Program, but has everything to do with preventing crime.  Although the Plaintiffs alleged that the police activity was the result of their participation in the Program this allegation, by their very own testimony, the limited stops by officers of clients, and the emphasis on East Main Street because of crime and high drug activity makes it more than reasonable that the stops were not the result of a violation of the Court Order.   This testimony is supported in some respects by the John Does and John Roes, as well as the officers who described the activity in that area confined to the drug sales and not the fact that the van operated in that area as one stop (12/15/05 Tr. at pages 49, 94).   The quarterly reports of Ms. Clark-Smith and Ms. Trojanowski show that during a three month period of time the van serviced from approximately 600 exchanges (Exhibit 510, 7/15/03 to 9/30/03)  This figure, taken with the Reports noted as Exhibit 502, shows approximately 450 to 700 new and returning clients on a quarterly basis. There are, by these records, a vast number of individuals going in and out of the van and office for assistance.  Looking at the figures of both Exhibit 502 and 510, it is reasonable to determine that approximately 1000 exchanges per year occur through the Bridgeport Program.  This number for the years 2003, 2004, 2005 could be

estimated at 3000 exchanges during a portion of the time of the allegations for this Court. The Plaintiffs have testified that there were approximately 6 occurrences that have represented the routine violation by the defendants. Even if the allegations are accepted, it appears there is no routine violation. The Defendants are not advocating that there should be any violations, but towards that effort they educate and supervise their officers on a consistent basis. Given the nature of the allegations and the lack of substantive information, as well as the history of the Plaintiffs with the Bridgeport Police creating possible prejudices, the claims are weak and without merit.

Ms. Robin Clark-Smith also provided the Court with a schedule of van locations for the Needle Exchange Program (Exhibit 503). This Program indicates that during the time period from 2003 to July, 2005 the van had locations at PT Barnum, Marina Village, and East Main Street, as well as the Program at the Public Health Department Building on East Main Street. In July, 2005 the locations were expanded to Iranistan Avenue and Briarwood Avenues (Exhibit 503). However, it appears that the complaints emanate from the East Main Street area only. It is reasonable to infer that the claims come as a result of the enforcement of the laws to reduce drug activity and not because the officers are targeting the Program

participants. The testimony of the Defendant officers indicates that the area of East

Main Street in the intersection of Jane, Shelton and Ogden Streets has been an area

of high drug activity. Captain Radzimirski testified that the area of East Main,

Ogden, Arctic and Shelton is "an area where we have been a lot of arrests regarding

drug activity both street level and, you know, businesses, houses, search warrants,

that type of activity. It seems to be an area where there's a lot of drug activity going

on." (12/16/05 Tr. at 249). He further describes the area as one that "requires

constant attention," and states "The eastside that you referred to as far as East

Main and Jane, Ogden, Shelton, and Pembroke and Hallet and Arctic Street, those

are since I have been on those have been the perennial. There's always activity

there." (12/16/05 Tr. at 250). Sergeant Villegas and Lt. Stolze, who were the

supervisors in the Narcotics and Vice Division, indicated that the area in East Main

Street is particularly active for their Division (12/16/05 Tr. at pages 321-322). This

activity was affirmed by the patrol supervisors in the area of East Main Street

(Straubel - 12/16/05 Tr. at 336; Otero - 12/15/05 Tr. at 197-198 and 204). Sergeant

Otero described the activity that they are drawn to in this area is the result of street

robberies. He stated that "There's a telephone there and the telephones is the way

of communicating and they pick up these phones, they call the dealers to come

down and they are hanging around there loitering.  It's gotten to the point I talk to the

owners of the three businesses right there to make up their own signs that says no

trespassing, no loitering, police take notice . . .   They hang around there and follow

the instructions.   The instructions could be stand there or go down the block or

somebody come by so it's been I have been telling my community police guys post 3

and 4, I want enforcement, I don't want no loitering, we're listening to the merchants

. . . asking us to clear those areas because it is killing their businesses and people

are afraid."  (12/15/05 Tr. at pages 204-205).   Captain Radzimirski described the

methods that they are aware are used in the areas to conduct the drug activity.  He

stated, "There are people to use the eastside, for example, a common thing is kids

on bikes.  Circle the block, act as lookout, looking for our cars, for us, they keep

reporting back to the same person that's swiveling his head and it is hanging out

there for apparently no good reason.  Then you will wait and see.  You will wait for a

drug dealer, a drug deal to go down.  It will be somebody will approach, a brief

conversation, it could happen a variety of ways...." (12/16/05 Tr. at pages 251-252).

The Defendants have indicated that they do surveillances in the area but none of

them have conducted a surveillance with the focus as the needle exchange van

(12/16/05 Tr. at pages 254, 301 and 322).  Although the Plaintiffs indicate that it was

Bridgeport police officers who improperly and for no reason took their needles and syringes, there is no evidence, except their testimony, that supports the contentions.[2] It is not only that the four individuals who came to this court have felony records but their arrests led to convictions and time in jail that have been, for the most part, accomplished as the result of the efforts of the very police department they now accuse of these violations. The accusations are themselves confusing, nebulous, contradictory and not entirely credible. The John Does and John Roes, although making serious allegations, cannot provide this Court with a specific officer, a specific date, names of witnesses or any corroborating evidence to support the claims. Additionally, although the claims clearly indicate that the confrontation with the officers was instigated because the individuals possessed hypodermic needles and syringes, the testimony of the Plaintiffs contradict the claim.

Each and every one of the supervisors confirmed the fact that they are familiar not only with the Needle Exchange Program but with the training through the Department. Sergeant Straubel testified that he supervisors the patrol officers and booking officers and that he has instructed the officers who stop individuals who

---

[2] It should be noted that John Roe 6 indicates he was with others at the time, but no one else has testified for him and almost all of the other instances alleged took place with other people in the area yet no witnesses were introduced to support the claims.

have needles as follows: "The officers are instructed not to take the needles. Oftentimes for our safety, we ask the individuals to place the needles on the rear of the patrol car. They will be patted down, questioned appropriately and their needles will be given to them." (12/16/05 Tr. at 333). This same type of procedure was enunciated by Sergeant Stolze who testified that his understanding and the information he conveys to the officers in Narcotics and Vice that he supervises is that: " . . . unless the person had other issues outside of needles, up to 30 needles was considered legal. It wasn't cause for an arrest based strictly on the needles "we're expected to find residue in the needle. That's what the whole needle exchange is about. If they have less than 30 needles, there's no reason to take the needle or charge anybody with paraphernalia." (12/16/05 Tr. at 326). Officer Stolze conveys this to officers and has not encountered a situation were the officers in his command have ever taken the needles. The supervision of the officers by him in Narcotics and Vice involved setting up the work for the day including any surveillance. If there was a surveillance he would go out on the street with the officers (12/16/05 Tr. At 320-321).

This testimony was consistent with the testimony of Sergeant Villegas who was the supervisor prior to Lt. Stolze and the overall Commander of the Narcotics

and Vice Division, Captain Radzimirski (12/16/05 Tr. at page 222-223 and 297). In fact, Sergeant Villegas testified that if he was not specifically with the officer he would supervise by the use of the Nextel that was with every member for security. He stated: "Whenever an officer was making a stop for safety reasons, you would basically say I'm stopping so and so at this location or time, stopping the car and they would tell you why. So I'm able to hear all of that. My radio was on all the time." (12/16/05 Tr. at pages 297-298).

Each of the supervisors testified about the various ways that they supervise the patrol officers. Although it is obvious that the supervisor cannot be at every call and cannot take place in every arrest given the fact that there are oftentimes more than one patrol car and, therefore, more than one activity taking place at the time the supervisors indicated that they have methods to keep in touch with what is happening. Sergeant Otero testified the way he looks at his position is that he is "like the extra patrol car out there also. I patrol the areas, If I'm not covering another call or responding to another call, I will respond to an officer who is making a stop of individual or individuals." (12/15/05 Tr. at page 201). He further explained that there is a Bridgeport Police Department protocol that when an officer stops an individual, "he's got to come on the air and say that he's stopping an individual. Give a

description as he's getting out of the car if he's in the car." (12/15/05 ID).  Sergeant Straubel also testified that it is the policy of the Bridgeport Police Department that when the officer stops in a patrol car to approach a person on the street that he should radio in (12/16/05 Tr. at page 342).  Sergeant Struabel indicated that as a Sergeant he encountered only one situation that the officer did not do so and he gave him a verbal counseling and addressed the need for calling in for officer safety and told him even (sic) he was found to do it again, a report would be required and he would be disciplined (12/16/05 Tr. at page 343).

Sergeant Otero testified that if he discovered an officer did not follow the order, his responsibility would be "number one, I ask them to do a report to me, then I would write them up and their actions for not following because that's an order that we're given and by them not following it, they are violating a direct order so I will write them up and send it up the chain of command to my lieutenant and captain." (12/15/05 Tr. at 207).

The active presence and the constant radio transmissions, as well as follow-up in Booking, provides pro-active involvement to keep the officers in line with the law.

**Alleged Prior Actions**

During the times that are consistent with the allegations of the four defendants, the Bridgeport Police Department did not have complaints submitted in writing or verbally to the commanders of the involved patrol and/or special divisions. Captain Radzimirski who is the commander of the Narcotics and Vice Division and responsible for the overall supervision indicated that he had no complaints regarding officers in his division seizing individuals needles or syringes and not giving them back during the summer of 2004 and the spring of 2005 (12/16/05 Tr. at 227). Additionally, he testified that although he was the officer in charge of Narcotics and Vice he did not receive and notice from a Health Department supervisor or employee that the officers were seizing needles and syringes (12/16 05 Tr. at pages 256-257). In fact, he indicates that he had no complaints from Robin Clark-Smith who actually is one of the directors of the program. (Id. At 257)  Although Ms. Robin Clark-Smith testified that she never personally saw a police officer take a syringe or card from a client, she contacted her boss that she was told syringes and/or cards were taken (12/16/05 Tr. at 159-160).  She indicated that although she never made a call, she was with Jack McCarthy when he called the Police Department and spoke to someone about setting up a meeting with the Chief (12/16/05 Tr. at page 161).

There is no testimony that the message was ever conveyed to the Chief of Police and no indication that the message conveyed informed the Chief of Police or anyone within the chain of authority in the Bridgeport Police Department that there was an allegation about the needle exchange program. Simply leaving a message for the chief to call the Director of Health provides nothing. Additionally, Ms. Robin Clark-Smith does not recall a specific date. As this court heard and is now aware as a result of the amended pleading Anthony Armeno became the Acting Chief of Police in approximately December 2004 or January 2005 (12/15/05 Tr. at 223). What is even more perplexing about the allegations as to the officers names that were apparently discussed with Ms. Clark-Smith is that Sergeant Pablo Otero who is know as "Pabalito" and who she implicates was involved in some action according to her unnamed client was actually not working on the streets from August 2004 until March or April of 2005 because he had a heart attack (12/15/05 Tr. at 203). Sergeant Villegas who had a nickname of Berretta left the employment of the Bridgeport Police Department in April 2004 (12/16/05 Tr. at 293). Therefore, the reference to the names she was given and the time periods she was discussing are perplexing and inconsistent.

There was never an item in writing and, although some of the Plaintiffs indicate they told the people in the Health Department, none of that information was ever conveyed to the Bridgeport Police Department. It appears that if there is any truth in the Plaintiffs' contentions of complaints to Health officials, there was a dead end at this Department. As noted in the testimony of Lt. Sapiro below, the Department had addressed this dead end.

**Recent Response To August Allegations**

During the course of the cross-examination of Captain Radzimirski, Plaintiffs confirmed that in September, 2005 he received additional training bulletins concerning the Needle Exchange Program in the form of a training bulletin (Plaintiffs' Exhibit 2). This document was circulated and followed-up with five days of reading the bulleting and letter to each line-up. The document that was circulated as a training bulletin in September, 2005 contained more than the training bulletin. The bulletin contained an order from the Chief reflecting the importance of the Needle Exchange Program and warning of severe discipline if any officer failed to comply with the Order of the Court and the bulletin (Exhibit 509). The memorandum dated September 13, 2005 was in addition to a training bulletin that had been issued in 2002, 2003, 2004 (12/16/05 Tr. at 291). Captain Radzimirski also confirmed that

training is ongoing and that in November, on November 15 and 16, they had training in their "shop" on the Needle Exchange Program (12/16/05 Tr. at page 221). Robin Clarke-Smith also testified she did training for the Narcotics and Vice Division (12/16/05 Tr. at pages 175-176).

Lt. Sapiro testified that in the beginning of November he began in a position as a liaison with the Health Department and the Needle Exchange Program and the Police Department. He indicated that his "responsibilities include direct contact with the needle exchange coordinator Robin Clark to field any complaints that may have come from clients of theirs so that she would have a direct line to the police department. I could investigate, collect information and pass on or mediate or if there's any problems, they're also redeveloping a more intensive or training for our officers about the needle exchange. Talking to her about maybe how can the police department help with keeping the drug addicts we become in contact with. That the needle exchange also sends people to rehab." (12/16/05 Tr. at 364-365).

The Bridgeport Police Department has not ignored its responsibility to abide by the Court Order and, as can been seen, has attempted to make efforts to address any concerns with additional training and initiatives.

BMF06020

Therefore, the Defendants respectfully request that the Court rules that the Defendants are not in contempt of the January 18, 2001 Order.

THE DEFENDANTS

By: _Barbara B Massa_

Barbara Brazzel-Massaro
Associate City Attorney
OFFICE OF THE CITY ATTORNEY
999 Broad Street - 2nd Floor
Bridgeport, CT 06604
Telephone #203/576-7647
Fed. Bar No. 05746

## CERTIFICATION

This is to certify that a copy of the foregoing "Defendants' Response to Plaintiffs' Proposed Order and Reply to Motion to Clarify" has been mailed, postage prepaid, on this 13th day of February, 2006 to:

**Graham Boyd, Esq.**
**Rebecca Bernhardt, Esq.**
**Adam Wolf, Esq.**
**Michael Perez, Esq.**
**1101 Pacific Avenue, Suite 333**
**Santa Cruz, CA  955060**

**Philip Tegeler, Esq.**
**CCLU**
**32 Grand Street**
**Hartford, CT  06106**

Barbara B. Massaro
Barbara Brazzel-Massaro