GRAHAM A. BOYD (CBN 18419)
REBECCA BERNHARDT (PHV 0616)
ADAM B. WOLF (PHV 0617)
ALYSE BERTENTHAL (PHV granted without number)
American Civil Liberties Union
    Drug Law Reform Project
1101 Pacific Avenue, Ste. 333
Santa Cruz, CA 95060
Telephone: (831) 471-9000
Fax: (831) 471-9676

Attorneys for Plaintiffs

| | |
|---|---|
| JOHN DOE, JOHN ROE, & CONNECTICUT HARM REDUCTION COALITION,<br><br>        Plaintiffs,<br>    vs.<br><br>BRIDGEPORT POLICE DEPARTMENT & ANTHONY ARMENO, Acting Chief of the Bridgeport Police Department, in his official capacity only,<br><br>        Defendants. | Case No. 3-00-cv-2167 (JCH)<br><br>**PLAINTIFFS' SUBSTANTIVE REPLY BRIEF IN SUPPORT OF MOTION TO CLARIFY INJUNCTION**<br><br>**Court:** Hon. Janet C. Hall<br>**Filed:** February 9, 2006 |

Plaintiffs hereby file this reply brief in support of their motion for clarification of the Court's injunction.[1] The brief addresses a comment the Court has made regarding plaintiffs' position in this motion, as well as some of the arguments defendants raised in their opposition brief and sur-reply in

---

[1] Although plaintiffs have styled this motion as a "motion to clarify injunction," they have no objection to the Court construing it as a motion to enlarge the scope of the injunction or to amend the injunction. Plaintiffs do not maintain that cotton and cookers, among other objects used for injecting controlled substances, were clearly included within the scope of the injunction at the time that it issued. Instead, plaintiffs argue that these items should now be included within the scope of the injunction.

Plaintiffs' Substantive Reply Br. in Support of Motion to Clarify Injunction- 1
Case No. 3-00-cv-2167 (JCH)

opposition to plaintiffs' motion. Specifically, plaintiffs will discuss the relative applicability to cookers of two sub-parts of Connecticut's drug-paraphernalia law, one concerning large-scale drug distributors' machinery for preparing controlled substances and the other concerning objects used by an individual in the process of parenterally injecting controlled substances. Lastly, plaintiffs will demonstrate that a Massachusetts case on which defendants rely in their opposition brief actually supports plaintiffs' argument that Connecticut law permits the possession of cookers and cotton, among other objects used in the process of parenterally injecting controlled substances.

I. SECTION (IX) OF CONNECTICUT'S DRUG PARAPHERNALIA STATUTE, AND NOT SECTION (II), RELATES TO OBJECTS, SUCH AS COTTON AND A COOKER, USED BY INDIVIDUALS IN THE PROCESS OF PARENTERALLY INJECTING CONTROLLED SUBSTANCES.

Plaintiffs recognize that the Court at oral argument alluded to the possibility that cotton and cookers are drug paraphernalia under a sub-section of Connecticut's drug paraphernalia statute referencing "kits used to prepare controlled substances." Therefore, although defendants have not argued that this sub-section is relevant, plaintiffs would like to discuss the non-applicability of this sub-section.

As plaintiffs have briefed previously, Conn. Gen. Stat. Ann. § 21a-240(20)(A) defines "drug paraphernalia," the possession of which is prohibited by law. Relying on the plain language of the statute, the legislative intent to protect against the spread of blood-borne diseases, and various well-established canons of statutory interpretation, Plaintiffs have maintained that the sub-section addressing "syringes, needles, and other objects used . . . in parenterally injecting controlled substances," Conn. Gen. Stat. Ann. § 21a-240(20)(A)(ix) ("Section (ix)"), expressly exempts 30 or fewer cottons and cookers from the definition of drug paraphernalia.

A different sub-section of the same paraphernalia statute provides that drug paraphernalia includes "kits used, intended for use or designed for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances." Conn. Gen. Stat. Ann. § 21a-240(20)(A)(ii) ("Section (ii)"). This Court's reference to Section (ii) at an earlier hearing suggests a possible argument that cotton and cookers, whether provided by the Exchange or elsewhere, might be "kits" used to "prepar[e] controlled substances." If that is the case, the argument continues, another sub-section (e.g., Section (ix)) cannot exempt cookers from the definition of drug paraphernalia because the same statute cannot say both that cookers are, and are not, drug paraphernalia. For the two reasons below, in addition to those arguments previously raised by plaintiffs, Section (ix)— and not Section (ii)— applies when an individual possesses objects like cotton and a cooker.

> A. **The Sub-Section Of Connecticut Law Providing that Drug Paraphernalia Includes Kits Used To Prepare Controlled Substances Is Inapplicable To An Individual Who Uses Cotton and a Cooker Because This Sub-Section Is Limited To The Apparatuses Employed by Large-Scale Distributors Of Controlled Substances.**

Section (ii) is concerned with the apparatuses ("kits") used by large-scale drug manufacturers and distributors. "Preparing controlled substances," as used in Section (ii), simply does not apply to an individual's use of cotton or a cooker.

Under the canon of statutory interpretation known as *noscitur a sociis*, words in a statute derive meaning from the words surrounding it. *See, e.g., Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Development, LLC*, 273 Conn. 724, 740 (2004) ("Where a provision contains two or more words grouped together, we often examine a particular word's relationship to the associated words and phrases to determine its meaning pursuant to the canon of construction noscitur a sociis."); *Connecticut Nat'l Bank v. Giacomo*, 242 Conn. 17, 33 (1997) (same). Accordingly, "preparing" should be accorded a meaning within the same general universe of "manufacturing," "compounding,"

"converting," "producing," and "processing." These words make clear that the sub-section is applicable to enterprises that make and prepare controlled substances. Section (ii) covers the implements inside the warehouses and laboratories where distributors access controlled substances, a far cry from the cotton and cooker used by an individual who wishes to mix his solid-form heroin with water.

A few examples of "preparing" a controlled substance under Section (ii) will flush out its meaning. For instance, the instruments that break up large "rocks" of crack cocaine into smaller pieces that are then sold to an end-user to place in a pipe for smoking is a kit used for preparing the controlled substance. Another example is the machinery used to place lysergic acid diethylamide (more commonly known as "acid" or "LSD") onto blotter sheets for individual consumption. Furthermore, the implements that put methylenedioxymethamphetamine ("MDMA") into tablets that one may ingest as ecstasy are likewise kits for "preparing" the MDMA, which is a controlled substance.[2]

These preparatory actions are different from placing heroin into a cooker with cotton for purposes of then being able to draw it into a syringe in at least one fundamental way: they are the actions taken by large-scale drug distributors, often using machinery, who then make the substance available for individual consumption. In short, Section (ii) provides that the apparatuses used by methamphetamine laboratories, crack-cocaine dealers, and ecstasy factories are drug paraphernalia; it does not implicate the small-scale, individual user who takes heroin and adds water in a bottle cap.

---

[2]   Nor would the apparatuses used in the abovementioned processes be considered "kits" under any other part of Section ii. While it might be tempting, at first blush, to think that making ecstasy tablets, for example, is manufacturing, compounding, converting, producing, or processing, the making of the tablets themselves is not "manufacturing controlled substances," just as it is not compounding the controlled substance itself. (Amphetamines are sometimes, but not always, added to the MDMA pill. Because amphetamines are also a controlled substance, this process would be "compounding" a controlled substance. However, without adding amphetamines to ecstasy tablets, the process of making the pill would be "preparing" the MDMA.) Rather, placing the substance in a medium for its ingestion is preparing the controlled substance.

Cotton and cookers are not drug paraphernalia under Section (ii). Rather, they are covered in Section (ix). No other sub-section of the drug-paraphernalia definitional provision could possibly encompass these objects. *See* Conn. Gen. Stat. Ann. §21a-240(20)(A)(i),(iii-viii),(x). As a matter of state law, cotton and cookers are objects used in the process of parenterally injecting controlled substances pursuant to Section (ix).

### B. *Assuming Arguendo* That Cotton and Cookers Would Otherwise Be Deemed Kits Used in Preparing Controlled Substances Pursuant to Section (ii), They Are Nonetheless Exempted by Section (ix).

*Assuming arguendo* that an individual's use of cotton and a cooker would otherwise be considered "kits" used when "preparing" controlled substances under Section (ii), they are not in fact "drug paraphernalia" under that sub-section because they are expressly exempted from the reach of the paraphernalia definition by Section (ix). Section (ix), as plaintiffs have briefed previously, addresses equipment used in the process of parenterally injecting controlled substances, which includes objects like cotton and cookers.

Connecticut's drug-paraphernalia statute is typical legislation that prohibits the possession of a broad class of items and then carves out certain objects that one may lawfully possess. Assuming that the reach of Section (ii) would otherwise implicate items used to prepare controlled substances that one parenterally injects, Section (ix) exempts from the definition of drug paraphernalia those objects used in the process of "parenterally injecting" controlled substances. As plaintiffs' evidence, in the form of declarations and testimony, demonstrates, cotton and cookers are, as a functional matter, such objects, and, consistent with the legislative purpose, these objects are also critical in prevention of the spread of deadly disease.

In addition to filing the declaration of Dr. Robert Heimer and the articles attached as exhibits to that declaration (Dkt. No. 73), plaintiffs adduced testimony at the contempt trial from Dr. Heimer, an Associate Professor in the Department of Epidemiology and Public Health at the Yale University

School of Medicine, Tr. (Dec. 15, 2005), at 183:1-7. Dr. Heimer, a widely renowned expert in infectious disease transmission through the sharing of "needles, syringes, and other parts of injection equipment," *id.* at 184:1; *see also id.* at 183:7 – 184:25, testified as follows:

> Q: You mentioned a cooker. Is a cooker a necessary object for injecting?
>
> A: Absolutely because drugs [like heroin] are sold solid and you can't inject a solid.

*Id.* at 186:14-17. Dr. Heimer then explained that contaminated blood can get on used cookers and that this blood can enter another's bloodstream when a cooker is re-used, thus causing the second user of the cooker to contract HIV, Hepatitis B, and Hepatitis C. *Id.* at 186:18 – 187:6. In a similar manner, Dr. Heimer noted that many injection drug users ("IDUs") use a piece of cotton in the injection process, which object also becomes contaminated with blood and is a pathway through which one can contract blood-borne diseases like HIV, Hepatitis B, and Hepatitis C. *Id.* at 187:7 – 188:6. In fact, Dr. Heimer testified, studies have found that "cookers and the cottons much more than the syringes themselves were associated with the transmission of hepatitis C among drug users . . . ." *Id.* at 190:23 – 191:7.

Dr. Heimer's testimony, in addition to his declaration and its attached exhibits, demonstrate that cotton and cookers are objects used in the process of parenterally injecting controlled substances. Pursuant to the plain language of Section (ix)— not to mention the legislature's intent in passing that provision[3]— cotton and cookers, among other items used in the process of parenterally

---

[3] Defendants' cross-examination of Dr. Heimer did not seek to contradict his well-established testimony that cotton and cookers are objects used in parenterally injecting controlled substances and are pathways through which bloodborne diseases pass to IDUs. Rather, defendants' cross-examination established that Dr. Heimer did not testify to the legislature regarding any object other than syringes or needles. While it is true that Dr. Heimer did not discuss cotton and cookers with the legislature, his testimony is unchallenged with respect to the public health hazard that arises by sharing cookers and cotton. It is similarly beyond dispute that the legislature's intent in passing Section (ix) was to protect public health by ensuring access to clean injection equipment.

Plaintiffs' Substantive Reply Br. in Support of Motion to Clarify Injunction- 6
Case No. 3-00-cv-2167 (JCH)

injecting controlled substances, are simply not drug paraphernalia when possessed in quantities less than 31. Accordingly, BPD officers may not search, stop, arrest, punish, or penalize in any way an individual based on his possession of such objects.

## II. A COMPARISON OF THE RELEVANT STATUTES IN CONNECTICUT AND MASSACHUSETTS REVEALS THAT INIDIVDUALS MAY LEGALLY POSSESS OBJECTS LIKE COTTON AND COOKERS IN CONNECTICUT.

Defendants attempt to rely on plaintiffs' counsel's representations in a case before the Massachusetts Supreme Court to establish an interpretation of Connecticut's drug-paraphernalia statute. Defs.' Resp. to Mot. for Clarif. (Dkt. No. 85), at 5-6. However, contrary to defendants' assertions, *Commonwealth v. Landry*, 438 Mass. 206 (2002), actually supports plaintiffs' position with regard to why one may legally possess objects like cotton and cookers in Connecticut.

Plaintiffs' counsel's office successfully represented Maria Landry in the Massachusetts Supreme Court, which heard Ms. Landry's appeal from a conviction for possessing hypodermic needles. Ms. Landry was a client of a Massachusetts syringe exchange who was arrested for possessing the exchange's syringes in a Massachusetts county that did not host an exchange. *Landry*, 438 Mass. at 207. She was subsequently convicted of violating a Massachusetts statute that prohibited the possession of a "hypodermic syringe, hypodermic needle, or any instrument adapted

---

BPD officers confiscating cookers and cotton would frustrate the legislature's goal in passing this statute. Injection drug use accounts for 36% of new AIDS cases in the United States, including 57% of new AIDS cases among women, Center for Disease Control, *Drug-Associated HIV Transmission Continues in the United States*, available at http://www.cdc.gov/hiv/pubs/facts/idu.htm (last visited Feb. 6, 2006), and sharing cottons and cookers are more correlated with transmission of Hepatitis C than sharing syringes, Tr. (Dec. 15, 2005), at 190:23 – 191:7. Unless the individual from whom the cotton and cooker were confiscated were an Exchange client, the Exchange were operating simultaneously with the officers' confiscation, and the Exchange were located proximate to the location of the confiscation, IDUs would use someone else's used cotton and cooker for injecting in lieu of being able to use their own cotton and cooker.

for the administration of controlled substances by injection." Mass. Gen. Laws Ann. ch. 94, § 27(a); *Landry*, 438 Mass. at 207.

At issue in *Landry* was the applicability of a Massachusetts statute that provided as follows: "Notwithstanding any . . . law to the contrary, needles and syringes may be distributed or possessed[,] . . . and any such distribution or exchange of said needles or syringes shall not be a crime." Mass. Gen. Laws Ann. ch. 94, § 27(f); *Landry*, 438 Mass. at 207. Finding that this provision permitted Ms. Landry's possession of syringes, the Massachusetts Supreme Court reversed her conviction, holding that police officers lack probable cause to arrest an exchange client for possessing syringes and needles anywhere in the state. *Landry*, 438 Mass. at 208-11.

Defendants attempt to attach significance to the fact that "[t]here was nothing in the Massachusetts case about the extension of the program to the so called [sic] cooker or any other item [besides a syringe or needle]." Defs.' Resp. to Mot. for Clarif. (Dkt. No. 85), at 5. However, there are at least three reasons that Ms. Landry might not have raised the legality of possessing cotton, cookers, or any other non-syringe objects used in injecting controlled substances: First, there is no evidence that Ms. Landry was arrested for possessing anything other than four needles (i.e., there is no mention in the *Landry* opinion or the brief attached by defendants that she was arrested for possessing cookers). Second, there is no evidence that the exchange from which Ms. Landry received needles provided anything other than syringes and needles (i.e., there is no mention in the *Landry* opinion or the brief attached by defendants that the exchange provided cotton or cookers). Third, the Massachusetts statute expressly limited the injection equipment that could be possessed legally to "needles and syringes," saying nothing about "other objects" used in the process of injecting controlled substances. Mass. Gen. Laws Ann. ch. 94, § 27(f).

The third point highlights an important difference in the Massachusetts and Connecticut laws. Massachusetts prohibits the possession of a "hypodermic syringe, hypodermic needle, *or any*

*instrument* adapted for the administration of controlled substances by injection," Mass. Gen. Laws Ann. ch. 94, § 27(a) (emphasis added), although its legislature carved out an exception for an exchange client to possess merely "needles and syringes," Mass. Gen. Laws Ann. ch. 94, § 27(f). Connecticut, on the other hand, permits the possession of fewer than 31 "hypodermic syringes, needles *and other objects* used, intended for use or designed for use in parenterally injecting controlled substances into the human body." Section (ix) (emphasis added). Accordingly, "other objects" used in the process of injecting controlled substances are not drug paraphernalia in Connecticut, perhaps unlike in Massachusetts.

## CONCLUSION

Accordingly, plaintiffs respectfully request that the Court add the following sentence at the end of the injunction it issued on January 18, 2001:

> Injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(2)(A)(ix), means objects, such as syringes, cotton, and cookers (containers used to mix an injectable controlled substance with a liquid), that are used for injecting controlled substances and that are pathways through which bloodborne viruses and bacteria may be shared.

Dated: February 8, 2006

Respectfully submitted,

Adam B. Wolf
Graham A. Boyd
Rebecca Bernhardt
Alyse Bertenthal
AMERICAN CIVIL LIBERTIES UNION
    DRUG LAW REFORM PROJECT
1101 Pacific Ave., Suite 333
Santa Cruz, CA 95060
Telephone: (831) 471-9000
Fax: (831) 471-9676

By: /s/ Adam Wolf (GB)
Adam B. Wolf (PHV 0617)
Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee for the American Civil Liberties Union Drug Law Reform Project, 1101 Pacific Avenue, Suite 333, Santa Cruz, California 95060; is a person of such age and discretion to be competent to serve papers; and that on February 8, 2006, she served copies of the following:

1. **PLAINTIFFS' MOTION FOR LEAVE TO FILE SUBSTANTIVE REPLY BRIEF IN SUPPORT OF MOTION TO CLARIFY INJUNCTION**
2. **PROPOSED ORDER GRANTING PLAINTIFFS LEAVE TO FILE SUBSTANTIVE REPLY BRIEF IN SUPPORT OF MOTION TO CLARIFY INJUNCTION**
3. **PLAINTIFFS' SUBSTANTIVE REPLY BRIEF IN SUPPORT OF MOTION TO CLARIFY INJUNCTION**

by causing said copies to be placed in a prepaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, by depositing said envelope with an overnight courier at Santa Cruz, California:

Attorney Barbara Massaro
Bridgeport City Attorney's Office
999 Broad Street
Bridgeport, CT 06604

Brenda J. Griffin