UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, JOHN ROE, and CONNECTICUT HARM REDUCTION COALITION,<br>    Plaintiffs,<br><br>v.<br><br>BRIDGEPORT POLICE DEPARTMENT and ANTHONY ARMENO, ACTING CHIEF OF THE BRIDGEPORT POLICE DEPARTMENT, in his official capacity only,<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION NO.<br>3:00-CV-2167 (JCH)<br><br><br><br><br>May 30, 2006 |

**RULING ON PLAINTIFFS' MOTION FOR CONTEMPT [DOC. NO. 46]**

The plaintiffs, John Doe, John Roe,[1] and the Connecticut Harm Reduction Coalition, bring this motion for contempt against the Bridgeport Police Department ("BPD") and its acting chief, Anthony Armeno[2], in his official capacity, for violation of this court's permanent injunction regarding the conduct of the Bridgeport Police department vis-a-vis possessors of hypodermic injection equipment.[3]  See Ruling, 1/18/2001 [Doc. No. 38].  The plaintiffs claim, inter alia, that the defendants have violated the court's injunction by harassing clients of the Syringe Exchange Program in Bridgeport, Connecticut ("Exchange") and wrongfully confiscating their needles and Exchange

---

[1]The court granted the Plaintiffs' Motion to Proceed under Fictitious Name [Doc. No. 15] on November 13, 2000.

[2]Pursuant to the defendants' oral motion, Chief Armeno was substituted as a party to this suit for former Chief of Police Wilbur L. Chapman.  See [Doc. No. 70].

[3]The parties have also moved for a clarification of the meaning of the term "injection equipment" as employed in the court's injunction.  The motions for clarification of the court's Order will be addressed in a separate opinion.

identification cards. The defendants deny the plaintiffs' allegations and claim, inter alia, that they have been reasonably diligent in ensuring the compliance of the BPD with the court's Order. An evidentiary hearing was held on December 15 and 16, 2005 on the plaintiffs' motion for contempt, and the parties subsequently filed post-hearing pleadings.

For the following reasons, the plaintiffs' motion for contempt is DENIED.

## I. PROCEDURAL BACKGROUND

The plaintiffs brought this action, pursuant to 42 U.S.C. § 1983, on behalf of themselves and a class of similarly situated injecting drug users, against defendants for violation of the plaintiffs' fourth amendment rights to be free from illegal search and seizures, false arrest and malicious prosecution. The Connecticut Harm Reduction Coalition, a non-profit association organized to educate, train, and advocate for pragmatic public-health-oriented models of drug use prevention, treatment, and policy, is also a plaintiff in the action. The plaintiffs' complaint alleged that the defendants had illegally harassed and arrested, and destroyed the property of, members of the plaintiff class for possessing lawful amounts of injection equipment under Conn.Gen.Stat. § 21a-240(20)(ix)(establishing that 30 or fewer "hypodermic syringes, needles, and other objects used, intended for use, or designed for use in parenterally injecting controlled substances into the human body" was not within definition of "drug paraphernalia" under Connecticut law).

The plaintiffs filed an Application for Temporary Restraining Order on November 13, 2000, and oral argument on the plaintiffs' motion was heard the same day. On November 15, 2000, the court issued the following temporary restraining order:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief
> of the Bridgeport Police Department, their agents, employees, assigns,
> and all persons acting in concert or participating with them are enjoined
> and restrained from searching, stopping, arresting, punishing or penalizing
> in any way, or threatening to search, stop, arrest, punish or penalize in
> any way, any person who is a participant in the Bridgeport Syringe
> Exchange Program, based solely upon that person's possession of up to
> thirty sets of injection equipment, whether sterile or previously-used and
> possibly containing a residue of drugs.

Ruling on Plaintiffs' Application for Temporary Restraining Order [Doc. No. 18], p. 26.

On January 18, 2001, following oral argument, the court issued a ruling granting the plaintiffs' motion for class certification and the plaintiffs' motion for a permanent injunction.[4]  Ruling on Plaintiffs' Application for Preliminary Injunction and Motion for Class Certification [Doc. No. 38].  The ruling contained the following permanent injunction:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief
> of the Bridgeport Police Department, their agents, employees, assigns,
> and all persons acting in concert or participating with them are enjoined
> and restrained from searching, stopping, arresting, punishing or penalizing
> in any way, or threatening to search, stop, arrest, punish or penalize in
> any way, any person based solely upon that person's possession of up to
> thirty sets of injection equipment, within the scope of Conn. Gen. Stat. §
> 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace
> amount of narcotic substances contained therein as residue.

Id. at p. 64.  The plaintiffs have now moved for contempt, arguing that the defendants have not complied with the terms of the January 18, 2001 injunction.

## II.    FACTUAL BACKGROUND

At the hearing on the plaintiffs' motion for contempt, the plaintiffs proffered the

---

[4] At oral argument on December 15, 2000, with the consent of the parties, the plaintiffs' motion for a preliminary injunction was converted to a motion for a permanent injunction.

testimony of several witnesses in support of their motion. Four of their witnesses were clients of the Exchange, and another was an employee of the Bridgeport Health Department.

John Roe 6[5] was a client of the Exchange, and he testified regarding two incidents involving members of the BPD. He stated that, in the summer of 2004, he was pulled over by BPD officers while driving his car. Hearing Tr., 12/15/05 [Doc. No. 92], p. 42. In the course of searching his car, the officers tossed a syringe possessed by Roe 6 into a nearby vacant lot. Id.

Roe 6 also testified that, in the spring of 2005, he was stopped by officers of the BPD while walking on Pembroke Avenue with a couple of friends. Id. at 43. During the course of the stop, he showed his Exchange identification card to the police. Id. The police confiscated syringes that were possessed by Roe 6 and his two companions and put them into an evidence bag. Id. Roe 6 testified that he told an employee of the Exchange the badge number of one of the officers that he spoke to during this incident. Id. at 65. Roe 6 stated that he was able to obtain a new syringe from the Exchange when he explained what had happened. Id. at 56. At the hearing, it was established on cross-examination that Roe 6 had been convicted of felony assault.

John Doe 4 testified that, on July 14, 2003, he was stopped by two BPD officers when he was walking home from the Exchange, after exchanging needles. Id. at 78. The officers searched him and confiscated his Exchange identification card and his

---

[5]At the hearing on the plaintiffs' motion for contempt, the court granted in part the plaintiffs' motion for a protective order [Doc. No. 75] to allow certain witnesses to testify anonymously.

needles. Id. at 79.

Doe 4 also testified that, at approximately 1:30 pm on January 15, 2004, he was stopped by BPD officers approximately one block from the Exchange van. He stated that the officers searched him and found that he was not carrying any drugs. Id. at 77. Subsequent to his search, he testified that the officers "slapped" him three times, and then asked him to be an informant for the police. Id. He told an employee of the Exchange about the incident. Id.

John Roe 5 testified that he and a companion were stopped by a BPD officer on Jane Street in the summer of 2005, after having exchanged a needle at the Exchange van earlier in the day.[6] Id. at 106, 116. The officer asked Roe 5 and his companion whether they had any needles in their pockets. Id. Roe 5 informed the officer that he had needles in his bag. According to Roe 5, the officer ripped up his Exchange identification card and threw his and his companion's syringes down the sewer. Id. at 107. The officer also threatened to arrest Roe 5. Id. at 108.  Roe 5 also stated that he had witnessed the police take syringes from other people "a few times." Id. One particular incident occurred "a few days" after the initial incident involving Roe 5. Id. Roe 5 stated that he observed a BPD officer stop his friend and throw his friend's syringes to the ground. Id. at 108-9. At the hearing, it was established on cross-

---

[6] In an affidavit submitted in support of the plaintiffs' motion for contempt, Roe 5 described the incident as occurring in the "winter of 2004-2005." Dec. of Michael Perez [Doc. No. 47], Ex. G, ¶ 4. On cross examination, Roe 5 stated that he "can't really say if it was 2005, 2004 or 2003 because most of the time I was under the influence of drugs." Hearing Tr., 12/15/05, p. 111. In his affidavit, he also stated that he was on his bicycle when he was stopped and that the BPD officer threw his needles into the officer's car. Dec. of Michael Perez, Ex. 6, ¶ 4.

examination that Roe 5 had been convicted of two drug-related felonies.

John Doe 11 testified that in mid-July 2005 he was stopped on East Main Street by BPD officers. He stated that the officers asked him if he possessed any drugs, and he informed them that he had syringes as well as an Exchange identification card. Id. at 132. According to Doe 11, the officers broke the syringes, threw them down the sewers, and took his Exchange card. Id. The officers also told Doe 11 that he was not allowed to carry syringes. Id. Doe 11 had also been previously convicted of felony drug possession charges. Id. at 141-42.

Robin Clark-Smith also testified on behalf of the plaintiffs. Smith was the AIDS program director at the Bridgeport Health Department, in which capacity she supervised the needle exchange program. Id. at 148-149. She testified that she was "aware of" the BPD confiscating people's syringes and Exchange identification cards between 2001 and 2005, although she never personally witnessed a BPD officer confiscate these items from someone. Id. at 158-59, 160. She also testified that she informed her supervisor, Jack McCarthy, of these incidents, and that McCarthy called BPD Chief Chapman multiple times about them in her presence. Id. at 159. According to Clark-Smith, his phone calls were not returned. Id. at 161-62.

Clark-Smith also testified that, under the protocol established by state law, the Exchange generally worked on a "one-to-one" exchange basis, i.e., a syringes were only distributed in the number in which they were received by the Exchange from Exchange clients. Id. at 173. She would not be able to give a client needles if he did not have any to exchange; it would not suffice for the client to say that they had been taken. Id. at 177.

The defendants deny that the incidents described by the plaintiffs' witnesses took place, and they argue that the vagueness and lack of detail in the accounts, as well as the inconsistency of their accounts with the protocols of the BPD and the Exchange, render the witnesses' testimony non-credible.

At the hearing the defendants also produced several witnesses from the BPD who denied having participated in, or having knowledge of, the conduct ascribed to the BPD by the plaintiffs' witnesses. Sergeant Pablo Ortero, testified that, since August of 2004, he has been assigned as a supervisor of patrol officers on the East Side area of Bridgeport. Id. at 198. Sergeant Ortero is also known as Papalito, and he was identified by Clark-Smith as having confiscated some Exchange clients' needles. Id. at 161. He testified that he has never taken anyone's needles when they possess fewer than 30 of them, nor was he aware that any officer under his supervision has taken needles from anyone possessing fewer than 30. Id. at 200-1. He stated that he would never take syringes and throw them into a sewer because he would not personally touch anyone's needles for fear of disease. Id. at 200. He also stated that he was not working on patrol from August 2004 until March or April 2005 due to a health condition. Id. at 203. On cross-examination, Sergeant Otero stated that he was not aware of the injunction issued by this court. Id. at 213 [Doc. No. 94].

Captain Adam Radzimirski, the commander of the Narcotics and Vice Division, stated that he did not have any complaints from anyone in the summer of 2004 and the spring of 2005 regarding officers seizing syringes from anyone. Id. at 227. Sergeant Ralph Villegas was the daytime supervisor of the Narcotics and Vice Division from 2000 until 2004, and he retired in 2004. Id. at 293. He testified that, as a supervisor, he was

not aware of any incident in which his officers confiscated syringes in violation of this court's Order. Id. at 297. Sergeant Mark Straubel supervises patrol officers in their daily activities. Id. at 329. He testified that he and his officers do not stop people for having needles or being part of the Exchange program. Id. at 333. Although, for officer safety, officers often ask individuals to place needles on the rear of a patrol car, the officers are instructed not to take anyone's needles. Id. at 334. He testified that he has never observed officers taking needles and throwing them down a sewer or into a lot. Id. at 335. He stated that needles are only confiscated if an individual is placed under arrest, and that officers must state over the radio their actions and location any time that they stop an individual. Id. at 335-36.

Anne Trojanowski, the driver of the Exchange van, testified that no syringes were exchanged from the van on January 15, 2004. Id. at 352.

The defendants also presented testimony regarding the training that the BPD had receiving in relation to the court's 2001 injunction to support their argument that the defendants have been reasonably diligent in abiding by the court's Order. Lieutenant James Viadiero testified that, in 2001, as an executive officer in the training division of the BPD, he prepared a training bulletin regarding the court's Order that was distributed to the BPD through a "sign-in" system whereby each officer signs a sheet to acknowledge his or her receipt of the bulletin. Id. at 315. Lieutenant Viadiero did not check to see if the bulletin had in fact been signed for by any individual officer. Id. at 315-16. He also included the bulletin in some monthly legal services trainings that he conducted. Id. at 316. Sergeant Straubel testified that training bulletins are read to BPD officers, and that it is his responsibility to make sure that his supervisees have

signed for them. Id. at 341. Sergeants Otero and Villegas also mentioned having received a training bulletin relating to the Exchange and this court's ruling. Id. at 214, 296.

Captain Radzimirski also testified that BPD officers receive annual training regarding blood borne pathogens, although it is not clear that this training included any information regarding the court's 2001 injunction and the circumstances under which officers could legally seize syringes from people. Id. at 291. Captain Radzimirski also stated that an additional training bulletin regarding the Exchange and the court's Order was circulated in 2005, and that this bulletin was different than that which had been circulated in the previous three years. Id.

Lieutenant Robert Sapiro testified that, in November 2005, he was named liaison to the Bridgeport Health Department and Exchange, in which capacity he has direct contact with Robin Clark-Smith to address any complaints that may arise. Id. at 364. He also indicated in his testimony that no one held this position prior to him. Id. at 367.

### III.   LEGAL STANDARD

"[T]he district court's power to hold a party in contempt--whether civil or criminal--is significantly circumscribed. In a civil contempt proceeding, like the present case, a contempt holding will fall unless the order violated by the contemnor is 'clear and unambiguous,' the proof of non-compliance is 'clear and convincing,' and the contemnor was not reasonably diligent in attempting to comply." U.S. v. Local 1804-1, Intern. Longshoremen's Ass'n, AFL-CIO, 44 F.3d 1091, 1096 (2d Cir.1995). See also Perez v. Danbury Hosp., 347 F.3d 419, 423-24 (2d Cir. 2003)("To establish contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear

and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.")  A contempt order is a "potent weapon . . . to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct."  King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995)(internal quotation marks omitted).  The decision to hold a party in contempt is within the discretion of the district court.  See Dunn v. New York State Dept. of Labor, 47 F.3d 485, 490 (2d Cir.1995).

**IV.    DISCUSSION**

      **A.    Clear and Unambiguous Order**

"A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, . . . who must be able to ascertain from the four corners of the order precisely what acts are forbidden."  King, 65 F.3d at 1058.  The clarity of an order is determined with reference to the conduct in question.  Perez, 347 F.3d at 424.  In New York State Nat. Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1989), an order was found to be clear and unambiguous where "the conduct that lay between that which was prohibited and that which was permitted was sufficiently clear for defendants to ascertain precisely what they could and could not do."

At oral argument on the plaintiffs' contempt motion, the defendants conceded that the court's January 2001 injunction clearly prohibited some of the conduct alleged to have been engaged in by the defendants.  In particular, the defendants did not contest the injunction clearly prohibited confiscating Exchange clients' Exchange identification cards and clearly prohibited confiscating individuals' needles, at least

unless the person was being taken into custody or arrested. Hearing Tr., 11/17/2005 [Doc. No. 69], p. 23-24. It also appears clear to the court that "slapping" or otherwise abusing an Exchange client, as alleged by Doe 4, would violate the clear and unambiguous provisions of the court's injunction.

The plaintiffs initially argued that the court's injunction also prohibits the seizure by the police of "cookers," i.e., small devices resembling bottle caps that are used to prepare intravenous drugs for injection. The question of whether the injunction should be clarified or modified to include cookers within the definition of injection equipment is the subject of separate motions filed by the parties that are addressed in a separate opinion. However, regardless of the disposition of these separate motions, given the language of the injunction, in light of the court's January 18, 2001 Ruling, the court cannot conclude that the injunction clearly and unambiguously prohibits the seizure of cookers.

### B.   Clear and Convincing Proof of Violation

To successfully demonstrate contempt, a movant must demonstrate by clear and convincing evidence the violation of a court's order. "The imposition of a civil contempt order is a severe sanction subject to a higher standard of proof than the preponderance of the evidence standard applicable to ordinary civil cases." King v. Allied Vision, Ltd., 155 F.R.D. 440, 448 (S.D.N.Y.1994), (citing Hart Schaffner & Marx v. Alexander's Department Stores, Inc., 341 F.2d 101, 102 (2d Cir.1965)), rev'd in part on other grounds, 65 F.3d 1051(2d Cir. 1995). "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." Levin v. Tiber Holding Corp., 277 F.3d

243, 250 (2d Cir. 2002). In another context, the Supreme Court has described this burden of proof as requiring the movant to "place in the ultimate factfinder an abiding conviction that the truth of its factional contentions are highly probable." <u>Colorado v. New Mexico</u>, 467 U.S. 310, 316 (1983)(internal quotation marks omitted).

      The plaintiffs' evidence largely consists of the accounts of the four Exchange clients who described seven incidents involving the BPD that allegedly occurred during a three year period, and the conclusory statements of Clark-Smith to the effect that she was generally aware of the BPD's actions in confiscating identification cards and syringes. As the defendants have pointed out, the witnesses's accounts are sketchy and lack details that would bolster the witness's reliability, such as the badge numbers of the officers involved in the stops and, in most cases, the approximate date and time of the stops. Aspects of the witnesses' accounts are also at odds with the protocol of the Exchange; in particular, Roe 6 testified that he was able to obtain new needles despite not having needles to exchange. This tension between the testimony and the proper protocol does not itself render the testimony unreliable; however, the testimony must be viewed in light of these circumstances. In addition, the long period of time in which the separate incidents recounted by the plaintiffs' witnesses are alleged to have occurred belies the inference that there is consistent pattern of violation of the court's order by the defendants.

      The plaintiffs have noted their difficulty in finding witnesses willing to testify regarding violations of the court's injunction. The court understands that the context of the court's injunction and the circumstances of the plaintiff class present difficulties to the plaintiffs in marshaling evidence in support of their motion not typically experienced

by litigants in federal court. Nonetheless, the court must judge the sufficiency of the evidence based on the record before it.

The court does not discredit the accounts of the plaintiffs' witnesses regarding their encounters with the police, nor does it find credible all of the evidence offered by the defendants that no BPD officer has engaged in conduct violative of the court's Order. In other words, the plaintiffs have produced some evidence in support of their motion for contempt. However, given the vagueness of the witnesses' accounts offered by the plaintiffs, some credible aspects of the defendants' denials, and the period of time over which violations are alleged to have occurred, the court cannot conclude that the plaintiffs have proven, under the heightened, clear-and-convincing standard of proof applicable to contempt proceedings, violations of the court's January 18, 2001 Order that would make appropriate a finding that the defendants are in contempt.

### C.    Defendants' Reasonable Diligence

Although the court finds that the plaintiffs have not produced sufficient evidence of the defendants' violation of the court's order to support a finding of contempt, the court would nonetheless note that it is underwhelmed by the extent of the defendants' efforts to ensure compliance with the court's January 18, 2001 Order. There is some evidence that, in 2001, following the court's Order, a training bulletin was produced to communicate the injunction to the BPD. However, there is no evidence that any supervisor in the BPD actually made sure that BPD patrol officers had read the bulletin and understood what was required of them. The court notes, in particular, Sergeant Otero's testimony that he was not aware of the court's injunction. As in Manhattan Indust. v. Sweater Bee By Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989), in which the Second

Circuit found that a party failed to "energetically police compliance" with a consent judgment, there appears to have been little attention given to the dictates of the court's Order in the defendants' training and supervision of its officers subsequent to its initial training bulletin and prior to the plaintiffs' indication of their intention to move for contempt. The court therefore finds that the defendants' efforts in 2001 to ensure compliance with the court's Order were not reasonably diligent.

The defendants have made several recent efforts to ensure compliance with the court's Order. The 2005 training bulletin, and the recent appointment of Lieutenant Sapiro as liaison to the Health Department are positive steps towards ensuring compliance; nonetheless, they are also appropriately characterized as "a spurt of activity on the heels of plaintiffs' motion for a finding of contempt." EEOC v. Local 638 of Sheet Metal Workers' Int'l Ass'n, 889 F.Supp. 642, 667-68 (S.D.N.Y. 1995), rev'd in part on other grounds, 81 F.3d 1162 (2d Cir. 1996).

Finally, it bears noting that the court is troubled by the suggestions made throughout the defendants' pleadings that the plaintiffs' failure to make civilian complaints to the BPD, or their failure to raise the issues underlying the motion for contempt with the BPD prior to their indication of their intention to move for contempt, somehow excuses the lack of efforts on the defendants' part to ensure that the court's Order is complied with. The court's January 18, 2001 injunction is directed at the defendants, and it is their burden alone to make reasonably diligent efforts to ensure their compliance.

## V. CONCLUSION

For the reasons stated above, the plaintiffs' Motion for Contempt [Doc. No. 46] is DENIED.

**SO ORDERED.**

Dated this 30th day of May, 2006, at Bridgeport, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge