**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN DOE, JOHN ROE, and | : | |
| CONNECTICUT HARM | : | CIVIL ACTION NO. |
| REDUCTION COALITION, | : | 3:00-CV-2167 (JCH) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGEPORT POLICE | : | |
| DEPARTMENT and ANTHONY | : | MAY 30, 2006 |
| ARMENO, ACTING CHIEF OF THE | : | |
| BRIDGEPORT POLICE | : | |
| DEPARTMENT, in his official | : | |
| capacity only, | : | |
|     Defendants. | : | |

**RULING ON MOTIONS TO CLARIFY INJUNCTION [DOC. NOS. 73 & 86]**

The plaintiffs, John Doe, John Roe,[1] and the Connecticut Harm Reduction

Coalition, and the defendants, the Bridgeport Police Department ("BPD") and its acting

chief, Anthony Armeno[2], in his official capacity, bring separate motions requesting that

the court clarify its January 18, 2001 injunction regarding the BPD's conduct in relation

to possessors of hypodermic injection equipment.  The parties both request that the

court clarify—or, more accurately, modify—the meaning of the phrase "injection

equipment," as employed in the courts' January 18, 2001 injunction.  In particular, the

plaintiffs seek that the term "injection equipment" be defined to include "objects, such as

syringes, cotton, and cookers (containers used to mix an injectable controlled with a

liquid), that are used for injecting controlled substances and that are pathways through

---

[1]The court granted the Plaintiffs' Motion to Proceed under Fictitious Name [Doc. No. 15] on November 13, 2000.

[2]Pursuant to the defendants' oral motion, Chief Armeno was substituted as a party to this suit for former Chief of Police Wilbur L. Chapman.  See [Doc. No. 70].

which bloodborne viruses and bacteria may be shared."  Pls' Mot. to Clarify Injunction

[Doc. No. 73], p. 1.   The plaintiffs argue, inter alia, that the plain language of

Conn.Gen.Stat. § 21a-240(20)(A)(ix), and principles of statutory construction, compel

this clarification.  The defendants argue that such a modification is beyond the scope of

the meaning of Conn.Gen.Stat. § 21a-240(20)(A)(ix), and, thus, the injunction should be

clarified to make clear that "cookers" are not included in the exemption from the

Connecticut paraphernalia law contained in section 21a-240(20)(A)(ix).  For the

following reasons, the plaintiffs' motion to clarify the court's injunction is GRANTED and

the defendants' motion to clarify the court's injunction is DENIED.

I.      **PROCEDURAL BACKGROUND**

        The plaintiffs brought this action, pursuant to 42 U.S.C. § 1983, on behalf of

themselves and a class of similarly situated injecting drug users, against defendants for

violation of the plaintiffs' fourth amendment rights to be free from illegal search and

seizures, false arrest and malicious prosecution.  The Connecticut Harm Reduction

Coalition, a non-profit association organized to educate, train, and advocate for

pragmatic public-health-oriented models of drug use prevention, treatment, and policy,

is also a plaintiff in the action. The plaintiffs' complaint alleged that the defendants had

illegally harassed and arrested, and destroyed the property of, members of the plaintiff

class for possessing lawful amounts of injection equipment under Conn.Gen.Stat. §

21a-240(20)(ix), which establishes that less than 31  "hypodermic syringes, needles,

and other objects used, intended for use, or designed for use in parenterally injecting

controlled substances into the human body" do not constitute illegal drug paraphernalia

under Connecticut law.

The plaintiffs filed an Application for Temporary Restraining Order on November 13, 2000, and oral argument on the plaintiffs' motion was heard the same day.  On November 15, 2000, the court issued the following temporary restraining order:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person who is a participant in the Bridgeport Syringe Exchange Program, based solely upon that person's possession of up to thirty sets of injection equipment, whether sterile or previously-used and possibly containing a residue of drugs.

Ruling on Plaintiffs' Application for Temporary Restraining Order [Doc. No. 18], p. 26.

On January 18, 2001, following oral argument, the court issued a ruling granting the plaintiffs' motion for class certification and the plaintiffs' motion for a permanent injunction.[3]  Ruling on Plaintiffs' Application for Preliminary Injunction and Motion for Class Certification [Doc. No. 38], Doe v. Bridgeport Police Department, 198 F.R.D. 325 (D.Conn. 2001).  In ruling on the plaintiff's motion for an injunction, the court reviewed the relevant legislative enactments preceding the current version of Conn.Gen.Stat. § 21a-240(20), and Conn.Gen.Stat. §§ 21a-267 and 21a-279(a), the provisions making illegal in Connecticut the possession of drug paraphernalia and controlled substances. Id. at 336-338.  The court also considered the relevant legislative history regarding these enactments. See id. at 344-344.   Applying principles of statutory interpretation under Connecticut law, the court determined that the intent of the legislature in enacting

---

[3]At oral argument on December 15, 2000, with the consent of the parties, the plaintiffs' motion for a preliminary injunction was converted to a motion for a permanent injunction.

the current legislative scheme was to decriminalize the possession of fewer than 31 syringes or needles by anyone in Connecticut (i.e., not just clients of a needle exchange program), even when the needles contained the residue of controlled substances.  Id. at 350.  Accordingly, the court found that the plaintiff class had succeeded on the merits of its Fourth Amendment claims.  Id.   The court thus ordered the following permanent injunction:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

Id.

In November 2005, prior to making the motion for clarification, the plaintiffs moved for contempt, arguing that the defendants have not complied with the terms of the January 18, 2001 injunction.  In support of their motion for contempt, the plaintiffs alleged that members of the BPD wrongfully confiscated, from members of the plaintiff class, "cookers," i.e., bottlecap-sized devices used in the conversion of controlled substances into liquid form for injection, the possession of which, the plaintiffs argued, are within the exemption of Conn.Gen.Stat. §21a-240(20)(A)(ix) and thus protected under the court's January 18, 2001 injunction.  At oral argument on the motion for contempt, the court indicated that it did not consider the injunction to clearly and unambiguously prohibit the seizure of cookers, as it subsequently held in its ruling on

4

the plaintiffs' motion for contempt.[4]  Hearing Tr., 11/17/05, p. 13; Ruling on Plaintiffs'

Motion for Contempt, p. 11.  The parties subsequently filed the instant motions to clarify

the scope of the court's injunction.

## II.    FACTUAL BACKGROUND

The legislative history of Conn.Gen.Stat. § 21a-240(20)(A)(ix) is recounted in the

court's previous ruling on the plaintiffs' motion for an injunction.  See 198 F.R.D. at 336-

338.  Most pertinent to the current question before the court was the enactment, in

1992, of Public Act No. 92-185, which was titled "An Act Concerning the Purchase and

Sale of Hypodermic Needles and Syringes," and which modified the definition of drug

paraphernalia in Conn.Gen.Stat. § 21a-240(2)(A)(9) to state "(ix) in a quantity greater

than eight, hypodermic syringes, needles and other objects used, intended for use or

designed for use in parenterally injecting controlled substances into the human body."[5]

───────────────────

[4] The court notes that the issue of the inclusion of cookers and other objects used in the injection of controlled substances in the exemption of Conn.Gen.Stat § 21a-240(20)(ix) was not previously specifically briefed by the parties or addressed by the court.  While the plaintiffs, in their initial memorandum of law in support of their motion for a preliminary injunction, spoke in terms of "injection equipment" generally, and mentioned that needle exchanges distribute sterile injection equipment which includes cookers, see Memo. of Points and Authorities in Supp. of Pls' Mot. for Temp. Rest. Order and Prelim. Inj. [Doc. No. 4], p. 6, the thrust of the plaintiffs' motion, and the court's subsequent rulings, focused only on the legal status of hypodermic needles and syringes.  The court, therefore, construes the plaintiffs' motion as a request not merely to "clarify" the previously entered injunction, but to "modify" it.

[5] The previous version of Conn.Gen.Stat. § 21a-240(20)(A)(20) read:

"Drug paraphernalia" refers to equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing or concealing, or injecting, ingesting, inhaling or otherwise introducing into the human body,

The quantity in section 21a-240(20)(A)(ix) was later adjusted to ten, and then thirty,

"hypodermic needles, syringes and other objects."  See 198 F.R.D. at 337-38.

At the hearing on the plaintiffs' motion for contempt, the plaintiffs proffered the

testimony of several witnesses that related to the question presented in the parties'

motions to clarify the injunction.  Robin Clark-Smith, an employee of the Bridgeport

---

any controlled substance contrary to the provisions of this chapter
including, but not limited to: (1) Kits intended for use or designed for use
in planting, propagating, cultivating, growing or harvesting of any species
of plant which is a controlled substance or from which a controlled
substance can be derived; (2) kits used, intended for use or designed for
use in manufacturing, compounding, converting, producing, processing or
preparing controlled substances; (3) isomerization devices used, intended
for use in increasing the potency of any species of plant which is a
controlled substance; (4) testing equipment used, intended for use or
designed for use in identifying or analyzing the strength, effectiveness or
purity of controlled substances; (5) dilutents and adulterants, such as
quinine hydrochloride, mannitol, mannite, dextrose and lactose used,
intended for use or designed for use in cutting controlled substances; (6)
separation gins and sifters used, intended for use or designed for use in
removing twigs and seeds from, or in otherwise cleaning or refining,
marihuana; (7) capsules and other containers used, intended for use or
designed for use in packaging small quantities of controlled substances;
(8) containers and other objects used, intended for use or designed for
use in storing or concealing controlled substances; (9) hypodermic
syringes, needles and other objects used, intended for use or designed for
use in parenterally injecting controlled substances into the human body;
(10) objects used, intended for use or designed for use in ingesting,
inhaling, or otherwise introducing marihuana, cocaine, hashish, or hashish
oil into the human body, such as: Metal, wooden, acrylic, glass, stone,
plastic or ceramic pipes with screens, permanent screens, hashish heads
or punctured metal bowls; water pipes; carburetion tubes and devices;
smoking and carburetion masks; roach clips: Meaning objects used to
hold burning material, such as a marihuana cigarette, that has become
too small or too short to be held in the hand; miniature cocaine spoons,
and cocaine vials; chamber pipes; carburetor pipes; electric pipes;
air-driven pipes; chillums; bongs or ice pipes or chillers . . . .

Conn.Gen.Stat. § 21a-240(20)(A) (1991).

6

Health Department who supervises the Bridgeport needle exchange program ("Exchange"), testified that it is the practice of the Exchange to provide to its clients, as injection equipment, "caps [i.e., cookers], cotton, tourniquet, syringes, sterile water . . . [and] bleach."  Hearing Tr., 12/15/05 [Doc. No. 93], p. 151-52.  She stated that cookers had always been suppled by the Exchange and that they are supplied because the sharing of cookers by intravenous drug users can spread blood-borne diseases, such as hepatitis and HIV.  Id.  She also stated that, unlike syringes, it is not necessary for a client to bring to the Exchange a used cooker to receive a new one.  Id.

Doctor Robert Heimer, an associate professor at the Yale University School of Medicine in the Department of Epidemiology and Public Health, also testified on behalf of the plaintiffs as an expert.  He testified that illegal intravenous drugs are purchased in solid form and are then dissolved in water using a cooker before they are injected.  Id. at 185.  He explained that a cooker can vary in its makeup, and objects such as bottle caps, the top of a syringe, spoons, or the bottom of a "Coke can cut up" can serve as a cooker.  Id.  He agreed that a cooker is a "necessary object" for injecting because drugs are sold solid.  Id. at 186.  He also described a study in which fifty percent of the cookers collected in a place where people were congregated to inject illegal drugs had traces of contaminated blood.  Id.  He stated that it would be possible to contract diseases such as HIV and hepatitis from the use of used cookers, as well as the use of "cottons," which are used to filter intravenous drugs.  Id. at 186-87.  He also testified that he had testified on three occasions before the Connecticut state legislature regarding needle exchange programs, and that the issue of returning used cookers to needle exchanges never came up in the course of his testimony.  Id. at 189-90.

7

## III.    LEGAL STANDARD

The question before the court rests on resolving the proper interpretation of

Conn.Gen.Stat. § 21a-240.  A district court interpreting a state statute must "carefully

predict how the state's highest court would rule if confronted with the issue, including

how it would resolve any ambiguity in the statute."  KLC, Inc. v. Trayner, 426 F.3d 172,

176 (2d Cir. 2005) (citations and internal quotation marks omitted).

The Connecticut Supreme Court has held that,"[w]hen construing a statute, [o]ur

fundamental objective is to ascertain and give effect to the apparent intent of the

legislature." Kinsey v. Pacific Employers Ins. Co., 277 Conn. 398, 405 (2006)

(citations omitted).

> In other words, we seek to determine, in a reasoned manner, the meaning
> of the statutory language as applied to the facts of [the] case, including
> the question of whether the language actually does apply.  In seeking to
> determine that meaning, [Conn.Gen.Stat.] §1-2z directs us first to
> consider the text of the statute itself and its relationship to other statutes.
> If, after examining such text and considering such relationship, the
> meaning of such text is plain and unambiguous and does not yield absurd
> or unworkable results, extratextual evidence of the meaning of the statute
> shall not be considered.  When a statute is not plain and unambiguous,
> we also look for interpretive guidance to the legislative history and
> circumstances surrounding its enactment, to the legislative policy it was
> designed to implement, and to its relationship to existing legislation and
> common law principles governing the same general subject matter.

Id. (quoting Cogan v. Chase Manhattan Auto Financial Corp., 276 Conn. 1, 7 (2005));

see also Conn.Gen. Stat § 1-2z ("The meaning of a statute shall, in the first instance,

be ascertained from the text of the statute itself and its relationship to other statutes. If,

after examining such text and considering such relationship, the meaning of such text is

plain and unambiguous and does not yield absurd or unworkable results, extratextual

evidence of the meaning of the statute shall not be considered.").

8

The meaning of a statute is plain and unambiguous only when the "meaning that is so strongly indicated or suggested by the statutory language as applied to the facts of the case that when the language is read as so applied, it appears to be the meaning and appears to preclude any other likely meaning." Kinsey, 277 Conn. at 408 (quoting State v. Courchesne, 262 Conn. 527, 573 n.30 (2003)). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." DaimlerChrysler Services N.A., LLC v. Comm'r of Revenue Servs., 274 Conn. 196, 203 (2005)(internal quotation marks omitted).

The Connecticut Supreme Court therefore looks "first to the language of the statute . . . which must be read in the context of the underlying statutory scheme." Fyber Props. Killingworth Ltd. P'ship v. Shanoff, 228 Conn. 476, 482 (1994) (citations omitted). "The words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed," Oxford Tire Supply, Inc. v. Comm'r of Revenue Servs., 253 Conn. 683, 696 (2000) (citation and internal quotation marks omitted), or "the context indicates that a different meaning was intended," Stamford Ridgeway Assocs. v. Bd. of Representatives, 214 Conn. 407, 425 (1990) (citation and internal quotation marks omitted). Conn. Gen. Stat. § 1-1(a) specifically provides that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Additionally, the Connecticut Supreme Court will "consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." Wiseman v. Armstrong, 269 Conn.

802, 813(2004) (citation and internal quotation marks omitted).  "'[S]uch . . .

reconciliation is especially important in dealing with provisions that are enacted as part

of the same legislation.'" Elliot v. Sears, Roebuck & Co., 229 Conn. 500, 512 (1994)

(citation omitted).

     "When the relevant statutory text and the relationship of that text to other

statutes do not reveal a meaning that is plain and unambiguous, our analysis is not

limited, and we look to other factors relevant to determine the meaning of [the statute],

including its legislative history, the circumstances surrounding its enactment and its

purpose."  DaimlerChrysler, 274 Conn at 202.   "'These aids to legislative interpretation

apply with equal force to amendatory acts which effectuate changes in existing

statutes.'"  Rose v. Freedom of Info. Comm'n, 221 Conn. 217, 227 (1992) (citation

omitted).   Among these other aids, courts may examine the relevant legislative history

and the statute's relationship to existing legislation, particularly existing statutes

regarding the same general subject matter.  See State v. Velasco, 253 Conn. 210, 221

(2000); Burke v. Fleet Bank, 252 Conn. 1, 21 (1999).  In this context, the Connecticut

Supreme Court has observed that "'[s]tatements of legislators often provide strong

indication of legislative intent."  Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 292 (1993)

(citation omitted).  Thus, "[s]tatements of purpose, committee reports, and floor debate

are all legitimate sources of legislative intent."  Burge v. Town of Stonington, 219 Conn.

581, 594 (1991) (citations omitted).

     Several well-established canons adopted by the Connecticut Supreme Court

counsel that courts must be wary of reading exceptions and repeals into statutes

beyond the statute's express language.  "'Courts may not by construction supply

omissions . . . or add exceptions merely because it appears that good reasons exist for adding them.'" Greco v. United Technologies Corp., 277 Conn. 337, 350 (2006) Furthermore, courts "are not permitted to supply statutory language that the legislature may have chosen to omit." Echavarria v. Nat. Grange Mut. Ins. Co., 275 Conn. 408, 414 (2005). Additionally, "'[i]n the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language.'" Rivera v. Comm'r of Corr., 254 Conn. 214, 242 (2000) (citation omitted). "'Furthermore, there is a presumption that an amendatory act does not change the existing law further than is expressly declared or necessarily implied.'" Id. (citation and footnote omitted).

## IV.    DISCUSSION

The question before the court is whether the language in Conn.Gen.Stat. § 21a-240(20)(A)(ix), which provides that fewer than 31 "hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body" do not constitute illegal drug paraphernalia, exempts the cookers and cottons, typically used by illegal intravenous drug users, from the definition of paraphernalia. The plaintiffs make several arguments in favor of their position that the legislature intended this meaning. They argue that the "plain language" of section (ix) permits the possession of objects like cookers and cottons; that this interpretation must be correct because otherwise Exchange employees would be exposing themselves and their clients to criminal liability; that the defendants' interpretation of the statute, i.e., cookers and cottons are not covered by section (ix), would undermine the purposes of the Exchange and its implementing legislation by creating a public-health risk; and the defendants' interpretation of the statute would

11

"eviscerate" the utility of the injunction.  See Pls' Points and Auth. Supp. Mot. to Clarify Inj. [Doc. No. 73], p. 2.  The defendants argue that section (ix) is only intended to decriminalize the possession of syringes and needles and cannot be interpreted to include cookers and other objects within the scope of its exemption.

At the outset, it is helpful to articulate the specific issue at hand in light of several characteristics about the structure of section 21a-240(20)(A).  The question before the court is not whether cookers and cottons fall within any part of the definition of drug paraphernalia in section § 21a-240(20)(A), but whether cookers and cottons fit specifically within the language of subsection (ix) such that the exemption provided within that subsection also includes cookers and cottons.  Section 21a-240(20)(A) provides a general and broad description of drug paraphernalia which includes, but is not limited to, the specific categories and types of drug paraphernalia that are described in subsections (i) through (x):

> "Drug paraphernalia" refers to equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing or concealing, or injecting, ingesting, inhaling or otherwise introducing into the human body, any controlled substance contrary to the provisions of this chapter including, but not limited to . . . .

Conn.Gen.Stat. § 21a-240(20)(A).  Furthermore, cookers have long been considered "drug paraphernalia" under Connecticut case law, although the court is not aware of any cases articulating the specific subsection of the current version of section 21a-240(20)(A) that applies to cookers.  See State v. Rose, 168 Conn. 623, 634 (1975)(categorizing a cooker as "narcotic paraphernalia" seized during a search); State

v. Holmes, 160 Conn. 140, 143 (1970) ("The bottle cap is an item of narcotics paraphernalia known as a 'cooker' and the cotton pledget is usually found with a cooker."); State v. Anonymous (1973-6), 30 Conn.Supp. 211, 215 (Conn. Super. 1973) (listing a "cooker" as a device used to violate Connecticut's drug distribution laws). Through amending subsection (ix) of section 21a-240(20)(A), the Connecticut legislature clearly intended to exempt, from the definition of drug paraphernalia, fewer than 31 "hypodermic syringes, needles, and other objects used . . in parenterally injecting controlled substances," despite the fact that a single syringe used to inject controlled substances could still qualify as "drug paraphernalia" under the general definition provided in section 21a-240(20)(A), as well as, perhaps, other subsections of the statute.[6]  Conn.Gen.Stat. § 21a-240(20(A)(ix); see also Chatterjee v. Comm. of Rev. Servs., 277 conn. 681, 692 (2006) ("W]hen the legislature amends the language of a statute, it is presumed that it intended to change the meaning of the statute and to accomplish some purpose.").  Accordingly, the court must resolve whether cookers and cottons fall within the exemption provided in the amended subsection (ix) of section 21a-240(20)(A)(ix), regardless of whether other language or other subsections of section 21a-240(20)(A)(ix) describe cookers and cottons.

In determining the meaning and scope of subsection (ix), the court looks first, of course, to the language of subsection (ix). The plaintiffs argue that the plain and

_____

[6]At oral argument, the court considered whether cookers fell into the category of objects described in subsection (ii) of section 21a-240(20)(A), i.e., "kits used, intended for use or designed for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances."  Given the court's interpretation of the statute, it need not resolve the meaning and scope of this provision.

13

unambiguous meaning of "other objects used, intended for use or designed for use in parenterally injecting controlled substances" includes cookers and cottons because, according to Dr. Heimer's testimony, these objects are used in the process of injecting illegal drugs such as heroin.

At first glance, it would appear that a potential ambiguity exists within the "other objects" language, as "other objects used in . . . parenterally injecting controlled substances," may have two different meanings: 1) the language may refer to objects, such as cookers and cottons, often used in the process of injecting drugs, or 2) the language may only refer to objects directly used to inject drugs parenterally into a person's body.[7]   When the language of subsection (ix) is viewed, however, in the context of the language of section 21a-240(20)(A), as well as other Connecticut statutes pertaining to drug paraphernalia, it is clear that the former meaning of "other objects," i.e. objects used in the process of parenterally injecting controlled substances, is plainly and unambiguously the only reasonable interpretation of the statute.

First, the gerund "injecting," as used in subsection (ix), connotes "the process of injection," in contrast to "to inject," which connotes, to a greater degree, the specific and direct act of introducing a substance into a human body parenterally.  When this language is viewed in the context of other Connecticut statutes that were passed concurrently with section 21a-240(20)(A), it becomes clear that the legislature intended

---

[7]Parenteral is defined in Stedman's Medical Dictionary, 27th Edition, as "[b]y some other means than through the gastrointestinal tract; referring particularly to the introduction of substances into an organism by intravenous, subcutaneous, intramuscular, or intramedullary injection."  Stedman's Medical Dictionary 1316 (27th ed. 2000).

the verb construction in section 21a-240(20)(A) to imply these broader, "process"-related connotations. The current language of section 21a-240(20)(A) was introduced into the definition of paraphernalia under Connecticut law in Public Act No. 80-224. Included within that act was a provision that became Conn.Gen.Stat. § 21a-267, which proscribes the use of the objects defined as paraphernalia under section 21a-240. P.A. No. 8-224 Section 3. Section 21a-267 reads, in relevant part,

> [n]o person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a-240, to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a-240.

Conn.Gen.Stat. 21a-267(a). The language of section 21a-267 tracks the general definition of drug paraphernalia in section 21a-240(20)(A); the list of verbs that describe the proscribed activities is identical except for the forms of the verbs. Accordingly, in choosing to use the gerund verb construction throughout section 21a-240(20)(A), rather than the infinitive construction that it used concurrently in section 21a-240(20A), it appears that the Connecticut legislature intended the language of section 21a-240(20)(A) to entail the broader meaning that the gerund verb construction connotes.

While the mere form of the words used in subsection (ix) is not dispositive as to the meaning of "other objects," the propriety of this interpretation becomes clear when subsection (ix) is viewed in light of subsection (x) of section 21a-240(20)(A). Subsection (x) specifically defines as drug paraphernalia,

> objects used, intended for use or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, or hashish oil into the human body, such as: Metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with screens, permanent screens, hashish heads or

15

> punctured metal bowls; water pipes; carburetion tubes and devices; smoking and carburetion masks; roach clips: Meaning objects used to hold burning material, such as a marijuana cigarette, that has become too small or too short to be held in the hand; miniature cocaine spoons, and cocaine vials; chamber pipes; carburetor pipes; electric pipes; air-driven pipes; chillums; bongs or ice pipes or chillers.

Conn.Gen.Stat. § 21a-240(20)(A)(x).  Significantly, subsection (x) specifically describes a "roach clip" as an "object[] used, intended for use or designed for use in ingesting, inhaling, or otherwise introducing [controlled substances] into the human body."  Id.  As it is defined in subsection (x), a roach clip, like a cooker and cotton, is not used to directly introduce drugs into a body, i.e., it does not, and cannot, itself convey controlled substances into a body.  Instead, it is used in the process of introducing drugs into a body.  Given the inclusion of "roach clip" within the definition of paraphernalia, and the parallel structure of the subsections of section 21a-240(20)(A), it is without question that the gerund construction employed in "other objects used, intended for use or designed for use in parenterally injecting controlled substances" implies that objects used as part of the process of injecting controlled substances, such as cookers and cottons, fall within the exemption provided by subsection (ix) of section 21a-240(20)(A).

Finally, when read as a whole, the language of section 21a-240(20)(A) reveals the intention of the legislature to enact a broad and general definition of drug paraphernalia.[8]  Like the other subsections of section 21a-240(20)(A), before it was

---

[8] In particular, the court notes the inclusion of 21 verbs and ten categories to describe activities and objects that relate to the use of drugs; the general (i.e., non-specific) nature of the language describing the activities and objects; the inclusion of activities related to the production and processing of drugs in addition to activities related to the ingestion and injection of drugs; and the non-limiting language (i.e., "including, but not limited to . . . "), suggest that the definition of drug paraphernalia under section 21a-240(20)(A) is intended to be broad in scope.

16

amended in 1992, the "other objects" language of subsection (ix) appears to have been intended to have a broad scope, i.e., one that covers all objects used in the process of injecting controlled substances.  In adding the "in a quantity greater than 30" language to subsection (ix), the Connecticut legislature did not change the prior meanings of the other words in subsection (ix).  Accordingly, to the extent that the "other objects" language of subsection (ix) had a broad scope prior to 1992, it retains the same broad scope now, and, therefore, includes within the exemption provided by the 1992 amendment to subsection (ix), objects used in the process of parenterally injecting controlled substances into the human body.

The court therefore finds that the language of subsection (ix), when viewed in the context of its relationship to other statutes, plainly and unambiguously includes objects used in the process of injecting controlled substances, such as cookers and cottons, within its meaning.  See Conn.Gen.Stat. 1-2z.  The court also finds that the exemption of these objects from the general definition of drug paraphernalia does not necessarily lead to an absurd or unworkable results.[9]  Id.  Accordingly, having found the meaning of the statute to be unambiguous, the court does not reach the parties' extratextual arguments concerning the purpose of the statute, the legislative history that led to the

_____

[9]The court recognizes that the title of Public Act No. 92-185, which amended section 21a-240(20)(A)(ix), was "An Act Concerning the Purchase and Sale of Hypodermic Needles and Syringes."  However, given Dr. Heimer's testimony regarding the ability of used cookers and cottons to transmit blood-borne diseases, the inclusion of cookers and cottons within the exemption provided by the amendment to subsection (ix) is consistent with the public health purpose of the amendment.  See Doe v. Bridgeport, 198 F.R.D. 325, 345 (2000).  Thus, the conclusion that cookers and cottons are within the exemption provided by section 21a-240(20)(A)(ix) is not an absurd result.  Furthermore, given the decriminalization of needles and syringes, the decriminalization of cookers and cottons does not lead to any unworkable results.

17

enactment of the current version, and the practices of the Exchange in Bridgeport.

The defendants' objection to the plaintiffs' interpretation of section 21a-240(20)(A)(ix) largely rest on their claim that the Connecticut legislature did not intend to decriminalize the possession of cookers when it decriminalized the possession of needles and syringes through P.A. 92-185. In support of this position, the defendants argue that "[t]here was never a whisper in the legislative hearings or through the Introduction [sic] of any amendment that the Needle Exchange Program was now a Needle [sic] and cooker program." Defs' Response to Mot. for Clarification [Doc. No. 86], p.4. The defendants also point out that Conn.Gen.Stat. § 19a-124, which provides for the establishment of needle exchange programs in Connecticut cities, requires that needles and syringes be exchanged on a one-to-one basis but contains no similar requirement for cookers and cottons. Conn.Gen.Stat. § 19a-124(b)(2).

Given the court's conclusion that the meaning of Conn.Gen.Stat. § 19a-240(20)(A)(ix) is unambiguous, the court, under Conn.Gen.Stat. § 1-2z, may not consider the defendants' claim about the legislative history of the statute. The silence of the Connecticut legislature on the disposition of cookers under its amendments to the Connecticut paraphernalia laws, however, does not compel the conclusion that the Connecticut legislature did not intend that their amendments included cookers, or that the language of subsection (ix) does not have the meaning that the court has found to be unambiguous. In addition, given that many common and household objects may be used as cookers, the absence of cookers and cottons from the exchange program scheme does not imply that cookers and cottons do not fall within section 21a-240(20)(A)(ix).

18

Accordingly, the plaintiffs' motion to clarify the court's January 18, 2001 injunction is GRANTED.  The defendants' motion to clarify the court's injunction is therefore DENIED.

Therefore, the court hereby orders that the injunction entered on January 18, 2001 be modified to read:

> Defendants Bridgeport Police Department and Anthony Armeno, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue. "Injection equipment" is defined as objects, such as needles, syringes, cottons, and cookers (containers used to mix an injectable controlled substance with a liquid), that are used, intended for use or designed for use in parenterally injecting controlled substances within the human body.

## V.    CONCLUSION

For the reasons stated above, the plaintiffs' Motion to Clarify Injunction [Doc. No. 73] is GRANTED as described above, and the defendants' Motion to Clarify "Injection Equipment" [Doc. No. 86] is DENIED.  The court hereby orders that the injunction entered on January 18, 2001 be modified to read:

> Defendants Bridgeport Police Department and Anthony Armeno, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

"Injection equipment" is defined as objects, such as needles, syringes, cottons, and cookers (containers used to mix an injectable controlled substance with a liquid), that are used, intended for use or designed for use in parenterally injecting controlled substances within the human body.

**SO ORDERED.**

Dated this 30th day of May, 2006, at Bridgeport, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge