UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, JOHN ROE, and CONNECTICUT HARM REDUCTION COALITION,<br>    Plaintiffs | CIVIL ACTION NO.<br>3:00-CV-2167 (JCH) |
| v. | |
| BRIDGEPORT POLICE DEPARTMENT and ANTHONY ARMENO, ACTING CHIEF OF THE BRIDGEPORT POLICE DEPARTMENT, in his official capacity only,<br>    Defendants | DECEMBER 14, 2006 |

**RULING RE: PLAINTIFFS' MOTION FOR ATTORNEYS' FEES [DOC. NO. 111]**

The plaintiffs, John Doe, John Roe,[1] and the Connecticut Harm Reduction Coalition, bring this action against the defendants, the Bridgeport Police Department ("BPD") and its acting chief, Anthony Armeno,[2] in his official capacity, to recover attorneys' fees pursuant to 42 U.S.C. § 1988. The plaintiffs' motion arises out of this court's May 30, 2006 Ruling (Doc. No. 109) granting the plaintiffs' Motion for Clarification (Doc. No. 73) and denying the defendants' Motion for Clarification (Doc. No. 86). For the following reasons, the plaintiffs' motion for attorneys' fees is GRANTED in part.

**I.    BACKGROUND**

The plaintiffs brought this action, pursuant to 42 U.S.C. § 1983, on behalf of

---

[1] The court granted the Plaintiffs' Motion to Proceed under Fictitious Name [Doc. No. 15] on November 13, 2000.

[2] Pursuant to the defendants' oral motion, Chief Armeno was substituted as a party to this suit for former Chief of Police Wilbur L. Chapman. See Doc. No. 70.

themselves and a class of similarly-situated-injecting drug users, against defendants for violation of the plaintiffs' fourth amendment rights to be free from illegal search and seizures, false arrest and malicious prosecution. The Connecticut Harm Reduction Coalition, a non-profit association organized to educate, train, and advocate for pragmatic public-health-oriented models of drug use prevention, treatment, and policy, is also a plaintiff in the action. The plaintiffs' complaint alleged that the defendants had illegally harassed and arrested, and destroyed the property of, members of the plaintiff class for possessing lawful amounts of injection equipment under C.G.S. § 21a-240(20)(ix). Section 21a-240(20(ix) establishes that less than 31 "hypodermic syringes, needles, and other objects used, intended for use, or designed for use in parenterally injecting controlled substances into the human body" do not constitute illegal drug paraphernalia under Connecticut law.

The plaintiffs filed an Application for Temporary Restraining Order on November 13, 2000, and oral argument on the plaintiffs' motion was heard the same day. On November 15, 2000, the court issued the following temporary restraining order:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person who is a participant in the Bridgeport Syringe Exchange Program, based solely upon that person's possession of up to thirty sets of injection equipment, whether sterile or previously-used and possibly containing a residue of drugs.

Ruling on Plaintiffs' Application for Temporary Restraining Order [Doc. No. 18] at 26.

On January 18, 2001, following oral argument, the court issued a ruling granting the plaintiffs' motion for class certification and the plaintiffs' motion for a permanent

injunction.³  Ruling on Plaintiffs' Application for Preliminary Injunction and Motion for Class Certification [Doc. No. 38], Doe v. Bridgeport Police Department, 198 F.R.D. 325 (D.Conn. 2001).  In ruling on the plaintiff's motion for an injunction, the court reviewed the relevant legislative enactments preceding the current version of Conn.Gen.Stat. § 21a-240(20), and Conn.Gen.Stat. §§ 21a-267 and 21a-279(a), the provisions making illegal in Connecticut the possession of drug paraphernalia and controlled substances. Id. at 336-338.  The court also considered the relevant legislative history regarding these enactments. See id. at 344-344.   Applying principles of statutory interpretation under Connecticut law, the court determined that the intent of the legislature in enacting the current legislative scheme was to decriminalize the possession of fewer than 31 syringes or needles by anyone in Connecticut (i.e., not just clients of a needle exchange program), even when the needles contained the residue of controlled substances.  Id. at 350.  Accordingly, the court found that the plaintiff class had succeeded on the merits of its Fourth Amendment claim.  Id.   The court ordered the following permanent injunction:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

Id.

---

³At oral argument on December 15, 2000, with the consent of the parties, the plaintiffs' motion for a preliminary injunction was converted to a motion for a permanent injunction.

In November 2005, the plaintiffs moved for contempt, arguing that the defendants had not complied with the terms of the 2001 injunction. In support of their motion for contempt, the plaintiffs alleged that members of the BPD wrongfully confiscated, from members of the plaintiff class, "cookers," i.e., bottlecap-sized devices used in the conversion of controlled substances into liquid form for injection, the possession of which, the plaintiffs argued, are within the scope of the exemption in C.G.S. § 21a-240(20)(A)(ix) and thus protected under the court's 2001 injunction. At oral argument on the motion for contempt, the court indicated that it did not consider the injunction to clearly and unambiguously prohibit the seizure of cookers, as it subsequently held in its Ruling on the plaintiffs' motion for contempt. Hearing Tr. (11/17/05) at 13; Ruling on Plaintiffs' Motion for Contempt at 11. After the contempt motion hearing, plaintiffs filed their motion to clarify the scope of the court's injunction.

On May 30, 2006, in granting the plaintiffs' Motion for Clarification and denying the defendants' Motion for Clarification, this court found that the language of subsection (ix), when viewed in the context of its relationship to other statutes, plainly and unambiguously includes objects used in the process of injecting controlled substances, such as cookers and cottons. Ruling Re: Motions to Clarify Injunction at 17. The court also found that the exemption of these objects from the general definition of drug paraphernalia did not necessarily lead to an absurd or unworkable results. Id. Consequently, this court modified the injunction entered on January 18, 2001 to read:

> Defendants Bridgeport Police Department and Anthony Armeno, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any

>way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen. Stat. § 21a-240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue. "Injection equipment" is defined as objects, such as needles, syringes, cottons, and cookers (containers used to mix an injectable controlled substance with a liquid), that are used, intended for use or designed for use in parenterally injecting controlled substances within the human body.

Id. at 19-20.

## II.   DISCUSSION

Based on the court's May 30, 2006 Ruling and pursuant to 42 U.S.C. § 1988, the plaintiffs have moved for attorneys' fees in the amount of $76,986.00 and attorneys' costs in the amount of $4,163.55, totaling $81,149.55. Section 1988(b) provides that, "[i]n any action or proceeding to enforce a provision of section[] . . . 1983, . . . the court, in its discretion, may allow the prevailing party . . .a reasonable attorney's fee as part of the costs." According to the plaintiffs, they are the prevailing party after the court granted amended their injunction, and the fees they request represent a reasonable "lodestar" figure under the law of this Circuit.

### A.   Prevailing party status

For a plaintiff to be considered a "prevailing party" under section 1988, the law is well-settled that, "[i]t is sufficient that the plaintiff succeeded on any significant issue in [the] litigation, . . . regardless of the magnitude of the relief obtained, . . ., if he received actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff . . .." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 757 (2d Cir. 1998) ("Fletcher II") (citations and internal quotation marks omitted). "A judgment for damages

in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." Farrar v. Hobby, 506 U.S. 103, 113 (1992).  On the other hand, under the prevailing party standard, "fee awards are not appropriate where, having failed to capture compensatory or punitive damages, a plaintiff wins only 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated.'" Pino v. Locascio, 101 F.3d 235, 238 (2d Cir. 1996) (quoting Farrar, 506 U.S. at 114).

The Second Circuit has held that section 1988 fees can be awarded "not only [for] the cost of obtaining a favorable judgment but also to the cost of successfully defending that judgment," including "against postjudgment motions," as well as "for time reasonably spent in preparing and defending an application for § 1988 fees." Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999) (citations omitted).  "As a general matter, such 'motion costs should be granted whenever underlying costs are allowed.'" Id. (citation omitted). Additionally, "'[a]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" Fletcher II, 143 F.3d at 763 (citation omitted).

Here, the plaintiffs have plainly prevailed against the defendants.  By expanding the permanent injunction to include items such as cookers and cottons, the court's Ruling materially altered the legal relationship between the parties in a manner that directly benefitted the plaintiffs.  While defendants argue the modified injunction does not affect any change in their behavior, see Mem. Opp. at 4 - 6 (Doc. No. 112) , this argument belies the defendants' position taken in the litigation, see e.g. Tr. (11/17/05) at 40 - 41 &  41 - 42; Defts' Mem. Opp. at 7 and 8 - 9 (Doc. No. 55).  The plaintiffs are

therefore eligible for an award of attorneys fees pursuant to section 1988.

### B. Lodestar determination

"In determining reasonable attorneys fees, the court must calculate a 'lodestar' figure based upon 'the hours reasonably spent by counsel . . . multiplied by the reasonable hourly rate.'" Cruz, 34 F.3d at 1159 (citation omitted). "Calculation of this basis, generally referred to as the 'lodestar,' . . . requires the court to determine the number of hours reasonably spent on the litigation and to exclude hours that '[we]re excessive, redundant, or otherwise unnecessary' due to, for example, 'overstaff[ing]' . . . ." Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 98 (2d Cir. 1997) (citations omitted). The "court is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items.' . . . However, '[t]he task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended.'" Haley v. Pataki, 106 F.3d 478, 484 (2d Cir. 1997) (citations omitted). Moreover, "[w]hile the degree of the plaintiff's success is the most critical factor in determining the reasonableness of a fee award, . . . [the Second Circuit] consistently [has] resisted a strict proportionality requirement in civil rights cases." Lunday v. City of Albany, 42 F.3d 131, 134-35 (2d Cir. 1994) (per curiam) (citations and internal quotation marks omitted).

"The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation.'" Cruz, 34 F.3d at 1159 (quoting Blum v. Stenson, 465 U.S. 886, 896 n. 11 (1984), and citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1982)). The Second

Circuit has held that "the 'prevailing community' the district court should consider to determine the 'lodestar' figure is 'the district in which the court sits,' unless there has been a showing that 'special expertise of counsel from a . . . [different] district [was] required, [or] it was clearly shown that local counsel was unwilling to take the case, or other special circumstances existed.'" Id. (citing Polk v. N.Y. State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983)).

"After calculating the lodestar, the district court may consider other factors 'that may lead [it] to adjust the fee upward or downward, including the important factor of the 'results obtained'' . . .., as well as the 12 Hensley factors . . .." Orchano, 107 F.3d at 98 (citation omitted).  The twelve "Hensley factors" are:  (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee;  (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained;  (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case;  11) the nature and length of the professional relationship with the client;  and (12) awards in similar cases.  Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 97 (2d Cir. 1997) (citation omitted).

    **C.**    **Award/Fees**

        **1.**    **Hourly Rates**.   The plaintiffs seek to use hourly rates in effect in San Francisco, the area where plaintiffs' counsel is currently located.  While the court acknowledges that obtaining Connecticut counsel to appear in civil rights actions is not

always easy, it has had many highly competent, Connecticut-based counsel appear before it in civil rights actions. Indeed, when this litigation began, one of plaintiff's counsel, Attorney Boyd, was located in New Haven. Therefore, the court will use the rates "prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." Blun v. Stevson, 465 US 886, 896 n. 11 (1984).

The court finds that the skill of plaintiffs' counsel, especially Attorney Boyd, is quite high. They have, and are developing, an expertise in the area of law involved in this lawsuit. Therefore, the court finds the following rates are reasonable based on the Affidavit of Attorney Brett Dignam as well as based on the court's years of practice and knowledge of rates charged generally within the District Court:

| | |
|---|---|
| Attorney Boyd | $375.00 |
| Attorney Wolf | $250.00 |

**2. Hours Billed**: Given that the court has recognized counsel's expertise in the billable rates awarded, the hours awarded must reflect that expertise, i.e., duplicative or excessive hours will not be awarded. In addition, time was spent in this case on the Motion for Contempt, part of which was not necessarily related to the subsequent Motion for Clarification.

Counsel have reduced the hours sought in connection with the Motion for Contempt to a quarter, which the court finds reasonable given that the testimony at the Motion for Contempt hearing generally provided a context for the court's Ruling on the Motion for Clarification and in some instances, was specifically relied on by the court in that Ruling. On the other hand, much of the Contempt proceeding was unnecessary for

the clarification motion.

The court has reduced some hours as excessively duplicative, as excessive in light of expertise, and travel time.[4] The court reduces the hours sought as set forth on Appendix A to this Ruling.

Therefore, the lodestar calculation is as follows:

| Attorney | Rate | Hours | Total |
|---|---|---|---|
| Attorney Boyd | $375.00 | 9.3 | $ 3,487.50 |
| Attorney Wolf | 250.00 | 71.0 | 17,750.00 |
| | | | $21,237.50 |

In addition, Attorney Wolf claimed, by verbal supplementation at oral argument, an additional 6.2 hours of preparation and 2.3 for hours travel (within Connecticut) and oral argument, which the court finds reasonable and awards. Therefore, the total lodestar figure is $23,362.50.

The court must then determine what, if any, multiplier to apply to this lodestar figure. After consideration of all the Hensley factors, see supra at 8, the court determines that a multiple of 2.0 is appropriate. The court rests its conclusion principally on the factors 1, 2, 3, and 9. The time actually awarded is conservative, the question addressed is of first impression and difficult, and the skill and ability of plaintiffs' attorneys in this area is strong. Therefore, the court awards the plaintiffs $46,725.

---

[4]While the court generally allows travel time, it does not view as reasonable charging for travel time from California given its conclusion that Connecticut counsel were capable of handling this matter.

### D. Award/Costs

The court does not award costs for traveling from the West Coast. Subpoena fees are allowed as statutory costs ($190.00). Transcript fees are allowed as reasonable and necessary ($228.80 and $612.50 and $174.90). Lunch and hotel are disallowed and are not reasonable/required in connection with the proceedings, particularly if Connecticut counsel had represented the plaintiffs. Thus, the total costs allowed are $1,206.20.

### III. <u>CONCLUSION</u>

Based on the foregoing, the court awards plaintiffs $47,931.20.

**SO ORDERED.**

Dated this 14th day of December, 2006, at Bridgeport, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge